CLARK, Justice.[1]
| i>This matter comes before the court pursuant to four writ applications filed by the plaintiffs, consolidated here for review. At issue are questions of fact and law *526 arising in tort and contract causes of action.
In the trial court, the Louisiana Commissioner of Insurance filed three separate lawsuits against several defendants on behalf of a failing health maintenance organization. One of the lawsuits sounded in contract, the other two sounded in tort. The Oklahoma Commissioner of Insurance and a receiver appointed by the Texas Commissioner of Insurance intervened as plaintiffs in the tort cases on behalf of affiliated health maintenance organizations, organized and doing business in those states, which had similar tort causes of action against the defendants. The three lawsuits — which alleged causes of action in negligence, negligent misrepresentation, conspiracy, fraud, breach of fiduciary duty, unfair or deceptive acts or practices, and contractual liability — were consolidated. Prior to trial, all of the defendants, except one, settled with the plaintiffs. The consolidated matters were tried to both the bench and jury against the sole remaining defendant. Both the judge and jury found in favor of the plaintiffs on the tort and contract causes of action and awarded damages.
The defendant appealed. Finding errors of law which interdicted both the bench and jury findings of fact in the tort claims, the court of appeal conducted a de novo review of the record and reversed the judgments which had been rendered in favor of the plaintiffs and the awards of damages. The court of appeal, in a separate opinion, affirmed the liability of the defendant in the contract matter, but amended the trial court’s judgment to reduce the amount of the award. This court granted certiorari to determine the correctness of the court of appeal’s rulings.
FACTS
At the outset we acknowledge this court’s recitation of the facts is very Isdifferent from those discussed in the court of appeal opinion which we now review. Our study of the record convinces us the court of appeal fundamentally misunderstood the facts underlying these complex business transactions and the issues presented. However, we believe the court of appeal’s confusion of the issues and failure to understand the facts are somewhat understandable. The record of these three consolidated cases is extensive, consisting of the pleadings in all three cases, a large number of documents and exhibits, and transcripts from numerous pretrial hearings and a lengthy trial.[2] The *527 business transactions, and their accompanying accounting treatment, are unusual. Most important in the consideration of the reasons for the court of appeal’s failure of understanding is the fact that what is at the core of these matters is a sophisticated deception which fooled even those individuals tasked with regulating the type of transaction at issue.
The operative facts of the tortious conduct to be described are common to all of the claims asserted by the plaintiffs. From the evidence presented at trial, the judge and jury could find the following facts.

Corporate History

Prior to 1997, Foundation Health Corporation (“Foundation”), a Delaware corporation with its principal place of business in California, owned all of the stock [4of three health maintenance organizations (“HMOs”). These subsidiary HMOs were known as Foundation Health, a Louisiana Health Plan, Inc., a Louisiana corporation operating in the State of Louisiana (“the Louisiana HMO”); Foundation Health, an Oklahoma Health Plan, Inc., an Oklahoma corporation operating in the State of Oklahoma (“the Oklahoma HMO”); and Foundation Health, a Texas Health Plan, Inc., a Texas corporation operating in the State of Texas (“the Texas HMO”). In 1997, Health Systems International acquired Foundation. Thereafter, Health Systems International, Inc. changed its name to Foundation Health Systems, Inc. and is now known as Health Net, Inc. (“Health Net”).[3] In this way, Health Net acquired sole ownership of the three HMOs.

The HMOs

Almost from the beginning, Health Net wanted to divest itself of the HMOs. These three HMOs were the smallest plans owned by Health Net, consisting of approximately 75,000 members combined, and did not fit Health Net’s overall business strategy. Health Net wanted to focus on its three main business units — on the West Coast in California; on the East Coast in New York, New Jersey and Connecticut; and on its contracts with the Department of Defense. Worse, the HMOs were an immense money drain on Health Net because their insurance premiums were underpriced; their contracts with insurance providers were too low. From 1993 through 1999, Health Net and its predecessor companies were required to infuse $50 million in capital contributions in order to keep these insurance companies in regulatory compliance in their respective states.
Soon after Health Net acquired the HMOs in 1997 through the above-described mergers, its then-CEO, Dr. Hasan, decided Health Net should not finance the HMOs 1 Bon a continuing basis. Dr. Hasan felt all three states were bad regulatory environments and directed his senior management to begin to “wind down” the plans.

Necessary Insurance Terms

It is important at this juncture to examine some terms and concepts necessary to understand the facts and the claims of the parties. These HMOs, all insurance entities, were regulated by the state insurance departments in their respective states; namely, the Louisiana Department of Insurance (“La-DOI”), the Oklahoma De *528 partment of Health (“Ok-DOH”), and the Texas Department of Insurance (“Tx-DOI”). The insurance industry is intensely scrutinized and regulated in the several states due to the public policy issues inherent within this type of business. The states have an interest both in ensuring their citizens obtain proper insurance to protect health and safety and in determining the companies which provide insurance policies appropriately utilize the insurance premiums which their citizens pay. This conservative approach to insurance regulation is reflected in the accounting method used for this type of business.
The proper method of accounting for the insurance industry is based on statutory accounting principles, or SAP. This method of accounting is more conservative than the one used for most businesses, known as generally accepted accounting principles, or GAAP. This more conservative accounting treatment is consistent with the states’ protection of the public through regulation of this industry. In addition, insurance companies and their accountants must follow the rules of the National Association of Insurance Commissioners, known as the NAIC rules.
Insurance policies, or contracts, are sold for a particular amount of money, or a premium. Sometimes, an insurance company has to pay out for a claim more money than was received as a premium. In the course of its business, an insurance company | (¡depends upon an actuary or accountant to determine the statistical probability of this premium deficiency. In order to cover this possible future cost, insurance companies set aside a reserve amount of money. In accounting terms, this is known as a premium deficiency reserve, or PDR, which is booked on a balance sheet as a liability. A PDR is also sometimes referred to as a “loss contract reserve.”
As soon as an insurance company determines a premium deficiency may exist, the insurance company is required under the applicable accounting principles to book a reserve amount of money to cover the anticipated liability. Once booked as a liability, a PDR is amortized over time to pay out claims as they accrue. The PDR should only be used for the reason for which the reserve fund was established, i.e. to pay future claims. If the claims which were anticipated do not ultimately materialize, or are actually less than predicted, then an insurance company may “take down” or “reverse” all or the remaining part of the PDR, placing those funds, which had been booked as a liability, back into the assets of the company. However, a PDR should only be reversed after an actuary or accountant determines the funds booked as the PDR will not be required to pay future health care costs.
Another type of reserve fund, different from a PDR, is a restructuring reserve. A restructuring reserve is a one-time charge to earnings designed to cover a different set of anticipated losses, namely, the anticipated costs of “restructuring” a company, whether by sale, merger, reorganization or adding/deleting a business unit. The restructuring reserve pays the costs anticipated with the restructuring event. After the restructuring event is completed, the restructuring reserve is taken down as a liability, or reversed on the balance sheet, and, if any funds are remaining, they are booked as an asset. It is not necessary for an accountant or actuary to make a determination or calculation before a restructuring reserve is reversed on the balance sheet. Instead, |7the facts that (1) the restructuring event has occurred and (2) funds remain in the company are sufficient for this amount to be re-characterized from a liability to an asset.
*529 One type of restructuring event is a “wind down.” When an insurance company decides to “wind down,” no new insurance policies are written and the already-existing insurance policies are allowed to expire under their terms. The PDR which was booked for these policies is paid out as claims are made, until all of the existing insurance policies have expired. If funds remain in the PDR after all of the claims are paid, the money remaining is considered an asset of the company which can then be distributed to the shareholders. If there are insufficient funds in the PDR to pay the claims as the insurance policies expire, the company must infuse more capital to pay those claims.

Development of the Scheme

Evidence established Health Net at that time was the fourth largest public provider of healthcare services in the nation. As such, the company had its own internal auditors, accountants and finance department. After Dr. Hasan gave the order to wind down the plans, Health Net’s financial personnel made projections of a wind down of the three HMOs and determined such a wind down would cost Health Net several million dollars.[4] Thereafter, senior management at Health Net approached Dr. Hasan with the idea the HMOs could be sold rather than allowing the contracts to expire in a wind down. Dr. Hasan did not believe a legitimate buyer could be found, as the three HMOs were not a good investment. However, since a sale would not be as disruptive to the policyholders as a wind down, Dr. Hasan indicated the company |scould attempt to sell the HMOs. Dr. Hasan told senior management the sale attempt could not interfere with winding down the plans, in case the effort to sell the HMOs was unsuccessful, because he did not want Health Net to infuse any more money into these unprofitable HMOs.
Health Net retained Shattuck Hammond Partners (“SHP”), the investment banking division of the accounting firm, PriceWat-erhouseCoopers (“PWC”) to find a buyer and structure the sale. Eric Coburn (“Co-burn”), an investment banker, was SHP’s primary contact with Health Net. Coburn worked with several members of the senior management of Health Net in developing the sale strategy, specifically, Curtis Wes-ten (“Westen”), Health Net senior vice-president, general counsel and secretary; Michael Jansen (“Jansen”), Health Net vice-president, assistant general counsel, assistant secretary and secretary of the three HMOs; Jay Gellert (“Gellert”), president of Health Net (and later CEO after Dr. Hasan retired in August of 1998), who served on the board of directors for each of the HMOs;[5] and Brian Crary (“Crary”), the CFO of Health Net’s Western Division, who was also CFO of all three HMOs.
A buyer was eventually located in Thomas Lucksinger (“Lucksinger”). Lucksinger had served for six years as the president and CEO of NYL Care Health Plans of the Gulf Coast, Inc., the largest HMO in Texas, with over 450,000 members. Before that, Lucksinger practiced law for 20 years, specializing in health care law, and was a partner in the Texas law firm of Vinson & Elkins. He was licensed as a CPA in Texas. Additionally, Lucksinger served on an oversight committee with the *530 Tx-DOI and was considered to be experienced and knowledgeable in turning around unprofitable HMOs.
Lucksinger originally wanted Health Net to loan him the money to buy the | nthree HMOs but Health Net declined that suggestion. Instead, the structure of the sale which Health Net insisted upon was developed by Health Net’s senior management and SHP and involved Luck-singer incorporating a holding company to buy the HMOs. The sale strategy required Health Net to sell the HMOs to Lucksinger’s new company in exchange for cash and a percentage of stock in the holding company.
On April 13, 1998, Lucksinger and other investors incorporated AmCareco, Inc. (“AmCareco”), a Delaware corporation, whose principle place of business was Texas, for the purpose of acquiring, operating and expanding the operations of the three HMOs at issue. Dr. M. Lee Pearce, an early investor in the company, was shown on documents as initially controlling Am-Careco. However, Lucksinger was the individual who negotiated the sale with Health Net from the earliest discussions. The New York law firm of Proskauer Rose incorporated AmCareco and was retained by AmCareco to draft the sale documents, particularly partner Stuart Rosow. Luck-singer’s former law firm of Vinson & El-kins was retained by AmCareco to serve as regulatory counsel.
In developing a sale strategy, Health Net and SHP had to contend with some daunting realities. In the absence of a loan from Health Net, AmCareco had no real assets with which to purchase the HMOs. Since the HMOs were insurance companies and regulated by the states where they conducted business, the likelihood the state insurance regulators would approve the sale of already-distressed HMOs to a company with no assets and no history of operating success was slim.[6] In addition, the longer the time period was between negotiations for a sale and the actual transfer of ownership, the more money Health Net, as the parent corporation, would have to infuse into the subsidiary HMOs in order to maintain their regulatory compliance.
1 inThe sale strategy which was developed by Health Net and SHP, agreed to by Lucksinger, implemented by documents drafted by Proskauer Rose attorneys, and guided through the regulatory process by Vinson & Elkins attorneys, addressed these realities. The unique structure of the sale was spread out over multiple documents.[7] In order to fully grasp all of the features of the sale, an individual would have to have all of the documents and understand their interconnection. Consistent with Dr. Hasan’s directive not to lose any more money on the HMOs, the architects of the sale strategy devised a way for Health Net to take out of the HMOs all of the money Health Net spent to keep the HMOs in regulatory compliance up to the time of the sale and more, despite the fact the regulators knew the HMOs were struggling financially.[8] By selling off the HMOs, Health Net was able to shed all responsibility for these underperforming companies and their financial woes. In a *531 final twist, Health Net retained a substantial minority interest of 47% in the holding company, in additional to favorable stock rights, on the off-chance Lucksinger would somehow be able to make a success out of this venture.[9]
The key to understanding the sale scheme that was developed is deceptively simple: after regulatory approval for the sale of the HMOs was obtained in all three states, the parties drafted a final sale document which re-characterized the PDR as a restructuring reserve. This sole action had the effect of increasing the assets of the HMOs as of the day before the sale, which allowed Health Net — under the expressly-approved sale terms — to take out more of the assets of the HMOs than the regulators | n believed would happen in the transaction. Thus stripped of their reserves, the HMOs were left in a shattered position from which they never recovered.
We will now examine, in chronological order, the documents prepared in connection with the sale of the HMOs at issue. As we discuss the relevant provisions in the documents, we will include comments to aid in understanding the strategy of the sale.

Letter of Intent

On April 17, 1998, AmCareco (through Dr. Pearce) and Health Net signed a Letter of Intent, memorializing the principal terms of a proposed acquisition by AmCa-reco of all of the outstanding stock of the three HMOs.[10] By its terms, the Letter of Intent was not meant to be a binding agreement, but was intended to set forth the substance of the discussions between the parties and served as the basis for continuing discussions and preparation of definitive agreements for the proposed acquisition. The Letter of Intent called for the parties to negotiate in good faith, with the goal that definitive agreements would be executed no later than May 18, 1998. During that time period, Health Net agreed not to negotiate with anyone else with respect to an acquisition, but reserved its right to continue efforts to wind down the companies, in the event the proposed acquisition was not consummated.
Attached to the Letter of Intent was a Term Sheet, also dated April 17, 1998.[11] The Term Sheet set forth the principal terms for the acquisition by AmCareco of the stock of the three HMOs. In exchange for all of the outstanding stock of the three HMOs, AmCareco was to issue to Health Net a number of shares of Class A Preferred Shares in AmCareco, as well as an amount of cash from the HMOs. This cash 1 [2payment or “cash sweep,” was intended to remove the “excess” capital in the HMOs. In general terms, the “excess” cash in the HMOs would be determined by subtracting from the assets of the HMOs the aggregate of their liabilities, statutory capital requirements and a $8.5 million “cushion.” A formula was provided for this “sweep” of excess cash, which included as components: (1) the reversal, before the closing, of all of the non-cash restructuring and merger related liabilities and reserves (called the “Restructuring Reserves”), and *532 (2) the settlement, before the closing, of all inter-company accounts.
An estimated calculation of the cash payment and adjusted book value (for use in determining the number and value of the shares of stock), as of February 28, 1998, was provided as Exhibit A to the Term Sheet. Important to note is the estimate, even at that early date, showing the cash sweep as $8.5 million. There is also a notation on the Term Sheet indicating $6.3 million in Restructuring Reserves would be reversed before the closing.[12]
Other provisions of the Term Sheet described the stock rights Health Net would have in connection with the AmCareco Class A Preferred Shares, such as conversion and redemption rights, right of first refusal, and certain “put” rights.[13] In addition, Health Net would have access to the financial records of AmCareco for a specified time period. The Term Sheet contemplated an accounting one year after the closing, called a “true up,” when the estimated values used to calculate the cash sweep and adjusted book value (for the par value of the Class A Preferred Stock) would be compared. At that anniversary date, if the actual amounts showed Health Net could |TShave taken a greater cash sweep, then the HMOs would immediately pay Health Net the difference, plus interest. If Health Net should have taken a smaller cash payment, then the initial aggregate par value of the Class A Preferred Stock would be retroactively reduced by an amount equal to the difference.

Stock Purchase Agreement

On November 4, 1998, AmCareco and Health Net signed a Stock Purchase Agreement (“SPA”).[14] This 46-page document set forth the agreement between the parties for the purchase of all of the outstanding stock of the three HMOs. The SPA spelled out the obligations and warranties of the parties; the terms of the sale, including the cash payment, issuance of stock, various rights with regard to the stock, and guarantees; as well as other provisions necessary to the transaction. For our analysis of the issues, all of the provisions need not be discussed herein. Those sections necessary to our consideration are addressed below.
Section 1 of the SPA set out the basic agreement between the parties. AmCare-co would purchase from Health Net all of the outstanding shares of capital stock of each of the HMOs in exchange for (1) shares of convertible Class A Preferred Stock of AmCareco, with a set par value, in an amount to be determined pursuant to a formula in Section 2.2 of the SPA, and (2) a cash payment from the HMOs.
Section 2.1 of the SPA described how the amount of the cash payment from the HMOs, or cash sweep, would be determined. The formula provided in the SPA had the same general features as the one set forth in the Letter of Intent, including the determination of what constituted “ex *533 cess” cash in the HMOs. Excess cash was still determined to be the assets of the HMOs minus the liabilities plus statutory and | ^regulatory required capital amounts plus $3.5 million. However, to discern these general features of the cash payment required a close reading of this provision.[15] There are some other important features of Section 2.1 which are critical to our analysis. Before the closing, all of the *534 non-cash restructuring and merger related liabilities and reserves would be reversed, ie. these liabilities would be counted as assets. These were termed “the Adjustments” which would take place, regardless of generally accepted accounting principles. In addition, all inter-company accounts were to be settled before “the Effective Time.” The “Effective Time” was defined in | ^Section 2.1 as the time “as of the close of business on the day preceding the date of the closing.” To re-state the most significant elements of these concepts more simply — the restructuring reserves would be counted as assets the day before the sale.
Section 2.2 of the SPA discussed the issuance of the stock in AmCareco. Important to our consideration is the reiteration that generally accepted accounting principles would be consistently applied, except that “the Adjustments,” i.e. the reversal of the non-cash restructuring and merger related liabilities and reserves, “shall be made.” What this means is that sometimes accounting principles would be observed and in other instances they would not be. Testimony from Health Net’s senior management indicated this document was not meant to be an accounting treatment, but a mechanism to arrive at a number for the cash sweep.
Section 2.3 of the SPA described the true-up which would take place one year after closing. Section 2.4 described the put and call rights between the parties with regard to the AmCareco stock, including the provision that, anytime after the third anniversary of the closing, Health Net had the right to “put,” or sell back to AmCareco, all or a portion of its shares, and to require AmCareco to buy them back. To secure Health Net’s “put” right, AmCareco was required to purchase a $2 million letter of credit at the closing.
Under Section 3.2 of the SPA, the parties agreed the outside date for the closing would be January 31,1999.
Section 4.8 of the SPA, with regard to representations and warranties by Health Net, reiterated the HMOs would make the cash payment immediately before the closing.[16] In other words, Health Net would take the cash before the change of ownership. This section also reiterated all inter-company accounts would be settled hfibefore “the Effective Time,” ie. the day before the closing. Section 4.28 similarly provided: “[a]ll inter-company agreements and arrangements shall terminate as of the closing, except as provided in section 7.14.” As will be discussed in the portion of this opinion dealing with the contract cause of action, there is no mention in section 7.14 of a contractual (or parental) guarantee which Health Net signed in favor of the Louisiana HMO in 1996.
The SPA reflected in Section 5.5 that AmCareco had no assets and no liabilities other than accrued expenses relating to the transactions contemplated by the SPA. Section 11.5 provided that the SPA constituted the entire agreement between the parties, “including the schedules and exhibits, and any other agreements entered into pursuant to this Agreement....” The SPA was signed by Curtis Westen, on behalf of Health Net, and Thomas Lucksinger, on behalf of AmCareco.[17]

Letter Agreement or Side Letter

On the same day the SPA was signed, the parties signed a Side Letter, or letter agreement.[18] The Side Letter provided *535 additional conditions for the sale transaction. In Section 1 of the Side Letter, the parties agreed AmCareco would try to raise additional funds by selling shares of Class B Preferred Stock or common stock of AmCareco. Sections 2, 3 and 4 described various contingency arrangements in the event the state regulators required the HMOs to meet additional capital or deposit requirements before approving the sale.
However, aside from these general provisions, the reason the Side Letter was necessary to the sale strategy was found in two of its provisions. In Section 5, the parties agreed, if one or more of the state regulatory authorities failed to approve all or part of the contemplated cash sweep from the HMOs, AmCareco would pay that |17amount of cash to Health Net, described as the “Sweep Shortfall.” In that circumstance, the Adjusted Book Value to calculate the number of Class A shares would likewise be reduced by the amount of the Sweep Shortfall.
This provision introduced a certain amount of ambiguity into understanding the source of payment for the sale. If the regulators disliked the idea that the money for the sale came from the HMOs themselves, ie. the object of the purchase was purchasing itself, the parties could point to this provision as showing the cash could, alternatively, come from AmCareco. The only problem with this alternative was that AmCareco did not have, and never had, sufficient money to be a viable alternative source for the Sweep Shortfall. In reality, whether the money for the cash sweep was taken directly from the HMOs, or from AmCareco under this provision, the cash was always being taken from the HMOs.
Section 6 of the Side Letter provided if the sale transaction did not take place on or before January 15, 1999, and Health Net had to infuse more capital to fund the PDR for fiscal year (“FY”) 1998, then the parties agreed to negotiate in good faith a mechanism whereby Health Net was entitled to recover the additional cash contributed, but only to the extent that the additional cash related to periods after the Effective Time.[19] The additional cash contributed by Health Net would be paid back | iseither through the cash sweep, paid by *536 the HMOs, or in the Sweep Shortfall, ostensibly by AmCareco, but in reality also paid by the HMOs.
Although this provision seems straightforward, Section 6 actually introduced another level of ambiguity into understanding the terms of the sale. Because Health Net had the insurance contracts and its own actuaries and accountants, Health Net could determine whether it would have to infuse more cash into the HMOs to keep them in regulatory compliance if the date for the sale went beyond January 15, 1999. In fact, the figures necessary for the year-end accounting of the HMOs for the annual statement for FY 1998 would become available after the first of the year. Any capital infused by Health Net for the PDR made the HMOs compliant as of December 31, 1998, but would be amortized, or used, in 1999 and 2000. So on the one hand, the additional cash contributed was infused before the sale and made the HMOs compliant as of the end of the year in 1998. But on the other hand, the additional cash contributed in 1999 would be used to satisfy claims made after the Effective Time.[20]

Private Offering Memorandum

On December 2, 1998, AmCareco distributed a confidential Private Offering Memorandum (“POM”) to potential investors.[21] Through this POM, AmCareco sought to raise additional capital by offering for sale a maximum of 22,000 of its Class B Preferred Shares, for $1,000 per share, to infuse an additional $22 million into the company. The POM explained the risks of the investment and provided | mpotential investors with information concerning the anticipated acquisition, including the SPA and the Side Letter, financial statements of the HMOs as of September 30, 1998, financial projections of AmCare-co, and pro forma closing balances of the three HMOs.
In addition to the explanation of risks, the POM included a detailed description of how the proceeds from the sale of Class B stock would be used. Assuming the sale of all of the Class B Preferred Shares, and before deducting the offering expenses,[22] AmCareco projected the business would use the proceeds of the stock sale to acquire data processing hardware and software ($2 million), to use as working capital and to fund losses of the three HMOs ($7 million), to pay start-up costs ($750,000) and to use as additional capital for the expansion of the business and acquisitions ($12,250,000).[23] AmCareco further estimated it would receive $10-12 million in equity through acquisition of the three HMOs in exchange for its Class A Preferred Shares to Foundation.[24] AmCareco projected it would require additional infusions of cash in the first 24 months of operations, and that a minimum of $8 million was required at closing.[25]
AmCareco stated the POM was being made for the purpose of raising this additional required equity.[26] Although specifically warning that no assurances could be given, AmCareco estimated the proceeds from the POM of Class B stock, together with the equity received in' exchange for the Class A stock and the acquisition of common stock, would be sufficient to meet *537 AmCareco’s “liquidity and working 12ncapital requirements for projected operations for a period of at least 24 months from the completion of this Offering.”[27]
To summarize, AmCareco projected its company needed an infusion of $22 million for its business plan to work, with a minimum of $8 million acquired by the closing. If the full amount was raised through the Class B stock sale, AmCareco intended to spend $2 million to acquire a data processing system, $750,000 in initial start-up costs, and $7 million in start-up losses of the HMOs. The remaining $12.25 million was estimated for additional capital for expansion and acquisitions.[28] There was no amount specifically designated to purchase the HMOs.
The record shows us AmCareco barely met its baseline goal of acquiring the $8 million before the closing. Thereafter, AmCareco never raised another dime, except on two occasions when existing shareholders infused capital to acquire some additional business. AmCareco remained undercapitalized throughout its existence. Consequently, AmCareco was never able to act as an alternative source of funds for the purchase of the HMOs or to infuse capital into the HMOs to keep them in statutory and regulatory compliance.
The Form A’s
AmCareco retained the Texas law firm of Vinson & Elkins as regulatory counsel.[29] Attorney Susan Conway (“Conway”) was the primary contact at Vinson & Elkins who, working with information from Luck-singer, the Proskauer Rose |21 attorneys and Coburn from SHP,[30] completed identical Form A applications requesting a change of ownership for the three HMOs. This filing is required in all three states where the HMOs did business and was coordinated to be acted upon on the same day in each state.[31] The Louisiana Form A, filed into evidence, was filed with the La-DOI on December 11,1998.[32]
The Form A’s indicated the consideration AmCareco would provide to acquire the HMOs would be shares of its own company and cash.[33] As to the source of the cash used as consideration, the Form A states the cash would be obtained “from a portion of the assets of the Acquired Companies [the HMOs] that constitute FHC’s [Foundation’s] equity in the Acquired Companies,” as explained in the SPA in the determination of the amount of the cash payment.[34] The Form A specified the source of consideration for the acquisition would not include a loan.[35]

The Weeks Before The Sale

As predicted by Health Net’s auditors, both internal and external, Health Net was *538 required to make capital contributions to the HMOs in the first quarter of 1999 to keep them in regulatory compliance because the HMOs continued to lose money. From December, 1998 to March 31, 1999, Health Net contributed $6.3 million to meet the minimum regulatory capital and surplus requirements for the HMOs in their respective states for FY 1998 and the first quarter of 1999, which ended on March 31, | ⅞;;1999.[36] After the $6.3 million was infused into the HMOs, Coburn sent a memorandum on April 7, 1999 to Luck-singer and the senior management of Health Net involved in negotiating the deal, suggesting ways the money could be recouped through the cash sweep and the best way to present that part of the deal to the regulators.[37] In addition, the HMOs were continuing to lose money. From March-April 1999, there was actually a $500,000 loss.
Insurance regulators in all three states had questions about the proposed acquisition, which is unsurprising given the unique structure of the sale and the confusing documents. Both through written questions and in scheduled meetings with representatives from Health Net and Am-Careco, the state insurance regulators sought to understand the terms of the change in ownership. All of the regulators were concerned with the feature of the sale whereby money would be removed from these historically-distressed HMOs.
In January 1999, the Texas regulators were told no money would be taken out of the Texas HMO in the cash sweep.[38] Nothing to the contrary was told to the Texas regulators as the date of the impending sale approached. In Oklahoma, the regulators understood Health Net would be paid back monies it had contributed to the HMOs, but were not certain how this repayment would work, and did not connect this payment with the reserve fund to pay anticipated future health care costs.
The Louisiana regulators were shown information at a meeting one week before the regulatory approval hearing which led those regulators to believe I ^approximately $670,000 would be “swept” out of the Louisiana HMO. No one from Health Net or AmCareco disputed the Louisiana regulators’ reading of the financial information which reached -this conclusion. La-DOI informed the parties to the sale that the regulators were not comfortable with that high an amount being taken from the Louisiana HMO and requested a new calculation. In addition, and because the La-DOI was concerned about the financial health of the Louisiana HMO, the La-DOI conditioned its approval of the acquisition of the HMO by AmCa-reco on a minimum reserve requirement of $4 million remaining in the Louisiana HMO after the closing.[39]

The Night Before The Sale

Late in the evening on April 29, 1999, one day before the approvals were sched *539 uled to be made, Conway sent separate faxes to each of the three states’ regulatory personnel with new calculations. At 8:51 p.m., Conway sent a letter to the La-DOI with an attached financial schedule.[40] In her letter, Conway acknowledged the condition the La-DOI had required for its approval of the acquisition — a minimum of $4 million of equity remaining in the Louisiana HMO after the closing. Conway stated the attached financial schedule indicated the Louisiana HMO, after all closing transactions, would have total equity of $5,216,489. According to the attached financial schedule, the line which indicated the Cash Sweep showed $243,531 being removed from the Louisiana HMO. There was also a place on the financial schedule which showed, in parentheses (which denotes the amount being subtracted), of $2.3 million on the line entitled “Less Cash Contributed by [Health Net] to Fund Premium Deficiency.”
| ¾Two minutes later, at 8:53 p.m., Conway sent a letter to the Ok-DOH with the same attached financial schedule, indicating the closing transaction would consist of a cash infusion into the Oklahoma HMO by Health Net of $1,735,619 to cover the net intercompany receivables, offset by a cash sweep of $2,903,761.[41] Conway stated this would result in Health Net receiving a net of $1,168,142 and would result in the Oklahoma HMO having total equity of $4,599,761 after the closing.
Two minutes thereafter, at 8:55 p.m., Conway faxed a letter to Tx-DOI, with the same attached financial schedule, stating the closing transaction would consist of a cash infusion into the Texas HMO by Health Net of $2,435,109 to cover the net intercompany receivable, offset by a cash sweep of $2,920,123.[42] Conway stated the results of the net cash withdrawal from the Texas HMO would be $484,014 to Health Net and that the Texas HMO would have total equity of $3,807,117 after the closing.
All of the regulators indicated they received and read Conway’s letters and the financial schedule before the approvals were granted.

The Approvals

Approval by the state regulatory agencies was coordinated to occur on the same day. In an order dated April 30, 1999, the Texas Commissioner of Insurance issued findings of fact and conclusions of law which resulted in approval of the request for the change of ownership of the Texas HMO from Health Net to AmCareco.[43] The approval order reflected the Tx-DOI considered the provisions of the SPA and the related letter agreement, as well as the POM, before approving the acquisition. The Tx-DOI approval order contained specific findings of fact and conclusions of law which showed the change of control would not result in harm to the Texas HMO or 12Bits enrollees.[44]
*540 On April 30, 1999, the Louisiana Commissioner approved the acquisition of the Louisiana HMO by AmCareco.[45] The approval order of the Louisiana Commissioner found the acquisition of the Louisiana HMO by AmCareco was in the best interest of policyholders and the citizens of the state, but imposed two special conditions on the acquisition. First, as stated before, the Louisiana Commissioner ordered that the minimum capital requirement of the Louisiana HMO be raised above the statutory minimum to $4 million. Second, the Louisiana Commissioner ordered that any transaction which would result in any person directly or indirectly acquiring 10% or more of the Louisiana HMO must obtain approval by the La-DOI.[46]
On April 30, 1999, the Ok-DOH approved the acquisition of the Oklahoma HMO by AmCareco from Health Net.[47] The Ok-DOH approval order referenced the SPA as the sale agreement of the parties, and the POM and its provisions forJjjAmCareco’s intended capitalization and use of stock sale proceeds.[48] The Ok-DOH approval order also noted the “current staff, contracts, and policies and procedures will largely remain in place under the new ownership.”[49] After approving the acquisition, the Ok-DOH set forth requirements for the Oklahoma HMO to maintain its licensing, including complying with the license requirements regarding net worth and deposit.[50]
Effective April 30, 1999, the members of senior management of Health Net who were also officers and/or directors of the HMOs, resigned their positions with the HMOs.[51] After their acquisition by AmCa-reco, the three HMOs were renamed, and became known as AmCare Health Plans of Louisiana, Inc. (“AmCare-La” or “the Louisiana HMO”), AmCare Health Plans of Oklahoma, Inc. (“AmCare-Ok” or “the Oklahoma HMO”) and AmCare Health Plans of Texas, Inc. (“AmCare-Tx” or “the Texas HMO”).

Immediately After Approval For The Sale

The approvals for the change of ownership were obtained on April 30, 1999, a Friday. On Monday, May 3, 1999, the cash sweep was accomplished through wire transfers. At that time, AmCareco did not have signatory power on any of the bank accounts of the HMOs, despite the fact the *541 change of ownership had been approved. Health Net did, and $2,543,530 was wired out of the Louisiana HMO to Health Net, $2,903,761 was wired out of the Oklahoma HMO to Health Net, and $2,920,123 was 127wired out of the Texas HMO to Health Net.[52] A total of $8,367,414 was transferred from the HMOs to Health Net. In addition' to the cash wired from the HMOs to Health Net, AmCareco purchased a $2 million letter of credit at the time of the closing to secure Health Net’s stock rights, pursuant to the provisions of the SPA which required this type of security.
Although Conway in her letters of April 29, and a document entered in evidence concerning the wire transfers indicated money was also supposed to flow from Health Net to the HMOs to settle inter-company accounts, testimony established no funds were ever noted on the accounting documents of the HMOs reflecting money as having been received in these transactions.[53]
The minimum statutory capital and surplus requirement for Louisiana at that time was $2 million, with the additional regulatory requirement that the capital in the Louisiana HMO must be maintained at a minimum of $4 million.[54] Expert testimony calculated the Louisiana HMO as having $1,371,000 in equity after the sale.[55] The minimum statutory capital and surplus requirement for the Texas HMO was $1.7 million.[56] Expert testimony calculated the Texas HMO had a negative equity of [-] $1,632,000 after the sale.[57] The minimum statutory capital requirement for the Oklahoma HMO was $750,000.[58] Expert testimony calculated the Oklahoma HMO as having $102,000 after the sale.[59] After the cash sweep, none of the HMOs were li>sever again in regulatory or statutory compliance in their respective states.[60]

Closing Agreement

Although the Closing Agreement includes the provision that the document “... is made as of the 30th day of April, 1999 ... ”, the parties to it agree that the Closing Agreement was actually signed by representatives from AmCareco and Health Net sometime between May 3 through 6,1999.[61] The Closing Agreement contained waivers, by all parties, of conditions agreed to in the SPA, and certain post-closing covenants.[62] The most important post-closing covenant to this Court’s consideration of the issues is contained in Section 3(q). Section 3(q) provides:
The Parties hereby acknowledge and agree that the premium deficiency reserves of the Acquired Corporations [the three HMOs] should be considered a “Restructuring Reserve” and therefore reversed pursuant to Section 2.1 of the Stock Purchase Agreement in order to calculate the Cash Payment, which reversal has been reflected in the FHS Cash Sweep and Preferred A Share Calculation prepared for Closing and at *542 tached as Exhibit E to this Agreement.[63]
This Closing Agreement, signed by the parties after regulatory approval was obtained for the acquisition of the three HMOs by AmCareco from Health Net, is the very first time that there was any indication that the parties intended to re-characterize the PDR as a Restructuring Reserve. Pursuant to this “re-characterization,” the PDR had been added back into the assets of the HMOs without an independent auditor’s report and without any event occurring which would have justified such a reversal. Although the parties claimed this reversal was reflected in the financial schedules prepared for the closing, such financial schedules were presented to the state regulators the night before approval was granted. Importantly, this significant and [ ¡^deal-altering feature was not pointed out to the regulators or highlighted. Moreover, there was not any indication on the financial schedule that this money was actually going to be withdrawn from the HMOs and was not some method of calculation only.[64] The document which explained the line at issue on the financial schedule disclosed to the regulators was not even drafted until after regulatory approval was obtained.

AmCareco’s Actions After The Sale

After the sale, the three HMOs continued to do business in their respective states. AmCareco managed the three HMOs through a management company newly-incorporated in Texas for that purpose and known as AmCare-Management, Inc. (“AmCare-Mgmt”). From the moment after the sale, the three HMOs had difficulties with cash flow. The HMOs were still losing money and Health Net had wiped out their reserves to pay future health care costs in the sale. AmCareco had to find a way to keep the HMOs in business and pay claims on an on-going basis.
Testimony established there are two sources of income in an insurance business to increase cash flow. The first source of income is the premium income from the sales of insurance policies. AmCareco aggressively pursued new books of business without regard to loss history. These new premiums were used to pay the claims of earlier members, and still more members were recruited to pay the claims of the new members. Each HMO contractually undertook to provide the health care for many thousands of citizens in their respective states, even though they were grossly undercapitalized and statutorily insolvent, and did not have the personnel, processes or computer systems capable of handling the new business.
IsoThe other source of income for an insurance company is derived from cashing out the investments of the companies. AmCareco did this; however, cash flow problems continued.
Over the next three and a half years, AmCareco covered up both its own insolvency and that of the HMOs by operating the three HMOs and AmCare-Mgmt in a coordinated, co-dependent and intertwined manner. The business entities transferred cash or marketable securities from one entity which had funds to another which needed funds. In place of the transferred money, the transferring entity would be *543 left with an “account receivable” from the receiving entity, with no real intention to pay back the money. This “account receivable” would be claimed on the balance sheet of the transferring entity as an admitted asset, in violation of applicable statutes and regulations. Funds were routinely shifted and moved between the entities without legal right or necessary regulatory approval, and with no business justification except to make the individual HMOs appear solvent at specific times to mislead regulators.[65]
Expert testimony established this was not appropriate from an accounting standpoint, but AmCareco did not have sufficient capital to infuse cash into the HMOs as Health Net had always done. As claims came in, AmCareco had to use whatever capital remained in the HMOs to pay them, as well as the premiums from the new policies which were written. The reserves which had been set aside to pay the claims for the first 12-18 months of operations had been taken in the cash sweep.
AmCareco also created phony or bogus funds on the books of the HMOs. An account receivable would be booked as an admitted asset that was nothing more than |S]an accounting entry, with no promissory notes, security agreement, board minutes or other standard documentation to evidence a bona fide and genuine debt between the entities. By mid-2000, almost one year after the sale, the HMOs began having trouble paying claims.
In order to disguise the worsening financial condition of the HMOs from the regulators, AmCareco moved the expenses and liabilities of the HMOs off of the HMOs’ books and moved them onto the balance sheet of the management company and AmCareco. This practice artificially increased the assets of the HMOs and kept the true financial picture hidden from the regulators because neither the management company, nor AmCareco itself, were regulated businesses. Consequently, the regulators received the quarterly and annual financial statements of the HMOs, but did not see the other side of the transactions, which were placed on the financial statements of AmCareco and/or AmCare-Mgmt. AmCareco would book a “cashless contribution,” basically only accounting entries without any documentation in support, from itself or AmCare-Mgmt to one of the HMOs to artificially balance the accounts of the HMOs. As time passed, the true imbalance of assets and liabilities grew.
In addition to the cash flow problem, AmCareco experienced problems with the claims adjudication system of the HMOs. Expert testimony described the “claims adjudication and payment processes [as] negligent to reckless to inconceivable.”[66] New computer systems were initially purchased, as described in the POM, but the systems were found to be inadequate and needed to be replaced again.
PWC, the external auditor for AmCare-co, AmCare-Mgmt and the HMOs, had to have seen the huge cash depletions that occurred the first business day after the | S2sale, but did not mention those payments in its audit reports and did nothing to alert regulators to these cash depletions or to the statutory insolvency of the HMOs and *544 their violation of capital requirements. PWC repeatedly signed off on financial statements, certifying that those financial statements fairly and accurately represented the time financial status of the HMOs. The improper and creative accounting of AmCareco and the HMOs, which was not disclosed by PWC, resulted in the HMOs appearing to meet them minimum capital requirements when, in fact, under applicable accounting standards, they did not.

Health Net’s Continued Involvement

Although Health Net sold the HMOs to AmCareco, the sale did not end Health Net’s involvement. Under the terms of the sale, the financial statements of the HMOs were provided to Health Net through 2000. Lucksinger testified he discussed major transactions with Westen and was guided in his business decisions by whether Westen seemed in favor of them or not. Lucksinger also claimed Health Net indicated it would fund potential transactions as they came forward. On two occasions, Lucksinger asked Health Net to provide financing for acquisitions of other businesses to help with the cash flow problems, and Health Net complied.[67]
Lucksinger also claimed, when the HMOs were clearly in distress, Health Net “fiat stated they were going to get it [the HMOs] funded up.”[68] Lucksinger denied that what AmCareco did with regard to its accounting of the HMOs was wrong, stating that once Health Net infused capital into the plans as he believed it would, there would be no insufficiencies. Health Net representatives flatly denied Luck-singer’s claims of any assurances by Health Net that it would continue to fund the HMOs post-sale.
LiiAs the financial situation for the HMOs continued to worsen, Lucksinger turned to Health Net, and Westen, for relief. On May 11, 2001, Lucksinger sent an email to Westen informing him, and through Westen, Health Net, of the serious issue AmCareco was having with the state regulators. Copied on this email were Rosow from Proskauer Rose; Nazar-enus, AmCareco’s CFO; Mike Nadler, AmCareco’s Chief Operating Officer; and Todd Lucksinger, AmCareco’s counsel and Lucksinger’s son. However, there is no indication that any other shareholder received this information at that time. Lucksinger warned the recipients of the email that state regulators were becoming increasingly concerned with the large amounts of the intercompany payables which the HMOs had on them books. In this email, Lucksinger provided Westen with financial information for a future scheduled telephone conference.[69]
On August 17, 2001, Lucksinger sent to Westen and other investors a confidential email requesting an immediate infusion of cash and capital to continue the operations of the HMOs. Lucksinger explained each of the three HMOs was carrying large receivables from AmCareco on them books and this continuing problem of intercompa-ny payables was coming to the attention of state regulators. Lucksinger wrote:
To this date we have been judiciously utilizing the various accounting treatments available to AmCareco, intercom-pany payables and cash on hand to stretch $2-3 million in total consolidated capital around to cover approximately $16 million in regulatory capital and cash reserve requirements and basically, *545 what is now transpiring is that the inadequacy of this capital base to cover these items is coming to the attention of the regulators.[70]
Lucksinger summarized investment opportunities to grow the HMOs and warned the investors AmCareco would have to cease operations without a capital infusion. In ^summary, Lucksinger wrote:
While the last thing that I wish to do is to present each of you with the hard facts contained in this memorandum, there is basically nothing I can operationally do at the present time to circumvent the situation. I have run out of smoke and mirrors.[71]
In response, Health Net in September 2001 undertook an investigation into the finances of AmCareco and the HMOs to find out the extent of their financial difficulties and to determine whether further investment of Health Net’s capital was advantageous. AmCareco made a proposal which Health Net agreed to consider; ultimately, however, Health Net declined making a funding commitment. Instead, Health Net exercised its stock option as described in the SPA, and received the $2 million letter of credit purchased by Am-Careco at the closing. Shortly thereafter, the insurance regulators in each of the three states where the HMOs did business took regulatory action. By the time the regulators took over the HMOs, the companies were insolvent by more than $60 million.[72]

Regulatory Action

On September 23, 2002, the Louisiana Commissioner of Insurance (“Louisiana Commissioner”) filed a petition in the 19th Judicial District Court seeking to have AmCare-La placed into rehabilitation and to have a receiver appointed, based on a determination by the Louisiana Commissioner that AmCare-La was financially troubled.[73] An Order of Rehabilitation and Injunctive Relief was signed that day by the district judge. On October 7, 2002, the Louisiana Commissioner filed a petition seeking the liquidation of AmCare-La. The district court entered an order of liquidation and injunctive relief on the same day, appointing the Louisiana 13sCommissioner as liquidator and appointing a receiver (“Louisiana Receiver”).
On December 16, 2002, the 200th District Court of Travis County, Texas placed AmCare-Tx and AmCare-Mgmt into receivership and appointed the Texas Insurance Commissioner as receiver. On December 23, 2002, the Texas Insurance Commissioner, as receiver, appointed Jean Johnson as the Special Deputy Receiver of each company (“Texas Receiver”). On January 21, 2003, the 200th District Court of Travis County, Texas placed AmCare-Tx and AmCare-Mgmt into permanent receivership.
AmCare-Ok’s license to operate as an HMO in Oklahoma expired on April 30, 2002. Although AmCare-Ok filed an application with the Ok-DOH for renewal, AmCare-Ok and Ok-DOH entered into a Consent Order dated September 18, 2002, which limited AmCare-Ok’s continued operation to the orderly conclusion of business, resolution of outstanding claims and winding down of the company. The Oklahoma HMO’s renewal application was denied effective October 1, 2002, upon a finding by the Ok-DOH that AmCare-Ok was *546 financially impaired. On July 8, 2003, Am-Care-Ok was placed into receivership and a receiver was appointed (“Oklahoma Receiver”).[74]
PROCEDURAL HISTORY

The Lawsuits

On June 30, 2003, the Louisiana Commissioner, acting in his capacity as liquidator of AmCare-La, filed two lawsuits on its behalf in the 19th Judicial District Court. The first lawsuit, designated Docket Number 499,737, was brought against the officers and/or directors of AmCareco, AmCare-La and AmCare-Mgmt, and their Isninsurers.[75] In this lawsuit, the Louisiana Commissioner alleged causes of action in tort against the various defendants for mismanagement, negligence, breach of fiduciary duty and certain other wrongful acts. The second lawsuit, designated Docket Number 509,297, was brought against the former owner of the Louisiana HMO in its various corporate capacities, including Health Net, seeking to enforce a 1996 contractual guarantee, and to recover damages, attorneys fees, and other equitable relief.[76]
On September 30, 2003, the Louisiana Commissioner filed a third lawsuit as liquidator of AmCare-La, designated Docket Number 512,366 in the 19th Judicial District Court.[77] In this suit, the Louisiana Commissioner raised various negligence and breach of contract claims against PWC, the former accounting and auditing firm for AmCare-La.[78]

Relevant Pretrial Action

While these lawsuits were pending, the Oklahoma Receiver, on behalf of AmCare-Ok, and the Texas Receiver, on behalf of AmCare-Tx, sought, and were granted, leave to intervene in the two tort suits, Nos. 499,737 and 512,366.[79] On October *547 15, 2004, the Louisiana Commissioner, through the Louisiana Receiver, joined by the Oklahoma Receiver and the Texas Receiver (hereinafter collectively “the Receivers” or “the plaintiffs,” unless separately designated), filed a motion to consolidate the three' lawsuits then pending in the 19th Judicial District Court relating to the failure of the three HMOs, now in receiver-ships.
That same day, the district court granted the Louisiana and Oklahoma Receivers provisional leave to file a joint “Consolidated, Amended and Restated” petition in Docket Number 499,737. This consolidated, amended and restated petition asserted claims for negligence, gross negligence, fraud, conspiracy, aiding and abetting, unjust enrichment, breach of fiduciary duty, unfair or deceptive acts or practices, violations of Louisiana and Texas law, as well as breach of contract. These two Receivers sought compensatory and punitive damages, as well as attorneys fees. Named as defendants in the consolidated, amended and restated action were Luck-singer; Nadler; Nazarenas; Michael K. Jhin; William F. Galtney; John P. Mudd; M. Lee Pearce; and Scott Westbrook (designated the “D & 0” defendants, because they were directors and/or officers of Am-Careco and/or its subsidiaries); Executive Risk Indemnity, Inc.; Executive Risk Specialty Insurance Company; Executive Risk Management Associates; Greenwich Insurance Company; and XL Specialty (designated the “insurer” defendants); Foundation Health Corporation; Foundation Health Systems, Inc.; and Health Net, Inc.; (designated the “Foundation/Health-Net” |3Sdefendants); and PWC (the auditing/accounting firm for AmCare-La); Proskauer Rose, LLP (the law firm in New York); Stuart Rosow (a partner with the New York law firm Proskauer Rose) and AmCareco, Inc.
Also on October 15, 2004, the Texas Receiver filed “AmCare-Tx’s First Supplemental and Amending Petition in Intervention” in Docket Number 499,737. In this supplemental and amending petition, the Texas Receiver likewise asserted causes of action for conspiracy, fraud, breach of fiduciary duty, negligence, negligent misrepresentation, unfair or deceptive acts or practices, and violations of Texas law. The Texas Receiver sought compensatory and exemplary damages and attorneys fees, and named as defendants most of the defendants named by the Oklahoma and Louisiana Receivers in the consolidated, amended and superceding petition.[80]
The record reflects a multitude of pretrial filings, hearings and rulings, most of which are unnecessary for our review and which will not be discussed further. We note that all of the parties were represent *548 ed by exceptionally able counsel. As the size of the appellate record reflects, all counsel pursued every available avenue of defense or prosecution in this litigation. We mention this fact to underscore our belief that all of the issues involved in these matters were fully briefed, discussed and argued in the district court and to acknowledge the nearly daily involvement in all aspects of this litigation by the district court judge.
However, two of the pretrial rulings are important to the ultimate structure of the trial and require mention. First, after a hearing held on November 8, 2004, the district court granted the motion to consolidate filed by the three Receivers. Consequently, the two tort suits and the contract action were consolidated for trial.[81] |3gThe second pretrial action concerned the applicable law. Before trial, the Oklahoma and Louisiana Receivers filed a motion in li-mine seeking a pretrial determination of which states’ law would govern. After extensive briefing, involving an issue-by-issue analysis, and argument on the matter at a hearing held on May 9, 2005, the district court ruled that Louisiana law would apply to all procedural aspects in the case, and Texas law would apply to the substantive causes of action.[82]

The Settlements

Before trial began, all of the defendants except Health Net settled with the Receivers.[83] The record indicates the Receivers settled with the D & O defendants and their insurers for $8,667,000 and this settlement was approved by the district court.[84] The Receivers settled with PWC for $3.5 million, which was also approved.[85] There is an indication that a settlement between the Receivers and Rosow/Pros-kauer Rose was pending at the time of trial for $1 million.[86] The record also contains an indication that the Receivers were settling with Dr. Pearce for $833,000.[87]

The Trial

LnIn a common trial, the district judge heard the claims of the Louisiana and Oklahoma Receivers, and a jury served as the fact finder for the claims of the Texas Receiver over an 11-day period on June 16-17, 20-24, and 27-30, 2005. At the conclusion of the trial, the district judge invited post-trial briefs, taking under advisement the claims of the Louisiana and Oklahoma Receivers. After its deliberations, the jury returned answers to special *549 interrogatories and found Health Net to be 85% at fault, and “Any other Company” to be 15% at fault, on the tort claims. Specifically, the jury found that Health Net’s fault was the proximate cause of the damages to AmCare-Tx or its creditors, and that Health Net engaged in the following tortious actions which caused damages: breached fiduciary duties, committed fraud, knowingly engaged in unfair or deceptive acts or practices, conspired, and acted with malice or gross negligence. The jury found the Texas Receiver proved entitlement to compensatory damages of $52.4 million.[88] After further instruction and argument of counsel, the jury deliberated on the issue of punitive damages, and subsequently awarded the Texas Receiver the additional amount of $65 million.[89]

Judgment on the Claims of the Texas Receiver

The district court thereafter made the special verdict of the jury the judgment of the court.[90] On August 2, 2005, the district court signed a judgment in favor of the Texas HMO, and against Health Net, awarding compensatory damages in the amount of $44,540,000 (after reduction for the allocation of fault), plus judicial interest from the date of judicial demand until paid. The Texas HMO was awarded punitive damages in the amount of $65 million plus judicial interest from the date of judgment [41until paid. Health Net was cast with court costs, less the costs associated with the jurors, to bé determined at a later hearing. The district court ruled in favor of Health Net, who had argued a settlement credit reduction for each dollar actually received by the Texas HMO should not be applied, but that the damages should instead be reduced based on the jury’s allocation of fault.[91] In addition, the district court ruled in favor of Health Net on the issue whether the Texas HMO should receive treble the compensatory damage award, as allowed under Texas law, denying the Texas HMO’s request.

Judgment Notwithstanding the Verdict

On August 12, 2005, Health Net filed a motion for a judgment notwithstanding the verdict (JNOV), or alternatively, a new trial or a remittitur.[92] A hearing was held on the JNOV motion on August 19, 2005. After considering the argument of counsel, the district court granted Health Net a JNOV on the fault allocation, apportioning an additional 15% fault to “other persons” with regard to the compensatory damages. In addition, finding the punitive damages to be excessive, the district court reduced that award by 30%.[93] The district court’s ruling on JNOV was memorialized in a judgment signed on November 3, 2005. The district court denied Health Net’s alternative motion for new trial and designated the JNOV judgment to be a final appealable judgment.[94]
Health Net sought a suspensive appeal of the November 3, 2005 JNOV judgment and the district court’s underlying August 2, 2005 judgment on the jury verdict.[95] *550 The Texas Receiver sought a devolutive appeal from the JNOV judgment.[96]

Judgment on the Claims of the Louisiana and Oklahoma Receivers

On November 4, 2005, the district court rendered judgment on the claims of the Louisiana and Oklahoma Receivers, finding in their favor and against Health Net. In separate judgments for each HMO, the district court allocated fault in the same way as determined in the JNOV judgment, ie. Health Net — 70%, “Any other Person” — 15%, and “Any other Company’— 15%. Specifically, the district court found Health Net breached fiduciary duties, committed fraud, made negligent misrepresentations, engaged in unfair or deceptive acts or practices, conspired, and acted with malice or gross negligence.[97]
The district court determined the Oklahoma Receiver sustained compensatory damages of $24,426,005. After considering the allocation of fault, the district court awarded the Oklahoma HMO compensatory damages in the amount of $17,098,203.50, plus judicial interest from the date of judicial demand until paid. The district court determined the Louisiana Receiver sustained compensatory damages of $9,511,624.19. After considering the allocation of fault, the district court awarded the Louisiana HMO compensatory damages in the amount of $6,658,136.93, plus judicial interest from the date of judicial demand until paid.
Since Health Net had been found to engage in unfair or deceptive acts or practices, and in fraud, malice and gross negligence, the district court held the Louisiana and Oklahoma Receivers were entitled under Texas law to an award of reasonable attorneys fees, and an award of punitive damages or treble compensatory damages, to be determined at a subsequent trial. Finally, the district judge awarded Lathe Receivers court costs, which would also be determined at a later date. These judgments were designated to be final appeal-able judgments.
On the contract claim asserted by the Louisiana HMO, the district court further determined that, independent of any fraudulent or otherwise tortious conduct, Health Net was contractually liable under its parental guarantee for the full amount of loss sustained by the Louisiana HMO, or $9,511,624.19, without reduction. The district court rendered judgment in favor of the Louisiana HMO, and against Health Net, in that amount, plus judicial interest from the date of judicial demand until paid on the contract claim.
Health Net sought suspensive appeals of the separate November 4, 2005 judgments in favor of the Louisiana HMO and the Oklahoma HMO.[98] A separate devolutive appeal was granted to Health Net from certain pretrial rulings on exceptions in connection with the Louisiana and Oklahoma Receivers’ claims.[99]

Attorneys Fees for the Louisiana and Oklahoma Receivers 
[100]

Although the district court’s judgment found that the Louisiana and Oklahoma Receivers were entitled to an award of reasonable attorneys fees, the district court postponed to a subsequent trial a determination of the amount of that award. *551 On November 21-22, 2005, the district court held a hearing to make this determination. After receiving evidence and hearing testimony, the district court provided oral reasons for judgment on December 6, 2005, ruling that the Louisiana and Oklahoma Receivers had failed to meet the required burden for a determination of the proper amount of the award;[101] consequently, separate judgments were signed denying an |44award of attorneys fees to either the Louisiana Receiver[102] or the Oklahoma Receiver.[103] These separate judgments were designated as final ap-pealable judgments.
On December 21, 2005, the Oklahoma Receiver sought review of this decision, and filed a motion for new trial for re-argument and/or reconsideration regarding the district court’s ruling as it concerned the attorney fee issue.[104] The district court denied the Oklahoma Receiver’s motion, in a judgment signed January 27, 2006, after a hearing held on January 23, 2006.[105] On February 13, 2006, the Oklahoma Receiver and Louisiana Receiver separately filed motions for devolutive appeal of the district court’s ruling denying them attorneys fees.[106]

Punitive Damages for the Louisiana and Oklahoma Receivers

At the November 21-22, 2005 hearing, the district court also considered the quantum of punitive damages that should be awarded to the Louisiana and Oklahoma Receivers. In oral reasons, the district judge noted her understanding that all three Receivers had agreed to share in any recovery. Finding the amount of punitive damages awarded by the jury on the claims of the Texas Receiver to be sufficient exemplary damages for all of the claims raised, the district court denied awarding separate and additional punitive damages for the Louisiana and Oklahoma Receivers. In a written judgment signed on December 20, 2005, and designated a final judgment, the district court ruled in favor of Health Net, finding the Louisiana and Oklahoma 14SReceivers had no right to separate and additional punitive damages.[107]
The Louisiana and Oklahoma Receivers then filed a notice into the court record, indicating their election to receive, under Texas law, treble compensatory damages as an award against Health Net, based on the district court’s November 4, 2005 judgments in their favor.[108] Health Net filed a motion for new trial on the plaintiffs’ election of treble damages and a motion to strike.[109] The Louisiana and Oklahoma Receivers opposed the motions to strike and for new trial.[110] After a hearing held on January 23, 2006,[111] the district court granted Health Net’s motion to strike the election of treble damages in a judgment signed on January 27, 2006.[112] The Louisiana and Oklahoma Receivers sought separate devolutive appeals from the district court’s judgments denying them punitive *552 damages, and treble damages, respectively.[113]

The Appeals

A panel of retired judges was appointed ad hoc to consider these appeals. During the pendency of these appeals, the court of appeal issued several opinions, some of which concerned issues not otherwise discussed herein.[114]
14fiOn June 11, 2007, almost two years after the district court signed its written judgment adjudicating the claims of the Louisiana and Oklahoma Receivers on November 4, 2005, Health Net filed in the court of appeal a motion for remand. In part, this motion sought remand on the ground that the district court had failed or refused to provide written findings of fact and reasons for judgment pursuant to La. C.C.P. arts. 1812 and 1917. On July 10, 2007, the ad hoc panel granted the motion to remand, ordering the district court to supply written findings of fact and reasons for judgment, with citations to pertinent constitutional provisions, law and/or jurisprudence, and citations to the record, in support of its reasons and conclusions. The coui’t of appeal additionally ordered the district court to address in its reasons fourteen (14) specific issues, and ordered this determination to be made in thirty (30) days.
On August 9, 2007, the district judge requested a ten-day extension of time, which was granted the same day. On August 17, 2007, the district court requested clarification with regard to the remand order, asking whether the district judge should convey her original reasons for granting the JNOV, or whether she should also consider her reasons adduced after reviewing all of the exhibits and evidence transmitted from the court of appeal upon limited remand. The court of appeal elected not to answer the district judge’s query, instead denying her request with the notation that the court of appeal’s remand order was “clear and unambiguous, and speaks for itself.”
Thereafter, the district court complied with the ad hoc panel’s remand order, issuing “Reasons for Judgment” on August 20, 2007, which were filed into the |,17district court record on August 22, 2007. According to the court of appeal, a copy of the written “Reasons for Judgment” was supplied to that court on the same day. On August 28, 2007, the district court filed its “Reasons for Judgment, Part II,” which supplemented the original reasons for judgment.
After another year and a half, the court of appeal issued its opinions on the main issues of liability. In Wooley /, its first ruling on the merits, the ad hoc panel separately determined the contract claim of the Louisiana Receiver.[115] Finding the *553 district court properly determined Health Net was liable under the contract of guarantee, the court of appeal affirmed that part of the district court judgment. However, the court of appeal found the district court erred in finding Health Net to be liable for the entire amount of compensatory damages, holding the language of the contract limited the amount of the award to $2 million, plus legal interest thereon from the date of judicial demand until paid.
In Wooley II, the ad hoc panel separately considered the tort causes of action in a 412-page decision with five appendices.[116] Although not raised as an assignment of error, the appellate court re-visited the district court’s choice of law determination and found error, concluding that the claims of the Texas Receiver should have been determined under Texas law, the claims of the Louisiana Receiver should have been determined under Louisiana law, and the claims of the Oklahoma Receiver should have been determined under Oklahoma law. Finding further errors of law which interdicted the findings of fact of the jury and judge, the court of appeal conducted a de novo review of the record. After conducting its review, the court of appeal reversed all of the judgments of the trial court in favor of the Receivers on all of the hstort causes of action, and rendered judgment in favor of Health Net, dismissing all of the Receivers’ claims with prejudice. The Texas and Oklahoma Receivers were cast with costs of the district court actions and most of the appellate court costs.[117] Applications for rehearing and for rehearing en banc were denied on February 13, 2009.
The Louisiana, Texas and Oklahoma Receivers filed four writ applications in this Court, seeking review of the court of appeal’s determinations on the tort causes of action and the Louisiana contract claim. We granted these four writ applications, and consolidated them for review, in order to determine the correctness of the court of appeal’s decisions.[118] We find it appropriate to now address the proper standards of review.
STANDARD OF APPELLATE REVIEW
In these consolidated cases, the appellate court was asked to review several final judgments. Finding errors of law which interdicted both the bench and jury findings of fact in the tort claims, the court of appeal conducted a de novo review of the record and reversed the judgments which had been entered in favor of the plaintiffs. The court of appeal, in a separate opinion, found no legal error in holding Health Net liable under the contractual cause of action, but amended the trial court’s judgment to reduce the amount of the award. Based on its finding that Health Net was not liable on the tort causes of action, the court of appeal did not reach the merits of the correctness of the judgment notwithstanding the verdict, or the issues of punitive damages and attorneys fees. We will review the court of appeal’s decisions under the following principles.
*554 |43The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal in a civil matter extends to both law and facts. La. Const. 1974, art. 5, § 10(B).[119] Questions of law are reviewed de novo, with the judgment rendered “on the record, without deference to the legal conclusions of the tribunals below.” Holly & Smith Architects, Inc. v. St. Helena Congregate Facility, Inc., 2006-0582 p. 9 (La.11/29/06), 943 So.2d 1037, 1045; citing Louisiana Municipal Association v. State, 2004-0227 p. 35 (La.1/19/05), 893 So.2d 809, 836. This constitutional provision has also “been interpreted as giving an appellate court the power to decide factual issues de novo.” Ferrell v. Fireman’s Fund Ins. Co., 1994-1252 p. 3 (La.2/20/95), 650 So.2d 742, 745. However, while a court of appeal may have the constitutional authority to make a de novo review of a factual finding, the exercise of this power has been limited by the jurisprudential rule that a trial court’s factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Brewer v. J.B. Hunt Transport, Inc., 2009-1408 p. 9 (La.3/16/10), 35 So.3d 230, 237.
Rosell v. ESCO, 549 So.2d 840 (La.1989) explained this jurisprudential limitation of review power:
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable infei’ences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the findings in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.... In applying the manifestly erroneous— clearly wrong standard to the findings below, 1 .^appellate courts must constantly have in mind that their review function is not to decide factual issues de novo. ...
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.... Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. ... But where such factors are not present, and a factfinder’s finding is based on its decision to credit the *555 testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Id., 549 So.2d at at 844-45 (citations omitted).
The issue for a reviewing court to resolve when faced with a fact finding “is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.... Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.” Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). This review standard is based, in part, on the trial court’s ability to better evaluate the testimony of live witnesses, compared with an appellate court’s sole reliance upon a written record. In addition, the standard is based on “the proper allocation of trial and appellate functions between the respective courts.” Stobart, 617 So.2d at 883, citing Canter v. Koehring Co., 283 So.2d 716 (La.1973), superceded by statute on other grounds as noted in Walls v. Am. Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, 1265. Consequently, “where two permissible views of the evidence exist, the factfin-der’s choice between them cannot be manifestly erroneous or clearly wrong.” | nId. As the court pointed out in Lasyone v. Kansas City Southern R.R., 2000-2628 p. 6 (La.4/3/01), 786 So.2d 682, 687-688, “[tjhese standards for manifest error review are not new. They are the guiding principles that aid our courts of appeal, which are our error correcting courts, when reviewing a trial court’s factual determinations.”
Considering together the standards of review for legal and factual issues, Sto-bart succinctly stated: “[tjhis state’s appellate review standard, which is constitutionally based and jurisprudentially driven, is that a court of appeal may not overturn a judgment of a trial court absent an error of law or a factual finding which is manifestly erroneous or clearly wrong.” Id., 617 So.2d at 882 n. 2. However, when an appellate court finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever the state of the record on appeal so allows, to redetermine the facts de novo from the entire record and render a judgment on the merits. Ferrell, 1994-1252 p. 4, 650 So.2d at 745. With these principles firmly in mind, we will examine separately the court of appeal’s review of the verdicts of each fact finder on the tort claims, as well as the trial judge’s determination of the contractual matter.
REVIEW OF THE DISTRICT COURT’S JUDGMENT — THE LOUISIANA RECEIVER’S CLAIMS REGARDING THE CONTRACTUAL (PARENTAL) GUARANTEE
We begin this discussion by noting the writ application seeking review of the court of appeal’s judgment regarding the contractual guarantee was filed by the Louisiana Receiver, and not Health Net. The trial court found Health Net liable under the parental guarantee and the holding was affirmed by the appellate court. Since Health Net has failed to seek review of that ruling, the issue of Health Net’s liability under the contract is not before us. The only issue we must consider with regard to the parental guarantee is the amount for which Health Net is liable under its terms.
| s2In order to understand the lower courts’ holdings on this matter, it is necessary to focus on some additional facts. As *556 previously stated, Foundation was the former owner and operator of the three HMOs at issue, including the Louisiana HMO, then known as Foundation Health, a Louisiana Health Plan, Inc. In 1996, based on the analytical reviews by the La-DOI of the Louisiana HMO’s financial filings, the La-DOI requested the Louisiana HMO’s parent company, at that time Foundation, to guarantee the HMO’s minimum capital and surplus requirements. Foundation, as the sole shareholder in the Louisiana HMO and its parent corporation, executed a guarantee obligating Foundation to provide sufficient capital to ensure that the Louisiana HMO maintained the “minimum amounts of paid capital and surplus required for an HMO under Louisiana law.” In full, the guarantee provided:
This is to certify that Foundation Health Corporation, the sole shareholder of Foundation Health, a Louisiana Health Plan, Inc. [the Louisiana HMO],[120] guarantees that it shall provide sufficient capital to [the Louisiana HMO] to ensure that [the Louisiana HMO] maintains the minimum amounts of paid capital and surplus required for an HMO under Louisiana law. This guarantee shall remain in place until [Foundation] provides written notice of its cancellation to the Commissioner of Insurance, State of Louisiana, at least sixty (60) calendars [sic] days in advance of the effective date of cancellation.
The guarantee was signed by Jeffrey L. Elder, the Chief Financial Officer of Foundation at that time. A notarized acknowledgment dated December 9, 1996 was attached to the guarantee and certified that Elder executed the guarantee.
After Foundation’s 1997 acquisition by Health System International, the La-DOI requested that the resulting entity — Foundation Health Systems, Inc. — agree to provide a parental guarantee with some additional conditions. The La-DOI wanted the new parent entity to agree to guarantee the statutory net worth requirements of the Louisiana HMO for as long as the Louisiana HMO was a subsidiary of Foundation ^Health Systems, Inc., or until the HMO dissolved, whichever occurred first. The La-DOI additionally requested the inclusion of language in the document stating the guarantee could not be cancelled by any party without the approval of the Louisiana Insurance Commissioner.[121]
By letter dated July 24, 1997, the Louisiana HMO responded to the La-DOI, rejecting the requested changes to the terms of the guarantee and its method of termination.[122] Instead, the Louisiana HMO indicated a parental guarantee already existed, referencing the 1996 guarantee executed by Foundation on its behalf, and attaching a copy. The Louisiana HMO further stated:
At this date, no specific assets of the parent have been pledged with respect to the guarantee issued to the Plan. However, please note that Foundation Health Systems, Inc. is a large company. At March 31, 1997, the pro-forma total assets of Foundation Health Systems, Inc. were $4.1 billion, including $1.8 billion in cash and investments.
Eventually, the Foundation parent entity became known as Health Net. In 1999, pursuant to the terms of the sale documents at issue, Health Net transferred all of its stock in the Louisiana HMO to Am-Careco. After the sale, AmCareco became *557 the sole shareholder of the Louisiana HMO, which became known as AmCare-La.
After AmCare-La was placed in rehabilitation on September 23, 2002, the Louisiana Commissioner and Receiver filed suit against all of the former parent entities of the Louisiana HMO, including Health Net, seeking enforcement of the guarantee. In defending against the contract suit, Health Net relied on Section 4.28 of the SPA, which stated all inter-company agreements and arrangements would terminate as of the closing, except those specifically named.[123] Since the parental ^guarantee the La-DOI sued upon was not listed as a guarantee which survived the sale, Health Net claimed the guarantee on behalf of the Louisiana HMO terminated with the sale.
Trial was held after consolidation of the contract claim with the tort actions also filed by the Louisiana Receiver. On November 4, 2005, the district court rendered judgment in favor of the Louisiana HMO and against Health Net on the parental guarantee, finding Health Net to be contractually liable for the total amount of compensatory damages awarded to the Louisiana HMO in the amount of $9,511,624.19.
Health Net appealed all of the judgments rendered against it, including the district court’s judgment finding Health Net contractually liable under the parental guarantee. In a separate opinion, which considered only the contractual claim, the appellate court affirmed the judgment of the district court holding Health Net contractually liable, but amended the judgment to reduce the amount of the award from $9,511,624.19 to $2 million plus legal interest thereon from the date of judicial demand until paid.
After rejecting Health Net’s argument the parental guarantee was terminated during the sale of the Louisiana HMO to AmCareco, the court of appeal found the terms of the parental guarantee were clear and unambiguous, and Health Net was contractually obligated for the “minimum capital and surplus amount required by Louisiana law.”[124] The appellate court found the minimum capital and surplus amount required by Louisiana law, described in the guarantee, was found in the statutory law regulating HMOs. At the time Foundation signed the guarantee in 1996, the minimum capital and surplus requirement under Louisiana law for an HMO | sr,which had filed an application for a certificate of authority by July 1, 1995 was $2 million by July 1, 1998. See former La. R.S. 22:2010(C), now La. R.S. 22:254(0. According to the Louisiana Form-A Application filed in connection with the sale, the original license for the Louisiana HMO was certified effective January 13, 1994.[125] Finding the record proved the losses of the enrollees, providers, employees, and other creditors of AmCare-La exceeded $2 million, and considering the provisions of former La. R.S. 22:2010(0), the court of appeal determined the full amount of the parental guarantee for which Health Net was liable was $2 million.
In doing so, the court of appeal rejected the district court’s determination that Health Net was contractually liable for the entire amount of the compensatory damages suffered by AmCare-La, or any in *558 creased amount of minimum capital and surplus required by the Louisiana Commissioner for approval of the Health Net/AmCareco sale of the Louisiana HMO. Consequently, while the court of appeal affirmed Health Net’s liability under the parental guarantee, the ad hoc panel found the district court’s award of $9,511,624.19 under the contract had “no basis in law or fact and [was] clearly erroneous and excessive.” [126]
The Louisiana Receiver argues in this court the clear language of the parental guarantee obligates Health Net to pay all capital and surplus obligations expected of a Louisiana HMO. The Louisiana Receiver claims this means the contract obligates Health Net to pay “the difference between admitted assets and liabilities at any given time plus an additional amount to keep [the] legally required cushion in place.”[127] The Louisiana Receiver asserts the difference between AmCare-La’s assets and | pliabilities was proved at trial to be, at a minimum, $9,511,624.19. In fact, the Louisiana Receiver contends Health Net may owe $3 or $4 million more than the actual damages proved.[128] However, since Am-Care-La is no longer in business, and the higher award would result in the Louisiana Receiver receiving a windfall beyond the failed HMO’s actual damages, the Louisiana Receiver seeks only to reinstate the district court’s judgment finding Health Net contractually liable for the full amount of the compensatory damages, or $9,511,624.19.
We disagree. The interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. “When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law.” Sims v. Mulhearn Funeral Home, Inc., 2007-0054 p. 10 (La.5/22/07), 956 So.2d 583, 590; Louisiana Ins. Guar. Ass’n v. Interstate Fire & Cas. Co., 1993-0911 p. 7 (La.1/14/94), 630 So.2d 759, 764 (“The determination of whether a contract is clear or ambiguous is a question of law.”). The interpretation of this contractual guarantee is a question of law which we will review de novo.
Contracts of guaranty or surety-ship are subject to the same rules of interpretation as contracts in general. Ferrell v. South Central Bell Telephone Co., 403 So.2d 698, 700 (La.1981). Accordingly, “[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. C.C. art. 2046.
By the clear and unambiguous terms of the contract, the court of appeal found Foundation agreed to provide sufficient capital to ensure the Louisiana HMO maintained the minimum amounts of capital and surplus required for an HMO under | ^Louisiana law. The court of appeal also found, at the time Foundation signed the guarantee in 1996, the minimum capital and surplus amount required under Louisiana law for an HMO like the Louisiana HMO at issue here was $2 million. We agree.
Former La. R.S. 22:2010, now La. R.S. 22:254, is entitled “Protection against *559 insolvency,” and provides, in pertinent part:[129]
C. Each health maintenance organization shall establish prior to the issuance of any certificate of authority, and shall maintain as long as it does business in Louisiana as a health maintenance organization, the following capital and surplus requirements:
(2) For each health maintenance organization which, by July 1, 1995, has filed its application for a certificate of authority with the commissioner as required by law, the minimum capital and surplus shall be:
(iii) Two million dollars by July 1, 1998.
Thus, the minimum capital and surplus amount which Foundation agreed to ensure on behalf of the Louisiana HMO in 1996 was $2 million.
Like the court of appeal, we reject the Louisiana Receiver’s arguments that the guarantee obligates Health Net to pay any greater amount. The guarantee at issue is not ambiguous and should be enforced as written. “When the language of [a contract] is clear, courts lack the authority to change or alter its terms under the guise of interpretation.” Louisiana Ins. Guar. Ass’n, 1993-0911 p. 7, 680 So.2d at 764. There would be no need for language in the guarantee obligating Health Net to pay the “minimum” financial requirements if the intent of the parties was for the guarantor to pay all of the HMO’s liabilities. Consequently, the Louisiana Receiver’s argument |ssthat Health Net is liable for the entire amount of the compensatory damages proved in this matter fails to give effect to the clear terms of the agreement.
Similarly, we find no merit in the Louisiana Receiver’s alternative arguments. The Louisiana Receiver alternatively contends Health Net is obligated to pay $4 million, because that is the amount the Louisiana Commissioner required as the minimum capital and surplus for the Louisiana HMO following the Health Net/AmCareco sale. In the further alternative, the Louisiana Receiver contends Health Net should pay $3 million, arguing the $1 million deposit required by former La. R.S. 22:2010(A), now La. R.S. 22:254(A) should be considered as a part of the minimum capital and surplus requirements.[130] However, there is nothing in the record to support the contention that Foundation agreed to an amount in excess of the minimum capital and surplus amounts as provided by statute at the time the guarantee was confected, or that the minimum capital and surplus amounts for the Louisiana HMO should also include the required statutory deposit.[131]
*560 |mThere is nothing in the former statute or its amendments which would alter our conclusion. As originally enacted, La. R.S. 22:2010 provided for both a “one million dollar deposit requirement” and “a minimum of $300,000 in capital and surplus.” See Acts 1986, No. 1065 (La. R.S. 22:2010(A) and (C)). The capital and surplus minimum was considered distinct from the deposit requirement, with the first sentence of La. R.S. 22:2010(0 beginning: “In addition to the one million dollar deposit requirement ... ”. (Emphasis added). That distinction in the introductory phrase remained unchanged in the subsequent amendment to the statute in Acts 1995, No. 1231, which raised the amount of the minimum capital and surplus requirement for an established HMO to $2 million by July 1, 1998. A further amendment in 2003 removed the introductory language to Subsection (C), and, for new HMOs [those which had not filed their certificates of authority with the Commissioner by July 1, 1995], required a capital and surplus minimum of the greater of $3 million or other amounts determined by statute. For a new HMO, the $1 million deposit was included in the minimum capital and surplus amount. See Acts 2003, No. 1106 *561 (“The million dollar deposit required pursuant to La. R.S. 22:2010(A) shall apply as a part of this |finminimum requirement.”). However, the requirements for established HMOs, which had filed their certificates of authority prior to July 1, 1995, like the Louisiana HMO at issue here, were for a minimum capital and surplus of $2 million.
We find, as did the court of appeal, the clear and unambiguous language of the guarantee contractually obligates Health Net to pay the minimum capital and surplus amount of $2 million, required in former La. R.S. 22:2010(C), now La. R.S. 22:254(C).[132] In this regard, the holding of the court of appeal is affirmed.
REVIEW OF THE DISTRICT COURT’S JUDGMENT — THE TORT CLAIMS OF THE LOUISIANA AND OKLAHOMA RECEIVERS
The appellate court found the district court committed prejudicial legal error in the following ways which interdicted the district court’s findings of fact on the tort claims asserted by the Louisiana and Oklahoma Receivers, justifying de novo review of the record: (1) the district court erroneously applied Texas law to decide the claims of the Louisiana and Oklahoma Receivers; (2) the district court failed tq comply sufficiently with the court of appeal’s remand order to supply reasons for judgment; and (3) the district court may have used erroneous Texas law when she decided the claims of the Louisiana and Oklahoma Receivers.[133]
In this court, the Louisiana and Oklahoma Receivers assert the court of appeal erred both in raising the choice-of-law issue sua sponte and in conducting an Im erroneous choice-of-law analysis which prejudiced them. The Louisiana and Oklahoma Receivers further contend the appellate court erred in conducting its de novo review. We will now determine the merits of each of these contentions.

Choice of Law Ruling

On October 14, 2004, the Louisiana and Oklahoma Receivers filed a joint motion in limine seeking the district court’s ruling on the choice of law for the substantive issues raised. All of the parties provided the district court with extensive briefing on the matter in an issue-by-issue analysis. A contradictory hearing was held on May 9, 2005, after which the district court ruled Texas law would apply to the substantive tort issues raised, and Louisiana law would apply to procedural issues. The comments made by the district court judge at the time of her ruling show the ruling was based on her appreciation of the Receivers’ allegations of fraud, negligence, unfair *562 trade practices and conspiracy which had their genesis in Texas but extended into the other states involved.[134] Both the parties and the trial court agreed the contractual matter would be governed by Louisiana law.
Health Net did not seek review of this ruling by writ and did not raise this issue as an assignment of error in its appeal. The appellate court noted the parties’ acceptance of the district court’s pretrial determination regarding the choice of law.[135] | ^Nevertheless, the court of appeal decided sua sponte to revisit the pretrial choice of law ruling with this explanation: “Determining the proper choice-of-law law to be applied to an issue is a question of law for which this court has the plenary and unlimited constitutional power and authority to review de novo.”[136]
After an extensive discussion of Louisiana’s choice of law rules for torts, the court of appeal ruled the district court erred in part in her choice of law decision. The ad hoc panel maintained Texas law should have governed the tort claims of the Texas Receiver; Louisiana law should have governed the tort claims of the Louisiana Receiver; and Oklahoma law should have governed the tort claims of the Oklahoma Receiver. As a consequence of this determination, the court of appeal thereafter found the district court committed reversible error in applying Texas law to certain of the claims of the Louisiana and Oklahoma Receivers.

1. Authority

At the outset, we note the absence of an assignment of error or lack of objection to the district court’s choice of law ruling by a litigant would not prevent the court of appeal from raising this issue. Without doubt, an appellate court has the authority to raise an issue sua sponte on appeal. The state constitution authorizes the appellate jurisdiction of a court of appeal in civil matters to extend to law and facts. La. Const. art. 5, § 10(A) and (B). La. C.C.P. art. 2129 specifically provides: *563 “[a]n assignment of error is not necessary in any appeal.” La. C.C.P. art. 2164 provides an appellate court “shall render any judgment which is just, legal, and proper upon the record on appeal.” Likewise, the uniform rules of the appellate courts require that an issue be submitted in an assignment of error, after first being raised in the district court, “unless the interest of justice clearly requires otherwise.” Uniform Rules Courts of Appeal, Rule 1-3 (emphasis added).
This court has held, on the basis of this constitutional and codal authority, that an “appellate court clearly had the authority to consider [an issue] even though there was no assignment of error in that regard.” Nicholas v. Allstate Ins. Co., 1999-2522 p.7-8 (La.8/31/00), 765 So.2d 1017, 1023; see also Georgia Gulf Corp. v. Board of Ethics for Public Employees, 96-1907 p. 5-6 (La.5/9/97), 694 So.2d 173, 176. Under the law, the court of appeal had the authority to raise an issue on appeal sua sponte. Since the law clearly authorizes the court of appeal to consider an issue on appeal in the absence of an assignment of error, the question then becomes whether a re-examination of the district court’s choice of law ruling was required in the interests of justice in this case.

2. Justification

We note the court of appeal failed to articulate why it addressed the uncontested choice of law issue in the first place, or how the application of Texas law to the claims of the Louisiana and Oklahoma Receivers was unjust. While the court of appeal appears to base its reexamination of the choice of law decision on the importance and uniqueness of the insurance laws of each state, that general observation is insufficient to justify a wholesale judicial intrusion into this pretrial legal ruling. Otherwise, the mere fact an insurance matter is involved in litigation 164involving actors from different states would lead to appellate courts second-guessing each pretrial legal ruling made, even in the absence of objection or prejudice.
Insurance is a highly regulated industry primarily because of the enormous public policy considerations at issue and the fact that insurance entities are entrusted with other people’s money. These concerns require each state to regulate the insurance industry closely; consequently, heightened regulation is not a unique aspect in any one state. Here, what was at issue was a sophisticated and complex business transaction, where the objects of the sale were highly-regulated HMOs, and where the Receivers asserted the sale of the HMOs was accomplished through tortious means of conspiracy, fraud, unfair practices, and breaches of fiduciary duty. Thus, the fact that each state has its own laws for the regulation of the insurance industry, or regarding HMOs in particular — both grounds relied on by the court of appeal for justification of its judicial intervention in the choice of law decision — are, for the most part, irrelevant here.
To the extent the court of appeal relied on La. C.E. art. 202 as additional justification for its decision to revisit the district court’s choice of law determination, such reliance was misplaced.[137] Article 202 provides the authority for a court to take judicial notice of, inter alia, the laws of other states.[138] But this evidence rule does lfiSnot exist in a vacuum and cannot *564 serve as a blanket authority to revisit every judicial decision made by a district court. Instead, the rule simply serves to require courts to judicially notice the laws of other jurisdictions, where necessary, even if the information is not provided by the parties.[139] The court of appeal failed to show the interests of justice demanded a re-examination of the choice of law determination in the absence of this issue being raised by any party. The appellate court did not articulate how its sua sponte intervention in this issue was just, legal or proper.

3. Notice

Even had there been justification for the court of appeal’s re-determination of the choice of law decision, the appellate court committed error in failing to give the litigants notice of its sua sponte determination or to provide the litigants with an | ^opportunity to be heard on the issue during the approximately 30 months the court of appeal reviewed the case.[140] Even La. C.E. art. 202, the stated authority for the court of appeal’s actions, requires notice to the parties: “A party who requests that judicial notice be taken and the court, if notice is taken without request shall give reasonable notice during trial to all other parties.” La. C.E. art. 202(B)(2) (emphasis added).
The court of appeal’s failure to provide notice to the parties was especially egre *565 gious in this case, where no objection was raised to the district court’s pretrial ruling that Texas law should apply to the tort claims presented by all of the Receivers. The Louisiana and Oklahoma Receivers presented their case under Texas law, and Health Net defended on the basis of Texas law. The parties were not permitted to weigh in, either on the appellate court’s decision to review the case using law different than had been used at trial, or on how to reach a proper resolution of any resulting conflict between the two legal standards — the law used at trial and the law newly-imposed by the court of appeal. Instead, the court of appeal engaged in its own analysis. We hold this was an error of law.
A Ruling
Our review of the record convinces us there was no error in the district court’s ruling that Texas law applied to each of the three Receivers’ tort claims. This case has contacts with several states, raising questions as to which states’ law should apply to the tort claims asserted in the Receivers’ petitions. As to many of the substantive legal issues, the law of all of the involved states is substantially similar, as acknowledged by the court of appeal. We also find, as did the district court, that the most important choice of law issues raised here related to the standards of conduct and the statutory duties and remedies imposed by the states on those in the business lfi7of insurance; the nature and scope of fiduciary duties; and whether punitive damages and attorneys fees may be awarded. We will briefly examine each of these issues.
La. C.C. art. 3542 provides the general rule for choice of law determinations in tort cases:
Except as otherwise provided in this Title, an issue of delictual or quasi-delic-tual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515,[141] as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
The underlying facts, as alleged at the hearing on the choice of law and at trial show the State of Texas has the most significant contacts with the parties in this matter. Although AmCareco is a corporation incorporated in Delaware, its principal place of business is in Texas. AmCareco was the owner of the four relevant subsid *566 iary corporations — AmCare-Mgmt., a Texas Corporation with its principal place of business in Texas; AmCare-La, a Louisiana corporation with its principal place of business in Louisiana; AmCare-Tex, a Texas corporation with its principal place in IfflTexas; and AmCare-Ok, an Oklahoma corporation with its principal place of business in Oklahoma. The three HMOs were shown to be basically paper corporations in their respective states of incorporation. Although AmCare-La had three offices in Louisiana, two of the buildings were actually leased to AmCare-Mgmt. Similarly, all but one of the buildings in Oklahoma for AmCare-Ok were actually leased by AmCare-Mgmt. All of the furniture and equipment were owned by, and all personnel working in Louisiana and Oklahoma were actually employed by, AmCare-Mgmt, the Texas corporation. The books and bank accounts of the Louisiana and Oklahoma HMOs were maintained in Texas.
The majority of the tortious conduct asserted against the defendants, including Health Net, as described in the Receivers’ petitions and shown at trial, occurred in Texas. The district court specifically found the genesis of all of the intertwined tortious conduct occurred in Texas. The court of appeal acknowledged this fact repeatedly. See Wooley II, p. 40, 14 So.3d at 354 (“A substantial majority of the conduct [of which the plaintiffs complain] occurred in Texas.”) and Wooley II, p. 51, 14 So.3d at 362 (“The record on appeal shows that a majority of the conduct complained of occurred in Texas and, based on the quantum of the damages awarded, sixty-one percent (61%) of the total injuries in this litigation occurred in Texas.”) and Wooley II, p. 53, 14 So.3d at 363 (“For the purposes of Article 3543, the majority of the conduct that caused the injury in Louisiana occurred in Texas.”).
The tortious conduct of the defendant had consequences and caused injury in Louisiana, Oklahoma and Texas; however, the most severe harm, in terms of the number of policy holders injured and dollar amounts of damage, occurred in Texas. Considering all of these facts, there was no error in the district court’s finding that Texas had the most significant contacts under the general rule of La. C.C. art. 3542 | sand its policies would be the most seriously impaired if its laws were not applied.
The law applicable to standards of conduct and safety in a delictual action is determined by application of La. C.C. art. 3543:
Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.
In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.
The preceding paragraph does not apply to cases in which the conduct that caused the injury occurred in this state and was caused by a person who was domiciled in, or had another significant connection with, this state. These cases are governed by the law of this state.
Here, the tortious conduct occurred primarily in Texas, but injuries occurred in all three affected states. Under the first paragraph of Art. 3543, the tort law of Texas applies to all standards of conduct and safety, unless Louisiana law or Oklahoma law supplies a higher standard of conduct than Texas law does. We find no error in the district court’s determination *567 that Texas law prohibits similar activities for those engaged in the business of insurance as the law in the other states, but provides for broader civil remedies, and applies traditional standards of care to the duties owed by a corporate board member or officer.
Finally, La. C.C. art. 3546 provides the standard for determining when the remedy of punitive damages may be imposed:
Punitive damages may not be awarded by a court of this state unless authorized:
(1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was 17ndomiciled.
This article points squarely toward the applicability of Texas law: Texas was the state where the majority of the tortious conduct occurred and where most of the damage was inflicted. Here, due to the intertwined nature of the tortious acts alleged, the operative facts relating to Health Net’s conduct are common to all of the claims asserted by the three Receivers. We find no error in the district court’s determination that all of the victims of the same scheme should share the same remedy, no matter where they reside. Moreover, to hold Health Net responsible for punitive damages does not somehow deny the insurance regulatory agencies in Louisiana and Oklahoma the authority to regulate insurance in their states.
Considering the unique facts of this case, we find the district court did not err in its determination that Texas law applied to all of the tort claims. We hold the court of appeal erroneously concluded the district court erred in its choice of law ruling. Consequently, the ad hoc panel’s subsequent rulings based on that conclusion were in error, as well; specifically: (1) the district court erred in using “proximate cause” in its analysis of the tort claims of the Louisiana Receiver;[142] (2) the district court erred in finding Health Net liable for conspiracy in favor of the Louisiana Receiver; [143] (3) the district court erred in finding in favor of the Louisiana and Oklahoma Receivers for Health Net’s violations of the Texas Insurance Code;[144] and (4) the district court erred in its fault allocation for the claims of the Louisiana and Oklahoma Receivers.[145] We find these erroneous rulings cannot support the court of appeal’s decision to undertake a de novo review.
171 Even if the district court was wrong to apply Texas law to the claims of the Louisiana and Oklahoma Receivers, the ad hoc panel should have reviewed the error from an appellate perspective to determine whether the error affected the ultimate judgment as to applicable remedies. From an appellate perspective, the district court’s application of Texas law to the claims of the Louisiana and Oklahoma Receivers had no effect as to the applicable remedies because no punitive damages or attorneys fees were awarded to the Louisiana or Oklahoma Receivers. Only the jury applying Texas law to the claims of the Texas Receiver, which the court of appeal conceded was correct, resulted in an award of punitive damages. The Texas Receiver did not seek attorney fees.

*568
Reasons for Judgment

The record shows the trial of these matters was held on June 16-17, 20-24, and 27-30, 2005. Immediately after trial, the district court took under advisement the claims of the Louisiana and Oklahoma Receivers. The district court issued its judgment on these claims in separate judgments signed on November 4, 2005, finding Health Net liable on all of the tort causes of action.
The record also shows Health Net filed a motion seeking written reasons for judgment and findings of fact on July 26, 2005, before a final judgment was rendered, and on November 10, 2005, six days after the final judgment was rendered on these matters. Neither of these motions was accompanied by an order.[146] However, the record in this matter shows affirmatively both that the district court was aware of the filing of these motions and that she informed counsel her written reasons would be forthcoming.[147] For reasons not apparent from the record, the district judge failed to 172file written reasons for the two judgments at that time.
Thereafter, Health Net took a suspen-sive appeal on December 6, 2005;[148] sus-pensive appeal bonds were filed on December 19, 2005.[149] An appeal order was signed on February 2, 2006.[150]
On June 11, 2007, more than 18 months after rendering of judgment, Health Net filed in the appellate court a motion for remand, citing, among other grounds, the district judge’s failure to issue reasons for judgment despite Health Net’s written requests that she do so.[151] Finding violations of La. C.C.P. art. 1917[152] and 1812,[153] *569 1 -athe court of appeal on July 10, 2007 ordered the matter remanded to the district court for the limited purpose of obtaining the district court’s written findings of fact and reasons for judgment.[154] In a detailed, multi-page order, the ad hoc panel ordered the district court to supply written findings of fact and reasons for judgment, supported by citations to pertinent constitutional provisions, law and/or jurisprudence, and citations to the record. In addition, the court of appeal ordered the district court to address in its reasons fourteen (14) specific issues, and ordered this determination to |74be made in thirty (30) days.[155]
Pursuant to a request by the district judge, the court of appeal granted a ten-day extension of time to comply with the court of appeal’s remand order.[156] According to the court of appeal, the district judge also requested guidance as to whether the district court had “to maintain its original reasons for granting the judgment notwithstanding the verdict with respect to the allocation of fault and reduction of the punitive damage award, or may it also consider the reasons adduced having reviewed all exhibits and evidence transmitted by the Court of Appeal?”[157] The court of appeal responded that its order was “clear and unambiguous, and speaks for *570 itself.”[158] Thereafter, the district judge filed “Written Reasons for Judgment” in the district court on August 22, 2007 and, the next week, filed “Reasons for Judgment, Part II.”
We note at this juncture the court of appeal correctly determined a timely request for written reasons for judgment and findings of fact had been made by Health Net. By the clear and unambiguous terms of the codal article, a request for written reasons pursuant to La. C.C.P. art. 1917 is timely, “provided the request is made not later than ten days after the mailing of the notice of the signing of the judgment.” Consequently, Health Net’s first request for written reasons, filed July 26, 2005, before final judgment was rendered, was not premature. Health Net’s second request for written reasons, filed November 10, 2005, was filed within the time limitation provided by the codal article. In addition, the record shows the district court was not 1 ^divested of jurisdiction at that time under La. C.C.P. art. 2088.[159]
We note also the court of appeal correctly remanded the matter to the district court to obtain the district court’s written reasons and findings of fact. The courts of appeal are in agreement the proper remedy for a trial court’s failure to provide written reasons for judgment, when a timely written request to provide reasons has been filed, is by writ or a motion for remand.[160]
While the court of appeal employed the proper procedure to obtain the district court’s written reasons for judgment and findings of fact, we find, under the facts of this case, the scope of the appellate court’s remand order was unrealistic, at best, and at the worst, abusive. We base this conclusion on considerations of the proper scope of a limited remand for written reasons and fact findings, the passage of time, the considerable complexity of the issues in this matter, the brevity of the time allowed, and the extensiveness of the record.
The remand order requested reasons for fourteen (14) specific issues. For each issue, the court of appeal specifically requested the supporting factual findings, including citations to pages in the record, and pertinent constitutional provisions, law and/or jurisprudence that controlled.[161] Although the exhibits of the trial were also remanded to the district court for the district judge’s use in responding to the remand order, there is no indication the district judge had available to her the voluminous procedural record or the multi-volume transcripts which comprise the ree- *571 ord on 17fiappeal.[162] Nevertheless, the court of appeal remarked on the absence of record citation to support the district court’s written reasons, even though most district court reasons for judgment do not contain this documentation. In effect, the appellate panel requested the district court to perform the review of the record and law which the court of appeal was tasked to do.
In this case, we find the passage of time, complexity of the issues involved, brevity of the time for remand, and extensiveness of the record could not help but combine to affect the district court’s ability to comply with the remand order. In her Reasons for Judgment, the district judge acknowledged the herculean task assigned to her and her efforts to comply with the court of appeal’s requests within the time allowed:
... this court has labored arduously for the last few weeks, together with its staff, to reconstruct facts from a ten-day trial which occurred more than two years ago, after two years of motion practice.
Nonetheless, the court has now reviewed hundreds of documents and exhibits, has read transcripts, briefs, and memoranda in a painstakingly, though belated, effort to comply with the order of the court of appeal, and its own obligation to render justice for the litigants, counsel and the public at large, all while maintaining its ambitious docket, its public, administrative, and quasi-judicial functions. Resultantly, any errors or omissions should be viewed in that context and under those constraints.[163]
To put the district court’s task into perspective, the appellate panel took approximately two and a half years and 413 pages (on the tort issues) and 13 pages (on the contractual issue) to do what it ordered the district judge to do in 40 days. We know from our own familiarity with this extensive record, and the complexity of the issues presented, the task set by the court of appeal in its remand order was unrealistic 177at best.[164]
The appellate panel failed to take into account the considerations described here or to view the district court’s written reasons “in that context and under those constraints.” [165] Rather, the court of appeal noted discrepancies between the record, to which the district court may not have had access in developing her belated written reasons, and found additional error on those grounds. Disappointed with the district judge’s efforts to comply with its demands to extensively articulate the legal theories and evidentiary facts supporting its two-year old judgment, the appellate panel concluded the basis for appellate review had been impaired and the district court’s factual findings had been interdicted.[166] On this basis, the appellate court found the review standard for this matter should be de novo.[167]
*572 The problem with the appellate panel’s conclusion is that it “fail[s] to take into account the well-settled rule that the district court’s oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment.” Bollará v. American Cent Ins. Co., 2007-1335 p. 25 (La.4/18/08), 980 So.2d 654, 671; Greater New Orleans Expressway Commission v. Olivier, 2002-2795 p. 3 (La.11/18/03), 860 So.2d 22, 24 (“Appeals are taken from the judgment, not the written reasons for judgment.”); La. C.C.P. arts. 1918, 2082 and 2083. Judgments are often upheld on appeal for reasons different than those assigned by the district judges. “The written reasons for judgment are merely an explication of the trial court’s determinations. They do not alter, amend, or affect the final [ 7¿judgment being appealed.... ” State in the Interest of Mason, 356 So.2d 530, 532 (La.App. 1 Cir. 1977).
When the district court failed to provide •written reasons for judgment despite a timely filed motion requesting written reasons, the court of appeal properly ordered the district court to provide its reasons. Having obtained the district court’s reasons, the court of appeal was entitled to use those reasons to gain insight into the district court’s judgment. Although the written reasons may, or may not, have been helpful in that regard, the job of the appellate court was to review the district court’s judgment, not its reasons for judgment. We find the court of appeal in this case improperly based its decision to conduct a de novo review of the record on the district court’s belated written reasons for judgment instead of reviewing the district court’s judgment.

Errors of Law

The appellate court found error in the jury instructions provided by the district judge to the jurors who were the finders of fact on the tort claims of the Texas Receiver. As previously stated, the appellate court also found the district court’s written reasons for judgment failed to provide the constitutional or jurisprudential bases for its decision. Based on these two findings, the appellate panel found it reasonable to infer that the district judge used the same Texas law which the ad hoc panel found erroneous in the jury instructions to make her decisions on the claims of the Louisiana and Oklahoma Receivers. Specifically, the court of appeal concluded the factual conclusions of the district judge on the issues of fiduciary duty and fraud were interdicted, necessitating de novo review.[168] Because we find no prejudicial error in the jury instructions in this opinion, we find no merit to the court of appeal’s | ^conclusion in this regard.

Recap-the District Judge’s Judgment

After reviewing the three grounds which the court of appeal relied upon for its de novo review with regard to the district judge’s judgment, we find no support in the law or the record for the court of appeal’s determination that the tort claims of the Louisiana and Oklahoma should be reviewed de novo. In this regard, the holding of the court of appeal is reversed.
REVIEW OF THE JURY’S VERDICT — THE TORT CLAIMS OF THE TEXAS RECEIVER
The tort claims of the Texas Receiver were tried to a jury and the jury found in favor of the Texas Receiver on all of the tort causes of action. The jury assessed Health Net’s fault as 85% of the damages suffered, and awarded both compensatory *573 and exemplary damages. The district court granted Health Net’s motion for JNOV, reducing the percentage of Health Net’s fault by 15% and reducing the amount of exemplary damages by 30%. On appeal, Health Net raised several assignments of error challenging the underlying jury verdict in the Texas case. Health Net urged both that the district judge erred in failing to give certain of its proposed jury instructions and that the jury instructions which were given were legally erroneous or incomplete. The court of appeal agreed with Health Net on both grounds.
After review of the entirety of the jury charge, the court of appeal concluded: “(1) the charges did not adequately provide correct principles of law as applied to the issues framed in the pleadings and the evidence, (2) the jury was not adequately guided in its deliberations, and (3) the jury instructions misled the jury to the extent that it was prevented from properly dispensing justice.” [169] These conclusions were based on the court of appeal’s finding of several separate instances of prejudicial l,c.nerror. Consequently, the court of appeal determined de novo review of the jury’s verdict was required.
A determination of the correctness of the court of appeal’s conclusion requires additional facts. The Case Management Order (“CMO”) for" the trial was orally amended several times as the parties were granted continuances. Throughout, the district judge urged the parties to work together to come to some agreement regarding the content and form of both the jury instructions and the interrogatories which would be submitted to the jury. However, the parties were unable to do so, until, with trial scheduled to begin on June 16, 2005, the district judge ordered both parties to submit written jury instructions which would be discussed on June 14, 2005. Health Net submitted 102 proposed special jury instructions on June 15, 2005 and thereafter supplemented this filing. The Texas Receiver submitted 23 proposed jury instructions.[170]
The district court informed counsel, before closing argument, of the interrogatories which would be submitted to the jury at the conclusion of the trial. However, the district judge did not tell counsel, before closing arguments, the content of the jury instructions which would be given. The district judge stated both sides had been tardy in filing their proposed instructions, but all proposed instructions had been considered in developing the jury charges. After the jury was charged and dismissed to begin its deliberations, Health Net placed specific objections on the record to some of the charges given and objections to the district court’s failure to use certain of its proposed instructions. The Texas Receiver objected to the absence of one proposed charge.
|s,La. C.C.P. art. 1792(B) requires a district judge to instruct the jury on the law applicable to the cause submitted to them. “The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate.” Adams v. Rhodia, Inc., 2007-2110 p. 5-6 (La.5/21/08), 983 So.2d 798, 804. Consider *574 ing the complexity and number of issues for the jury to decide in this case, the district judge determined from the outset she wanted to simplify the instructions and interrogatories for the jury’s consideration. The question here is whether the district judge adequately instructed the jury, as that concept has been defined by this court:
[ajdequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.
Adams, 2007-2110 p. 6, 983 So.2d at 804.
Generally, “the giving of an allegedly erroneous jury instruction will not constitute grounds for reversal unless the instruction is erroneous and the complaining party has been injured or prejudiced thereby.” Rosell, 549 So.2d at 849. In fact, Louisiana jurispnidence is well established that a reviewing court must exercise great restraint before it reverses a jury verdict due to an erroneous jury instruction. Adams, 2007-2110 p. 6, 983 So.2d at 804; Nicholas, 1999-2522 p.8, 765 So.2d at 1023. We have previously explained the following basis for this rule of law:
[t]rial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and |R?be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.
Adams, 2007-2110 p. 6, 983 So.2d at 804; see also Nicholas, 1999-2522 p. 8, 765 So.2d at 1023. When a reviewing court finds the jury was erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Adams, 2007-2110 p. 6, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
In order to determine whether an erroneous jury instruction was given, reviewing courts must assess the targeted portion of the instruction in the context of the entire jury charge “to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its determination.” Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849. The ultimate inquiry on appeal is whether the jury instructions misled the jury to such an extent that the jurors were prevented from dispensing justice. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p.8, 765 So.2d at 1023.
The law is clear the review function is not complete once error is found. Prejudice to the complaining party cannot automatically be assumed from the mere fact of an error. Instead, the reviewing court must then compare the degree of the error with the adequacy of the jury instructions as a whole and the circumstances of the case. As we found in Adams:
*575 the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge’s instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the [ ^gravity or degree of error and considering the instructions as a whole and the circumstances of the case.
Id., 2007-2110 p. 7-8, 983 So.2d at 805.
With this standard of review in mind, we examine the court of appeal’s determination of prejudicial error.

Timeliness of proposed jury instructions

The court of appeal first found the district judge committed prejudicial error in ruling the proposed jury instructions submitted by the parties were untimely under La. C.C.P. art. 1793(A).[171] To the contrary, we find no prejudicial error whatsoever occurred in this respect. In fact, we find the district judge’s ruling regarding the timeliness of the filing of Health Net’s proposed jury instructions to be inconsequential, i.e. literally without consequence, within the context of this case. The district judge was under no obligation to give any specific jury instructions which were submitted by either party. Adams, 2007-2110 p. 6, 983 So.2d at 804. The district judge’s only obligation in this regard was to correctly charge the jury on the applicable law. Id.; see also La. C.C.P. art. 1792(B).[172] In making her determination as to the appropriate law upon which to instruct the jury, the district judge acted within her discretion to incorporate or disregard the specific instructions proposed by either party. The court of appeal was accurate in describing the record as less than clear as to the exact deadline for filing the parties’ proposed jury instructions, possibly due to the oral amendments to the CMO and the press of business prior to trial. However, despite the district judge’s finding that both parties were untimely in their proposed jury instruction submissions, she nevertheless considered them in ^assembling the jury charge.[173] Our review of the jury instructions shows the district judge used many of the parties’ proposed instructions in assembling the charge provided to the jury. Since Health Net obtained the district judge’s consideration of its proposed jury instructions, the most it could have achieved in this regard, the district judge’s ruling that the parties’ proposed jury instructions were untimely had no ultimate affect on the substance of the charges subsequently presented to the jury.

Jury instructions and jury interrogatories

The court of appeal found the district judge committed prejudicial error in fail *576 ing to inform the parties, within a reasonable time before closing arguments, of the content of the instructions she intended to give to the jury, in violation of La. C.C.P. art. 1793(B).[174] We note this provision is similar to La. C.C.P. art. 1812(B), which requires a trial court to inform the parties, within a reasonable time before closing argument, of the special verdict form and instructions, where applicable.[175]
LsThe district court held a charge conference outside of the jury’s presence after the submission of all of the evidence to the jury, and discussed with counsel their proposed special interrogatories and objections thereto.[176] Finding the pro- *577 posed interrogatories of both parties to be untimely, and the parties unable to reach any type of agreement as to form or content, the district court drafted the jury interrogatories |snitse]f.[177] In order to prevent error and juror confusion, the district judge used as a basis for her jury interrogatories the language of La. C.C.P. art. 1812. Before closing argument, the district court read to counsel the interrogatories which would be presented to the jury. Counsel for both parties were allowed to express objections on the record.[178] Thus, the record reflects the district judge fully complied with the provisions of La. C.C.P. art. 1812(B), informing the parties within a reasonable time before their closing argument of the special jury interrogatories, and allowed the parties to record their objections.
With regard to the codal requirements on jury instructions, however, the district court’s actions fell short of compliance. The district judge informed counsel she would not use the entirety of the proposed jury instructions of either of the parties, although she had considered them. The district judge found the proposed instructions from both parties to be untimely and in some instances to contain incorrect statements of the law. While the district court told counsel generally the nature of the charge she would give, the district court ordered counsel to proceed with closing arguments without giving them an indication of the precise content of the final jury instructions.[179] We agree with the court of appeal this lack of compliance with La. C.C.P. art. 1793(B) was error.
187This finding of error, however, does not end our analysis. Nor should the mere discovery of an error lead inexorably to the automatic conclusion the error was prejudicial and de novo review of the record is required. Instead, a reviewing court must take one further step and examine the nature of the error and the resulting prejudice to the complaining party within the specific circumstances of the case. Adams, 2007-2110 p. 8, 983 So.2d at 805; Rosell, 549 So.2d at 849.
Here, the error is not found within the jury instructions given, or the failure to give a certain instruction, but in the violation of a codal provision regarding the *578 parties’ right to know which charges are to be given to the jury before presenting argument. However, we find this distinction does not change the Adams analysis: “On appellate review of a jury trial the mere discovery of an error in [or about the manner of] the judge’s instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the ease.” Id., 2007-2110 p. 7-8, 983 So.2d at 805.
We can conceive of three ways a party might be prejudiced in this circumstance. First, counsel would be unable to tailor closing arguments to conform to the jury instructions given by the court. We find no such prejudice was suffered by Health Net in this case. Despite the fact counsel did not know the specific contents of the court’s ultimate instruction to the jury, counsel for Health Net delivered a comprehensive presentation of its case for the jury’s consideration, comprising almost 30 pages of transcript in the record.[180]
The other two ways prejudice could result from a litigant having to present closing arguments without knowledge of the contents of the jury instructions are: (1) Isscounsel would not be permitted to object to the court’s failure to include certain instructions in the charge, and (2) counsel would not be able to object to perceived errors in the instructions before the jury heard them. When objections to jury charges are considered before closing argument, and are found valid, a district court may avoid error by either including the valid but omitted instruction, or by amending the court’s charge to exclude an erroneous charge.
In this case, counsel for Health Net placed objections on the record before the closing arguments, even in the absence of knowing what the court’s precise charge would be. However, the district court interrupted these objections in order to proceed with the trial.[181] After the court instructed the jury, counsel for Health Net placed its objections on the record.[182] Further objections were raised by Health Net on appeal.
An analysis of the possible prejudice to Health Net in this regard necessarily involves an analysis of the appropriateness of the jury instructions as a whole, as to those instructions actually given and those urged by Health Net which the district court failed to include in the jury charge. The court of appeal found the district court’s failure to provide instruction on three concepts, two raised by Health Net and one raised by the appellate panel sua sponte, was prejudicial error. The court of appeal additionally found prejudicial error in several of the jury instructions actually given. We will review these findings separately, as they were separately discussed by the court of appeal as additional findings of prejudicial error.

Failure to give certain jury instructions

The court of appeal found the district court’s failure to instruct the jury on these three legal issues constituted prejudicial error: (1) sham sale (raised by appellate Isspanel); (2) single business entity; and (3) certain provisions of Texas law.[183] Each of these will be examined to determine whether the district court’s failure to *579 instruct on these concepts resulted in prejudicial error to Health Net.

1. Sham Sale

The court of appeal held: “... the factual issue of whether the Stock Purchase Agreement executed by Health Net and AmCareco on November 4, 1998 is a sham is one of the most important factual issues in this case.”[184] We disagree. We find nothing from our review of the record to support this statement or belief. Moreover, we find this statement indicative of the court of appeal’s comprehensive failure to understand the facts at issue in, or within the context of, the tort causes of action. Far from being one of the most important facts at issue in this matter, we find the concept of a sham sale was so immaterial to the parties’ positions that neither party submitted a proposed jury instruction on the issue, despite the fact that a total of 124 jury instructions were proposed by the parties.[185] The court of appeal acknowledged the failure of the parties to raise this issue in their proposed charges, but nevertheless found the concept to be controlling.[186]
This case presented two very different interpretations of essentially undisputed factual events and documents. But from both parties’ perspective, ownership of the HMOs changed through a sale transaction. The Texas Receiver argued the facts and documents proved the sale was accomplished through conspiracy, breaches of fiduciary duty, fraud and deceptive practices. Health Net argued the facts proved lannormal business transactions. What the court of appeal missed was that the consummation of the sale of the HMOs was the object of the conspiracy alleged and the reason, or goal, for which the alleged fraud, deceptive practices and breaches of duty occurred.
In context, the concept of the sale being a “sham” was used in the illustrative sense in a brief comment by one of the Receivers’ expert witnesses in order to underscore the relative inequity of the sale transaction between Health Net and Am-Careco, and as evidence of the scheme by which Health Net divested itself of ownership responsibilities while improperly siphoning out the money in the HMOs.[187] Both parties at trial understood the very limited testimony and argument regarding the “sham” aspect of the sale to have been an illustrative term, and not a legal one requiring a jury instruction.
The court of appeal’s erroneous focus on the non-issue of the sale’s validity led the appellate panel into further error which must be mentioned here. The court of appeal unnecessarily found the validity of the unchallenged Stock Purchase Agreement was “critical to determining the obligations of the parties.”[188] For the court of appeal, then, the fact that Health Net and AmCareco designated Delaware law as controlling with regard to the SPA had implications far beyond the sale contract *580 itself. To the contrary, we find there were no disputed contractual issues between Health Net and AmCareco which needed to be determined at trial. Nevertheless, the court of appeal’s assessment that Delaware law was controlling in the SPA led the appellate panel to repudiate the testimony of Philip Preis, one of the | fl1 Receivers’ expert witnesses, because Preis had not considered the issues under Delaware law. The court of appeal refused to consider Preis’ expert opinion, despite the fact no evidence was presented that Delaware law required a different result.
To confect this alleged error regarding “sham sale,” the court of appeal claimed to rely on several of Health Net’s proposed instructions and an appellate assignment of error. However, our review shows the appellate court’s reliance is misplaced. None of these stated sources legitimately raise this concept as an issue. Nor do we find the evidence adduced at trial fairly raised this concept as a factual issue which would necessitate a legal instruction. Thus, we find no error in the district court’s failure to instruct the jury on the concept of a “sham sale.”[189]

2. Single Business Enterprise

On appeal, Health Net argued the district court failed to instruct the jurors they could consider the three HMOs and their parent, AmCareco, to be a “single business enterprise” (“SBE”). This, Health Net contends, would have allowed the jurors to consider the assets of AmCa-reco as part of the assets of the HMOs and would have led the jurors to conclude the HMOs were not out of statutory and regulatory compliance after the sale. From there, Health Net asserts there would have been insufficient evidence to support a jury finding of Health Net causing any damage to the HMOs through the sale.
The court of appeal agreed, finding the existence or absence of an SBE instruction to be relevant in connection with the concept of the sham sale. The court of appeal framed the trial issues, which may have been impacted by an SBE instruction, in the following manner:
|ci3SimplistieaIly, the Receivers want to use the SBE doctrine to make Health Net vicariously liable for any torts committed by AmCareco and the three HMOs, and Health Net wants to use it to show that collectively AmCareco and the three HMOs were solvent and initially met regulatory financial requirements. SBE also was asserted as relevant to maximize the number of persons to whom fault had to be individually allocated.[190]
After an extensive discussion of the SBE doctrine under Texas law, the court of appeal concluded there was sufficient evidence presented at trial to require a jury instruction on this issue.[191] Consequently, the appellate court found the absence of such an instruction was prejudicial error.
We must again point out the failure of the court of appeal to complete its appellate analysis. Finding there was sufficient evidence to necessitate an instruction on disregarding the corporate form, the court of appeal concluded the district court’s failure to so instruct was an error. Without *581 further discussion or analysis, the court of appeal found this error was prejudicial, affected the Texas jury verdict, and justified its de novo review of the issues.[192]
We find it necessary to correct the appellate court’s appreciation of the law with regard to prejudicial error. Even assuming the district court erred in failing to give an instruction, the mere discovery of an error does not, of itself, automatically equate with prejudice, nor does the mere discovery of an error justify an appellate court’s de novo review. Instead, to complete the analysis on appellate review, an appellate court must measure the gravity or degree of the error, and consider the entire instructions and the circumstances of the case. Adams, 2007-2110 p. 7-8, 983 So.2d at 805.
In this court, the Texas Receiver points out Texas law does not recognize the 193doctrine of SBE, and asserts none of its claims assert a cause of action which depends upon the jury ignoring the corporate form, and treating any one company as a mere alter ego of another, or treating any group of companies as a unit. Health Net disputes this contention, arguing each of the Texas Receiver’s claims seek, in part, to impose liability on Health Net based on its status as a controlling shareholder in AmCareco after the sale of the HMOs. Thus, Health Net claims, proper instruction on the SBE doctrine was essential for the jury to properly address this aspect of the Texas Receiver’s claims.
Technically, there is no SBE doctrine under Texas law; the Texas Supreme Court explicitly stated its rejection of the doctrine one month before the court of appeal handed down its opinion in this case. See SSP Partners v. Gladstrong Investments (USA) Corporation, 275 S.W.3d 444, 456 (Tex.2008). The fact Texas law had never endorsed the SBE doctrine was correctly pointed out in the cases analyzed by the court below in its discussion,[193] and the court of appeal here properly concluded the concept of “alter ego,” and not SBE, is the proper theory under Texas law for disregarding the existence of the corporate form.[194] Strictly speaking, the district court did not err in failing to include Health Net’s requested jury instruction in this regard since a charge on SBE would have been an incorrect statement of the applicable law.
Even under an expansive understanding of the requested charge, i.e. that some |94charge was requested with regard to when the existence of the corporate forms could be disregarded, we find the district court’s failure to include such an instruction did not constitute prejudicial *582 error which justified the court of appeal’s de novo review. Considering the evidence presented at trial, we find there is sufficient evidence to support the finding that Health Net was liable for its own actions prior to the sale of the HMOs. Whether Health Net could additionally be held liable for AmCareco’s actions post-sale, as one of its shareholders, is unnecessary to our analysis as will be discussed infra.
Insofar as Health Net sought an SBE-type instruction to bolster its argument that the assets of AmCareco should have been considered in determining the statutory capital compliance of the HMOs immediately after the sale, we again find the requested instruction was properly refused by the district court. The expert testimony at trial was undisputed that the shifting of assets between and among the regulated insurance companies and the unregulated parent company and management company was contrary to the statutes and regulations in each of the states where the HMOs conducted business, as well as to the applicable accounting principles used to determine the statutory minimum capital requirements.[195] Thus, in this regard, the requested instruction was contrary to the applicable law.[196]
|3Sff. Tex. Bus. Corp. Act AH. 2.21
Health Net claimed on appeal the district judge erred in failing to instruct the jury on the statutory provisions of former Tex. Bus. Corp. Act art. 2.21. The court of appeal agreed.[197] Since the trial, former Article 2.21 of the Texas Business Corporation Act was recodified and is currently located at Section 21.223 of the Texas For-Profit Corporation Law.[198] The former statute provided:
Art. 2.21. Liability of Subscribers and Shareholders
A. A holder of shares, an owner of any beneficial interest in shares, or a sub *583 scriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:
(1) such shares other than the obligation, if any, of such person to pay to the corporation the full amount of the consideration, fixed in compliance with Article 2.15 of this Act, for which such shares were or are to be issued;
(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate; or
(3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including without limitation: (a) the failure to comply with any requirement of this Act or of the articles of incorporation or bylaws of the corporation; or (b) the failure to observe any requirement prescribed by this Act or by the articles of incorporation or bylaws for acts to be taken by the | ^corporation, its board of directors, or its shareholders.
B.The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise, except that nothing contained in this article shall limit the obligation of a holder, owner, subscriber, or affiliate to an obli-gee of the corporation when:
(1) the holder, owner, subscriber, or affiliate has expressly assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation; or
(2) the holder, owner, subscriber, or affiliate is otherwise liable to the obligee for the obligation under this Act or another applicable statute.
C. Any person becoming an assignee or transferee of certificated shares or of uncertificated shares or of a subscription for shares in good faith and without knowledge or notice that the full consideration therefore has not been paid shall not be personally liable to the corporation or its creditors for any unpaid portion of such consideration.
D. An executor, administrator, conservator, guardian, trustee, assignee for the benefit of creditors, or receiver shall not be personally liable as a holder of or subscriber to shares of a corporation, but the estate and funds in his hands shall be so liable.
E. No pledgee or other holder of shares as collateral security shall be personally liable as a shareholder.
Under Texas law, former Art. 2.21 “provide[d] the exclusive method for piercing the corporate veil in Texas.” Kingston v. Helm, 82 S.W.3d 755, 764 (Tex.App.Corpus Christi 2002). The very terms of the statute limited its application “to suits which attempt to impose individual liability on a corporate shareholder not on the basis of the shareholder’s own actions, but rather on the basis of the shareholder’s mere status as shareholder.” Kingston, 82 S.W.3d at 765 (emphasis in original). *584 Even though the statute limits its applicability to contract matters, “the Bar Committee notes indicate that the statute should be applied ‘by analogy to tort obligations.’ ” Kingston, 82 S.W.3d at 766; Dick’s Last Resort of West End, Inc. v. Market/Ross, Ltd., 273 S.W.3d 905, 908 (Tex.App.-Dall.2008).[199] Former Art. 2.21 only applies where a plaintiff seeks to disregard a corporation’s existence and to hold another entity, its shareholders, responsible for the corporation’s conduct. Dick’s Last Resort, 273 S.W.3d at 908.
In this case, Health Net was the 100% shareholder and owner of the HMOs before their sale to AmCareco. After the sale of the HMOs, Health Net was a 47% shareholder in AmCareco, which owned 100% of the HMOs’ shares. Thus, to hold Health Net responsible for its status as a shareholder, the Receivers would have to have sought to hold Health Net liable for the actions of the HMOs before the sale, and AmCareco after the sale. We will discuss the applicability of this statute to both situations.
For the time period before the sale of the HMOs, when Health Net was their 100% shareholder, we find the Receivers’ sought to hold Health Net liable for tortious actions, not based on its status as a shareholder in the HMOs or for the actions of the HMOs themselves, but for its own actions. In fact, the HMOs were the alleged victims of the complained-of tortious conduct. Consequently, we hold this statute was inapplicable to the Receivers’ claims against Health Net for the time period before the sale of the HMOs. The district court did not err in failing to instruct the jury of the statute’s provisions in this regard.
For the time period after the sale, we are aware the Receivers’ arguments focused on whether Health Net was a controlling shareholder in AmCareco, despite Health Net’s minority ownership of AmCa-reco shares. However, to the extent the Receivers sought to hold Health Net liable as a shareholder in AmCareco for | ;)SAmCareco’s actions after the sale of the HMOs, we find no need to express an opinion. Since we find, infra, that there was sufficient evidence to support the factual finding of Health Net’s liability for its own actions occurring before the sale of the HMOs, there is no need for this court to determine whether Health Net could have been additionally liable for its actions post-sale under its subsequent and separate status as a shareholder in AmCareco.
We hold that Health Net is not prejudiced by our decision to limit review of the jury instructions and their application to its pre-sale actions only. Considering the evidence, and as will be discussed further in other sections of this opinion, we do not believe the judge or jury could find Health Net liable for conspiracy and the substantive tortious conduct asserted against Health Net post-sale, without also finding Health Net liable for its own pre-sale actions. Thus, even if the district court should have included the provisions of this statute in its jury instructions for the Receivers’ claims against Health Net post-sale, we hold any error in the district court’s omission cannot rise to the level of prejudicial error under the circumstances of this case. See Adams, 2007-2110 p. 7-8, 983 So.2d at 805.
A Superseding cause
Although the court of appeal opinion also discussed, and found prejudicial *585 error in, the trial judge’s failure to issue an instruction on “superseding cause,” that specific ground is not included in the court of appeal’s recapitulation of prejudicial error affecting the jury verdict. Compare Wooley II, p. 116, 14 So.3d at 401 with Wooley II, p. 172-173, 14 So.3d at 434-435. Nevertheless, we find no error in the district court’s failure to include a jury charge on “superseding cause.” “Superseding cause” and “new and independent cause” are sometimes used interchangeably. Rodriguez v. Moerbe, 963 S.W.2d 808, 820 n. 11 (Tex.App.-San Antonio 1998), citing Forth Worth & D.C. Ry. Co. v. Westrup, 285 S.W. 1053, 1054 (Tex.Comm.App.1926). Under Texas law, a “superseding cause” is defined as “the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys .the causal connection, if any, between the act or omission inquired about and the occurrence in question.” Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex.2009), citing Dew v. Crown Derrick Erectors, Inc., 208 S.W.3d 448, 450-451 (Tex.2006) and Dillard v. Tex. Elec. Coop., 157 S.W.3d 429, 432 n. 3 (Tex.2005).
In this case, whether the mismanagement of AmCareeo, the intervening acts raised by Health Net, was foreseeable or unforeseeable, we find the result would be the same. The intervention of an unforeseen cause of injury does not necessarily mean there is a new and independent cause, or superseding cause, that will relieve a defendant from liability. “If the chain of causation is continuous or unbroken, even an unforeseeable intervening cause may be a concurring cause of the injury.... An intervening cause that was set in motion by the original wrongdoer can never be deemed to supersede the original act.” Rodriguez, 963 S.W.2d at 821 (citation omitted). Likewise, “if the act or omission alleged to have been a new and independent cause is reasonably foreseeable at the time of the defendant’s alleged negligence, the new act or omission is a concurring cause as opposed to a superseding or new and independent cause.” Hawley, 284 S.W.3d at 857. “A new and independent cause alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant’s allegedly negligent act or omission.” Id.
Here, we find the intervening acts raised by Health Net, ie. the 1 mnmismanagement of AmCareeo, were not superseding in nature. The financially-distressed conditions of the HMOs were created by Health Net’s initial wrongdoing and continued to contribute to the resulting injuries to the HMOs. While the mismanagement of AmCareeo may have been a “concurring” cause of the damages, it was not a “superseding” cause. Under these circumstances, the district court’s causation instruction was broad enough to encompass the question of concurring causes or more than one proximate cause of the damages.[200]
Finding no prejudicial error in the district court’s failure to instruct the jury on the three legal concepts of sham sale, single business enterprise and the provisions of Tex. Bus. Corp. Act Ann. art. 2.21, or in failing to instruct the jury on superseding cause, we reverse the court of appeal’s determination that these alleged errors justified de novo review of the record.

Alleged error in the jury instructions

Health Net claimed error in all of the jury charges on the substantive claims. *586 The court of appeal agreed, finding specifically: [201] (1) the facts presented at trial regarding breach of fiduciary duty required a more precise charge, with alternative interrogatories; [202] (2) the instruction given on fraud was “fatally flawed;”[203] (3) as a matter of law, the Texas statute on unfair or deceptive practices did not apply to Health Net,[204] and if it did, a more precise instruction was necessary; [205] and (4) the charge on conspiracy failed to instruct on specific intent, and this common law tort hmwas preempted by statute.[206] We will review each of these asserted errors to determine the correctness of the appellate court’s findings.

1. Breach of Fiduciary Duty

Health Net argues it had no fiduciary duties to the HMOs either before or after the sale. The court of appeal ultimately agreed. In reaching its conclusion, the appellate court made several legal findings, some of which will be discussed in our own analysis of this issue.
The court of appeal undertook a lengthy analysis of the law to determine whether Health Net owed fiduciary duties as owner and shareholder of the HMOs before their sale, or as a shareholder in AmCareco after the sale of the HMOs.[207] The court of appeal concluded its analysis by holding the common law cause of action for breach of fiduciary duty alleged against Health Net as a shareholder in either capacity (sole owner or minority shareholder) was preempted by Tex. Bus. Corp. Act art. 2.21. Under that statute, the ad hoc panel found the only duty Health Net owed as a shareholder was the duty not to commit actual fraud. The court of appeal found no special duty which Health Net owed to its wholly-owned subsidiary corporations due to the fact that they were HMOs.
After its examination of the common law, the appellate court reviewed statutory law. The court of appeal found a cause of action under Tex. Ins.Code § 843.401 was not preempted by Art. 2.21. However, the appellate court held the failure of the trial court to instruct the jury on the provisions of Art. 2.21 or Tex. Ins.Code § 843.401 was prejudicial error. We will examine that holding to determine its correctness.
Under Texas law, corporate officers and directors owe a strict fiduciary |^obligation to their corporation. International Bankers Life Insurance Company v. Holloway, 368 S.W.2d 567, 576 (Tex.1963); Landon v. S & H Marketing Group, Inc., 82 S.W.3d 666, 672 (Tex.App.Eastland 2002). “Three broad duties stem from the fiduciary status of corporate officers and directors: namely the duties of obedience, loyalty, and due care.” Landon, 82 S.W.3d at 672.
The trial court instructed the jury with this definition of a fiduciary duty:
Fiduciary duty means that as fiduciaries directors, officers, and controlling shareholders must act with the highest degree of loyalty, care, trust, and allegiance toward the corporation and, when the corporation is insolvent, toward the corporation’s creditors and potential creditors.[208]
*587 The jury was also instructed about the duties of officers, directors and controlling or dominant shareholders of a corporation.[209] In addition, fiduciary duty was mentioned 1in3in connection with the definition of malice.[210]
In order to determine whether a fiduciary duty was owed by Health Net, it is important to focus on the precise corporate entities and the circumstances of this case.

a. Common directors/officers

Health Net, before the sale of the HMOs, was the parent corporation of the wholly-owned subsidiary HMOs. Several of the officers and directors of Health Net served as officers and directors of the HMOs. Jay Gellert, the Health Net CEO and president, was also on the board of directors of Health Net’s three subsidiary HMOs. Michael Jansen, a Health Net vice-president, its assistant general counsel and assistant secretary, was also the secretary of the three HMOs. Brian Crary, Health Net’s Chief Financial Officer (“CFO”) for Health Net’s Western Division, was also the CFO for the three HMOs.[211]
In transactions between boards having common members, the burden is *588 upon those who would maintain the transactions to show its entire fairness and a fair price. See Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 600, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921); Crook v. Williams Drug Co., Inc., 558 S.W.2d 500, 506 (Tex.Civ.App.-Tyler 1977), writ refused n.r.e. However, the parties to the sale of the |in4HMOs were Health Net and AmCa-reco. The HMOs, as corporate entities, were not parties to the sale transaction but were, in fact, its object. Any fiduciary duty from which an obligation of fair dealing and a fair price would arise in a sale transaction where there are common officers or directors is not relevant to the fact situation presented here. The officers and directors of Health Net were not on opposite sides of the sale transaction from the officers and directors of the HMOs. Consequently, the fact that there were common officers or directors between the parent corporation and its subsidiary corporations does not give rise to a fiduciary duty to ensure the sale transaction was entirely fair or that there was adequate consideration.

b. Tex. Bus. Corp. Act Art. 2.21

For the time period before the sale, when Health Net was the owner and 100% shareholder of the HMOs, we find we are not constrained in our examination of tortious conduct to consider only actual fraud by operation of Tex. Bus. Corp. Act art. 2.21.[212] As we have already stated, that statute is applicable only to a situation where a party is seeking to hold a shareholder liable for its status as shareholder for the actions of the corporation. Here, the Receivers are not seeking to pierce the corporate veil in order to hold Health Net liable for the actions of the HMOs. Here, the HMOs, as corporate entities, did not act; the parties to the sale transaction were Health Net and AmCareco. The court of appeal erred in its holding in this regard.
c. Parent/subsidiary relationship
Health Net argued, and the court of appeal found, that Health Net, as the parent corporation, owed no fiduciary duties to its wholly-owned subsidiaries.[213] In support of this proposition, the ad hoc panel included a lengthy passage from VFB LLC v. Campbell Soup Co., 482 F.3d 624, 634-35 (3rd Cir.2007), which held there would be no sense to impose a fiduciary duty on the director of a solvent, wholly owned subsidiary to be loyal to the subsidiary itself, and against the parent company, since the only substantive interest to be protected is that of the parent.[214] Other cases relied on by the court of appeal for this premise are TrenwicJc America Litigation Trust v. Ernst & Young, L.L.P., 906 A.2d 168, 173-174 (Del.Ch.2006), affirmed sub nom. Trenwick America Litigation Trust v. Billett, 931 A.2d 438 (Del.2007); Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171, 1174 (Del.1988); and Resolution Trust Corp. v. Bonner, 1993 WL 414679 (S.D.Tex.1993).
We find that the nature and extent of the fiduciary duty of a parent corporation *589 to its subsidiary generally depends upon the facts and circumstances in each case.[215] In this case, officers of Health Net participated in developing the sale strategy for the HMOs, and some of that same senior management served as officers/directors of the subsidiary corporations. Consequently, we feel the scope of the fiduciary duty of a subsidiary’s officers/directors requires our further review.
The immediate question which arises is whether the officers/directors of the subsidiary HMOs owed a fiduciary duty to the subsidiary corporation itself, or only to the parent corporation, the sole shareholder, in this parent/wholly-owned subsidiary relationship. All of the cases relied upon by the ad hoc panel are based on the reasoning found in Anadarko, supra. In Ana-darko, the Delaware Supreme Court was asked to resolve “whether a corporate parent and directors of a wholly-owned subsidiary owe fiduciary duties to the prospective stockholders of the subsidiary after | loathe parent declares its intention to spinoff the subsidiary.”[216] Within this context, the Supreme Court of Delaware stated that “in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.”[217] Later courts used this statement as authority for the proposition that a wholly-owned subsidiary’s director has only one fiduciary duty — to the parent corporation.
The Anadarko ruling has been criticized as having been extended beyond its original intent. In First American Corp. v. Al-Nahyan, 17 F.Supp.2d 10, 26 (D.D.C.1998), the federal district court restricted Anadarko’s statement to its narrow factual confines and rejected an interpretation which would result in a subsidiary’s directors owing no duties to the subsidiary itself.[218] First American held, instead, that “the directors of a wholly-owned subsidiary owe the corporation fiduciary duties, just as they would any other corporation.”[219] In accord is Collins v. Kohlberg and Company (In re Southwest Supermarkets, LLC), 376 B.R. 281, 283 (Bankr.D.Az.2007), where the federal bankruptcy court agreed Anadarko’s statement in this regard had been interpreted in an overly broad manner. Instead, the court there held Delaware law, at issue in Anadarko, would impose fiduciary duties on the officers and directors of ajj^wholly owned subsidiary that run directly to the subsidiary itself, and not only *590 to its sole shareholder.[220] In fact, the federal bankruptcy court found Anadarko’s extension beyond its facts would yield shocking results in certain circumstances.[221]
Subsequent holdings by Delaware courts have proved the accuracy of this re-interpretation. In Cochran v. Stifel Financial Corp., 2000 WL 286722 (Del.Ch.2000), aff'd in part and rev’ in part on other grounds, 809 A.2d 555 (Del.2002), the Delaware Chancery Court refused to find that an earlier arbitration action filed by a subsidiary corporation against one of its directors, which included a claim for breach of fiduciary duty, should be considered an action also filed by the parent corporation.[222] In its analysis, the Delaware Chancery court stated:
Our law has traditionally respected the separate existences of a parent corporation and its wholly-owned subsidiary, absent circumstances justifying veil piercing or the conclusion that the wholly-owned subsidiary was the parent’s agent.[223]
The Delaware Chancery court’s analysis makes clear the subsidiary corporation had a claim for breach of fiduciary duties from one of its directors which was separate and distinct from a claim of its parent corporation. In Williams v. McGreevey (In re Touch America Holdings, Inc.), 401 B.R. 107, 129 (Bankr.D.Del.2009), the federal bankruptcy court in Delaware noted the rejection of an overly-broad reading of Anadarko by later courts and held “the directors of a wholly-owned subsidiary owe fiduciary duties to both the subsidiary and to the sole shareholder, the parent corporation.” In Claybrook v. Morris (In re Scott Acquisition Corp.), 344 B.R. 283, 290 (Bankr.D.Del.2006), the federal bankruptcy court in Delaware also held that a director of a wholly-owned subsidiary owes fiduciary duties to the subsidiary corporation, even in insolvency. The only thing that changes in an insolvency situation is that the director will also owe a fiduciary duty to the subsidiary’s creditors, instead of its shareholders.
In trying to discern what the Texas courts would hold with regard to this issue, we are stymied by the absence of a clear analysis in that jurisdiction. Our research shows the Texas Supreme Court has not yet weighed in on the Anadarko decision. Although federal district courts and bank *591 ruptcy courts in Texas have cited to Anadarko, the rulings have either failed to specifically rule on the issue at hand or have applied the substantive law of states other than Texas.[224]
Considering the facts of this case, and in light of the subsequent interpretation of Anadarko by several courts, which limited its ruling to its facts, we believe the Texas court would hold a wholly-owned subsidiary’s directors owe a fiduciary duty to the subsidiary corporation itself, as well as to the parent corporation which owns 100% of its shares. In making this determination, we are aided by language in Trenwick, supra, which relied on Anadarko, yet described a situation very similar to the one presented here. In Trenwick, the Delaware Chancery Court held a subsidiary corporation’s board was “free to take action in aid of its parent’s business strategy” “[i]n the absence of any indication that they would be causing [the subsidiary corporation] to violate legal obligations owed to others.”[225] Trenwick observed that directors of a wholly-owned subsidiary’s board were entitled to follow the parent’s instruction “unless those instructions required the board to violate the legal rights of others.”[226] In its discussion whether a due care claim could be brought against the subsidiary’s directors who followed the parent’s instructions, the Trenwick court acknowledged an admittedly narrow factu *592 al circumstance where a subsidiary’s directors would owe a separate duty to the subsidiary itself, in addition to their fiduciary duty of loyalty to the parent corporation: “At most, one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefiting [sic] a parent corporation that they know will render the subsidiary unable to meet its legal obligations.” [227] The Trenwick court found |1inthe complaint there did not “plead facts supporting an inference that [the subsidiary corporation] was rendered insolvent by the challenged transaction, much less that the [subsidiary] board knew that was the case.” [228] Not only did the Receivers plead such a situation here, they presented sufficient evidence at trial to prove that this occurred.
Having found that a subsidiary’s director/officer has a fiduciary duty to the subsidiary corporation itself, even if wholly-owned, which is separate from their fiduciary duty to the parent corporation, we must apply that rule to the pre-sale situation here. Directors and officers of Health Net, the parent corporation, were also directors and officers of the subsidiary HMOs. Health Net’s senior management, which included the common directors/officers, participated in creating the scheme for divesting the subsidiary HMOs. Whatever the scope of the fiduciary duty owed by the HMOs’ directors/officers to the subsidiary corporations under Texas law, we hold it would be broad enough to encompass the duty to refrain from involvement in a conspiracy or scheme to mislead regulators in connection with a sale of the subsidiary HMOs which would strip them of assets reserved to pay future health care costs and which would leave the HMOs unable to meet the statutory and regulatory requirements in order for them to continue to do business in their respective states. Consequently, the HMOs’ directors/officers — Gellert, Jansen and Crary — breached their fiduciary duties to the subsidiary HMOs by not acting with the due care, trust and loyalty which their positions demanded. In helping to craft the strategy which swept out large amounts of the HMOs’ assets and left them unable to meet their legal obligations, Gellert, Jansen and Crary acted on behalf of Health Net, because the HMOs were not parties to the sale.[229] Health Net is liable for the actions of its directors and officers either vicariously or as the instigator of the civil conspiracy for |inwhich they acted. See Holloway v. Skinner, 898 S.W.2d 793, 795 (Tex.1995) (“Corporations, by their very nature, cannot function without human agents. As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation’s acts.”).

d. Statutory liability

Even if Health Net could not be found liable for a breach of fiduciary duty under the common law, the Texas Insurance Code provides for a specific fiduciary duty for those entrusted with the financial affairs of HMOs. Tex. Ins.Code Ann. § 843.401 states:
A director, officer, member, employee, or partner of a health maintenance organization who receives, collects, disburses, or invests funds in connection with the activities of the health maintenance organization is responsible for the *593 funds in a fiduciary relationship to the enrollees.
The court of appeal held this statute inapplicable as a means for finding Health Net vicariously liable for Gellert, as a director of the HMOs, and Jansen, as secretary of the HMOs, holding there was no evidence Gellert and Jansen engaged in the activities described in the statute.[230] While we find the court of appeal may have erred in interpreting the Texas statute too restrictively, we need not further analyze that issue because the court of appeal failed to consider the testimony regarding Brian Crary, the CFO for the HMOs. We cannot conceive of a circumstance where the chief financial officer of an HMO would not be considered an officer who “receives, collects, disburses, or invests funds in connection with the activities of the health maintenance organization.” We find Crary, at least, owed a fiduciary duty to the enrollees for the funds in the HMOs based upon this Texas statute. The evidence established that it was Crary who was most involved in the formulation of the sale ln2strategy on Health Net’s behalf. Consequently, we hold Health Net was vicariously liable through Crary for a fiduciary duty owed to the HMOs and their enrollees pursuant to this statute.

e. Post-sale activity

After the sale of the HMOs to AmCare-co, the directors and officers which were common to both the HMOs and Health Net were replaced. None of the new directors/officers of the HMOs were persons for whom Health Net could be held vicariously liable. Although there was testimony about Health Net’s continuing involvement with AmCareco after the sale in an attempt to show Health Net was a controlling shareholder during that time period, we need not consider, as unnecessary, whether Health Net was additionally liable for a breach of fiduciary duties post-sale.

f Adequacy of instruction

The court of appeal held the facts presented at trial regarding the breach of fiduciary duty required a more precise charge, with alternative interrogatories.[231] While we agree the actual legal analysis of this issue is far more complex than the jury instruction given to the jury, we hold, after our review of the legal issues, Health Net was not prejudiced by the absence of a more complicated jury instruction.
The jury was instructed regarding the definition of a fiduciary duty of a corporation’s directors and officers. The jury heard the testimony regarding Gellert, Jansen and Crary, who were officers/directors of the HMOs, as well as senior management of Health Net, who acted on Health Net’s behalf in devising the sale strategy which divested the HMOs. The jury heard what these persons did and could make a factual determination whether their actions rose to a breach of fiduciary duty. Finding a breach, the jury found Health Net liable for their actions on its behalf or ash1sa participant in the conspiracy.[232] We hold the fiduciary duty instruc *594 tion given by the district court adequately provided the correct principles of law for the jury to apply to the issues framed in the pleadings and the evidence, and adequately guided the jury in its deliberations on this issue. Adams, 2007-2110, p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849.

2. Fraud

Health Net’s complaint about the fraud charge presented to the jury arises in connection with its previous argument regarding the district judge’s failure to instruct the jury as to the provisions of Tex. Bus. Corp. Act Art. 2.21. Under the provisions of the former Art. 2.21(A)(2), a shareholder could not be held liable for the actions of the corporation, or have the corporate veil “pierced,” on the basis that (1) the shareholder is the alter ego of the corporation, or (2) fraud of some sort occurred, unless the plaintiff demonstrates the shareholder caused the corporation to be used to perpetrate, and did perpetrate, an actual fraud on the plaintiff primarily for the shareholder’s direct personal benefit.[233] Former Art. 2.21(B) provided this liability |U4of the shareholder was exclusive, and preempts any other liability under common law or otherwise, except when the shareholder expressly accepted personal liability or the shareholder was otherwise liable under the Act or another applicable statute.[234]
From these provisions of the former statute, Health Net argued that its liability for fraud was limited to proof of actual fraud for its own personal benefit. The ad hoc panel agreed, finding the jury instructions on this issue fatally flawed by the lack of an instruction on actual fraud. In addition, the appellate court found the district court failed to instruct on the elements of fraud by misrepresentation. Finally, the court of appeal found the district court failed to properly instruct on the element of fraud by omission, since the *595 district judge mistakenly inserted “or” in two instances where the phrases were to have been joined by the conjunctive word “and.”[235]
As previously stated, the provisions of Art. 2.21 do not apply to Health Net’s pre-sale actions since the Receivers did not seek to hold Health Net liable for its status as the sole shareholder of the HMOs, or for the HMOs’ actions, but for its own |11fiactions during that time period.[236] Consequently, the preemption for holding a party liable for fraud other than actual fraud does not apply. In addition, we find the appellate court erred in demanding too narrow a definition of fraud, when the jury was correctly instructed with a fraud charge appropriate to the facts.
Under Texas law, the traditional elements of fraud are:
(1) material representation; (2) that was false; (3) that the speaker knew the representation to be false or made it with reckless disregard of the truth; (4) the speaker made it with the intention that it be acted upon by the other party; (5) the other party acted in reliance upon it; and (6) the other party suffered injury.
Green Intern., Inc. v. Solis, 951 S.W.2d 384, 390 (Tex.1997); see also Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex.2001). The district court’s failure to include a jury charge on these traditional elements of fraud by misrepresentation was held to be error by the ad hoc panel. Yet, as found in Johnson v. Smith, 697 S.W.2d 625, 632 (Tex.App.-Houston 1985), “[mjisrepresen-tation, however, is not the only method through which fraud is practiced.”
In addition to the traditional elements, Texas courts recognize that “not all fraud is comprehended within elements of the traditional test.” McEwin v. Allstate Texas Lloyds, 118 S.W.3d 811, 816 (Tex.App.-Amarillo 2003). Indeed, Texas courts have held:
Fraud consists of many forms and species. It has been stated that the term “fraud” is not exactly definable, Hayter v. Hudgens, 236 S.W. 232, 233 (Tex.Civ. App.-Texarkana 1921, no writ), fraud is an elusive term, Kinard v. Sims, 53 S.W.2d 803, 805 (Tex.Civ.App.-Amarillo 1921 [1932], writ ref'd), and that fraud is so multiform as to admit to no rules or definitions. Klindworth v. O’Connor, 240 S.W.2d 470, 477 (Tex.Civ.App.-Dallas 1951, writ ref'd n.r.e.). See also Parker v. Solis, 277 S.W. 714, 717 (Tex.Civ.App.-San Antonio 1925, writ dism’d) (stating that fraud in most cases is difficult to define). Nevertheless, courts have | ^attempted to define fraud. In that regard, fraud has been defined as any cunning or artifice used to cheat or deceive another and it is synonymous with bad faith, overreaching and dishonesty.
First State Bank of Miami v. Fatheree, 847 S.W.2d 391, 395 (Tex.App.-Amarillo 1993) (emphasis added). Fatheree further discussed the reasons why the definition of fraud cannot be limited to only one aspect:
It is the generally accepted rule that there can be no all-embracing definition of fraud, but that each case must be considered upon its own peculiar facts. 37 Am.Jur.2d Fraud and Deceit § 1 *596 (1968). Fraud assumes so many different degrees and forms that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat. In fact, the fertility of man’s invention in devising new schemes of fraud is so great that courts have generally declined to define it, reserving to themselves the liberty to deal with fraud in whatever form it may present itself. Id. In that regard it is said that it is better not to define the term lest the craft of men should find ways of committing fraud which might evade such a definition. Id.
The authorities point out that even though it is often said that fraud cannot or should not be precisely defined, the books contain many definitions such as:
... unfair dealing, malfeasance, as positive act resulting from a willful intent to deceive, an artifice by which a person is deceived to his hurt, a willful, malevolent act, directed to perpetrating a wrong to the rights of others; anything which is calculated to deceive, whether it is a single act or a combination of circumstances, or acts or words which amount to a suppression of the truth, or mere silence, deceitful practices in depriving or endeavoring to deprive another of his known right by means of some artful device or plan contrary to the plain rules of common honesty; the unlawful appropriation of another’s property by design, and making one state of things appear to a person with whom dealings are had to be the true state of things, while acting on the knowledge of a different state of things. Fraud has also been said to consist of conduct that operates prejudicially on the rights of others and is so intended, a deceitful design to deprive another of some profit or advantage; or deception practiced to induce another to part with property or to surrender some legal right, which accomplishes the end desired.
In general, fraud embraces all multifarious means resorted to by one individual to get advantages over another by false suggestions or suppression of truth, including all surprise, tricks, cunning, dissembling ligand unfair way by which another is cheated.
The district court in the present case instructed the jury as follows:
You are instructed that fraud occurs when a party fails to disclose a material act within the knowledge of that party, that the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth or the party intends to induce the other to take some action by failing to disclose a fact or the party suffers injury as a result of the act of acting without knowledge of the undisclosed fact.
In addition, fraud includes the successful use of cunning, deception, or artifice to cheat another to their injury.[237]
In the first paragraph of the fraud charge, the district judge attempted to instruct the jury pursuant to Texas Pattern Jury Charge (“TPJC”) 105.4 on the elements of fraud for the failure to disclose when there is a duty to disclose. Health Net referred to this charge as “fraud by omission” in its Requested Charge # 54.[238] There can be no doubt the district judge erred when she mistakenly inserted “or” in two places which should have been joined *597 by the conjunctive word “and.” Yet we find this error did not mislead the jurors to such an extent they were prevented from dispensing justice in finding Health Net liable for fraud. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023.
This finding is bolstered by the fact the district judge correctly charged the jury with a fraud charge in the second paragraph. Consistent with Texas law, the district judge instructed the jury that fraud can incorporate “... the successful use of cunning, deception, or artifice to cheat another to their injury.” See McEwin, 118 S.W.3d at 816. This charge, or one similar to it, has been used by Texas courts for decades, both in jury instructions and in the analysis of fraud claims, and is particularly appropriate when the fraud at issue does not neatly fit the elements of traditional fraud. See Western Reserve Life Assur. Co. of Ohio v. Graben, 233 S.W.3d 360, 376 (Tex.App.-Fort Worth 2007) (used in analysis of fraud claim); In re: Western Star Trucks US, Inc., 112 S.W.3d 756, 760 (Tex.App.-Eastland 2003) (used in jury instruction); McEwin, 118 S.W.3d at 816 (used in analysis of fraud claim); Fatheree, 847 S.W.2d at 396 (used in jury instruction); Johnson, 697 S.W.2d at 631-32 (Tex.App.-Houston 1985) (used in jury instruction); and International Life Ins. Co. v. Herbert, 334 S.W.2d 525, 530 (Tex.Civ.App.-Waco 1960) (used in analysis of fraud claim).
The first paragraph of the fraud instruction, while containing error, was not wholly erroneous, and had no detrimental effect on the correct second portion of the charge. We find the second paragraph of the fraud instruction given by the district court adequately provided the correct principles of law for the jury to apply to the issues framed in the pleadings and the evidence, and adequately guided the jury-in its deliberations on this issue. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849. For the reasons previously stated, we hold the jurors were not limited to considering only evidence of actual fraud by Art. 2.21. Although there was error in the district court’s fraud charge, we find the court of appeal erred in finding the charge to be fatally flawed.

3. Unfair or Deceptive Acts or Practices

The Receivers claimed Health Net engaged in unfair or deceptive acts or practices in violation of Art. 21.21 of the Texas Insurance Code.[239] The ad hoc panel held as a matter of law that Art. 21.21 did not apply to Health Net, finding Health Net was not a person engaged in the business of insurance as defined by the Texas Insurance Code.
Former Art. 21.21, recodified at Tex. Ins.Code § 541.003, prohibited any person engaged in the business of insurance from engaging in an unfair or deceptive act or practice. Section 3 of this statute provided: “[n]o person shall engage in this state in any trade practice which is defined in this Act as, or determined pursuant to this Act to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.” A “person” was defined by the statute as “any individual, corporation, association, partnership, ... or other legal entity engaged in the business of insurance, including agents, brokers, adjusters, and life insurance counselors.” Former Art. 21.21 § 2(a), recodified as Tex. Ins.Code § 541.002(2).
*598 In pertinent part, former Art. 21.21 § 16(a) provided the following cause of action:
Any person who has sustained actual damages caused by another’s engaging in an act or practice declared in Section 4 of this Anticle to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in any practice enumerated in a subdivision of Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice may maintain an action against the person or persons engaging in such acts or practices....
In their petitions, the Receivers alleged the defendants committed violations of Tex. Ins.Code Art. 21.21 § 4(1), § 4(2), § 4(5)(a) and (b), and § 4(11). These former sections of the Insurance Code raised allegations of “Misrepresentations and False Advertising of Policy Contracts,”[240] “False Information and Advertising Generally,” [241] “False Financial Statements,”[242] and “Misrepresentation of Insurance Policy.” [243] Thus, the Receivers alleged violations of Section 4 of this article.
The court of appeal found the omission of the word “shareholder” from the [ 12ndefinition of “person” under Art. 21.21 § 2(a) was an intentional exclusion. As Health Net was the 100% shareholder of the HMOs before the sale, and only a minority shareholder in their parent corporation after the sale, the court of appeal found Health Net was not a “person” as defined in the Texas Insurance Code in its capacity as a shareholder. In addition, the ad hoc panel found Health Net, as the owner and parent corporation of the HMOs before the sale, was not engaged in the business of insurance, and only the HMOs, as its subsidiary corporations, were. For these reasons, the court of appeal refused to consider the sufficiency of the evidence with regard to unfair or deceptive acts or practices which may have been committed by Health Net, finding Health Net could not be found liable under the provisions of the Texas Insurance Code as a matter of law.
To the contrary, we hold the omission of the word “shareholder” from the illustrative list of entities which constitute a “person” under Article 21.21 is not fatal to the Receivers’ claims. The court of appeal erred in failing to liberally construe this definition such that the underlying purpose of the Texas Insurance Code provision would be effectuated. The Texas Legislature explicitly declared its intention in enacting this legislation in Art. 21.21 § 1:
The purpose of this Act is to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.[244]
The Texas Legislature further instructed that Art. 21.21 “shall be liberally construed and applied to promote its underlying purposes.” [245] See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 384 (Tex.2000). We *599 believe the statutory definition of 1l21“person” in Article 21.21 is broad enough to include Health Net, as the owner of the HMOs, such that its provisions may be applied to Health Net for its pre-sale actions without doing violence to the meaning of the statute.
Moreover, the record reveals Health Net admitted it was engaged in the business of insurance, at least before the sale of the HMOs to AmCareco. In a memorandum submitted in support of a motion for summary judgment in this litigation, Health Net stated:
It is undisputed that Health Net engages in the business of insurance in states other than Texas, Louisiana and Oklahoma. It is also undisputed that Health Net engaged in the business of insurance in Texas, Louisiana and Oklahoma before it sold the AmCare HMOs to AmCareco on April BO, 1999. ... (emphasis added)[246]
We find Health Net’s statement within this litigation to be determinative of the issue. Even if Health Net’s own statement was not sufficient on this point, we find the clear language of the Texas statute convinces us Health Net should be held to have engaged in the business of insurance before it sold the HMOs to AmCareco.
Our conclusion is further bolstered by the interpretation of former Article 21.21 found in the Texas Administrative Code. Title 28 Tex. Admin. Code § 21.1 provides:
§ 21.1. Deceptive Acts or Practices of Insurers, Agents, and Connected Persons
Purpose of regulation. It is the purpose of these sections to further define and state the standards that are necessary to prohibit deceptive acts or deceptive practices by insurers and insurance agents and other persons in their conduct of the business of insurance or in connection therewith, whether done directly or indirectly, and irrespective of whether the person is acting as insurer, principal, agent, employer, or employee, or in other capacity or connection with such insurer. (Emphasis added)
The insurance regulations broadly prohibit unfair trade practices by “connected persons” in Section 21.3:
[122§ 21.3. Unfair Trade Practices Prohibited
(a) Misrepresentation of insurance policies, unfair competition, and unfair practices by insurers, agents, and other connected persons are prohibited by Article 21.20 and Article 21.21 or by other provisions of the Insurance Code and by these sections of the State Board of Insurance. No person shall engage in this state in any trade practice that is a misrepresentation of an insurance policy, that is an unfair method of competition, or that is an unfair or deceptive act or practice as defined by these sections and other rules and regulations of the State Board of Insurance authorized by the Code.
(b) Irrespective of the fact that the improper trade practice is not defined in any other section of these rules and regulations, no person shall engage in this state in any trade practice which is determined pursuant by law to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance. (Emphasis added).
We find the statutory provisions are intended to have a broad reach, and should *600 not be limited to define a “person” engaged in the business of insurance as “agents, brokers, adjusters and life insurance counselors,” or even to corporations and their employees. Instead, these provisions prohibit unfair or deceptive acts or practices by any entity who acts in connection with the business of insurance.
After our analysis of the provisions of former Art. 21.21, we hold the appellate court committed legal error in failing to take notice of the statement made by Health Net within this litigation, and in failing to give a liberal interpretation to the statute at issue as required under Texas law.
With regard to the adequacy of the district judge’s instructions on unfair or deceptive acts or practices, we note the district judge tracked the language of the statute, which charged the jury as to what constitutes an unfair or deceptive act or practice under Texas law.[247]
| Conspiracy
According to the ad hoc panel, the jury charge on civil conspiracy was fatally defective because the district court failed to properly instruct on the concept of specific intent. For that reason, the court of appeal preferred another of Health Net’s proposed jury charges, rather than the two proposed Health Net instructions which were included in the charge given by the district court. The appellate court found the jury was given no guidance to determine whether the underlying intentional torts — of fraud, breach of fiduciary duty, and unfair or deceptive acts or practices— were committed. Finally, the court of appeal held civil conspiracy, as a common law tort, was preempted by Tex. Bus. Corp. Act Art. 2.21(A)(2).[248] We find the court of appeal legally erred in all respects.
Under Texas law, a civil conspiracy is defined as: *601 Operation Rescue-National v. Planned Parenthood of Houston and Southeast Texas, Inc., 975 S.W.2d 546, 553 (Tex.1998), citing Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex.1983) (citations omitted); Carroll v. Timmers Chevrolet, Inc., 592 S.W.2d 922, 925 (Tex.1979). The TPJC on Civil Conspiracy states:
*600 a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.
*601 To be part of a conspiracy, [defendant] and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to [plaintiff]. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.
TPJC 109.1.
Health Net relies on Triplex Communications, Inc. v. Riley, 900 S.W.2d 716 (Tex.1995) for the proposition that the judge’s failure to include a specific jury instruction defining specific intent with regard to the elements of civil conspiracy failed to adequately inform the jury of the cause of action to its prejudice. In Triplex, the defendant submitted a proposed jury instruction which defined “unlawful means” to include “negligence or the violation of a statute or law.” Id., 900 S.W.2d at 719. The inclusion of “negligence” in the definition of “unlawful means” was fatal to the requested charge, as the Texas Supreme Court held the proposed instruction “would have improperly eliminated the intentional or knowing aspects of civil conspiracy.” Id., 900 S.W.2d at 720. For the same reason, the Texas Supreme Court found erroneous the conspiracy charge actually given by the trial judge in Triplex, since the judge included negligence in its definition of a civil conspiracy.[249] The Texas Supreme Court reiterated that “[g]iven the requirement of specific intent, parties cannot engage in a civil conspiracy to be negligent.” Id., 900 S.W.2d at 720 n. 2.[250]
The district court in the present case instructed the jury as follows:
| ip,rYou are instructed that a conspiracy is a meeting of minds or agreement by two or more persons or corporations to accomplish an unlawful act or a lawful act by illegal means. To be part of a conspiracy, at least two parties must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damage to plaintiff.
One or more persons involved in a conspiracy must have performed some act or acts to further the conspiracy. One of [sic; or] more persons involved in a conspiracy must have performed some act or acts to further the conspiracy. One of [sic; or] more persons must commit an unlawful act in connection with the conspiracy.
Defendant maintains — excuse me. The plaintiff maintains that the defendant participated in a conspiracy with PriceWaterhouseCoopers, Tom Luck-singer, Michael Nadler, Stephen Nazar-enus, John Mudd, Michael Jihn [sic; Jhin], William Galtney, Proskauer Rose, *602 Stuart Rosow to accomplish an unlawful purpose or to use unlawful means to accomplish a lawful purpose.
Conspiracy is a derivative claim meaning it requires a [sic; an] underlying intentional wrong. To hold Health Net liable for conspiracy, you must find an underlying intentional wrong occurred.[251]
We find the jury was properly charged under Texas law in conformity with applicable jurisprudence, TPJC 109.1 and two of Health Net’s proposed jury charges.[252] The instruction does not improperly allow the jury to eliminate the intentional or knowing aspects of civil conspiracy. Instead, the instruction gave proper guidance to the jurors that the underlying wrong which they had to find proved in order to support a finding of conspiracy had to be an unlawful act, such as a statutory violation, or an intentional wrong other than negligence. The jury charge on conspiracy given in this case did not violate the holding in Triplex, but was, in fact, in conformity with its ruling.
Insofar as the court of appeal relied on the preemptive provision of Tex. Bus. 112fiCorp. Act Art. 2.21 to find Health Net could not be held liable as a shareholder as a matter of law for a common law tort other than actual fraud for its own direct personal benefit, we find, as previously discussed, that this finding has no merit. The Receivers were not seeking to pierce the corporate veil in order to hold Health Net liable for the actions of the HMOs. Instead, the Receivers were seeking to have Health Net held liable for its own actions.
We hold the jury charges on conspiracy adequately provided the correct principles of law for the jury to apply to the issues framed in the pleadings and the evidence, and adequately guided the jury in its deliberations on this issue. Adams, 2007-2110 p. 7, 983 So.2d at 804; Nicholas, 1999-2522 p. 8, 765 So.2d at 1023; Rosell, 549 So.2d at 849.

5. Alleged error in the jury interrogatories

On appeal, Health Net complained the jury interrogatories regarding the allocation of fault violate Texas law by grouping together any party other than Health Net under the generic terms “Any other person(s)” and “Any other Company.” The court of appeal agreed, finding “[t]he failure to submit to the jury the name of each possible responsible person and assess his or its individual percentage of fault was prejudicial error.”[253]
Initially, we must point out there was no error in the district court’s rejection of Health Net’s proposed jury interrogatory in this regard. Health Net submitted a proposed jury interrogatory on fault allocation which was extremely confusing. In addition, the proposed instruction contained a laundry-list of persons and entities, some not even mentioned during the 10-day trial, but whose names appear on some of the documentary evidence. However, insofar as the court of appeal found error in | mthe district court’s decision to group all other persons or companies together in the jury interrogatory on fault allocation, we will review this issue.
Tex. Civ. Prac. & Rem.Code Ann. § 33.003 provides:
*603 (a) The trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility, stated in whole numbers, for the following persons with respect to each person’s causing or contributing to cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably. dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these:
(1) each claimant;
(2) each defendant;
.(3) each settling person; and
(4) each responsible third party who has been designated under Section 33.004.
(b) This section does not allow a submission to the jury of a question regarding conduct by any person without sufficient evidence to support the submission.
Under Texas law, broad-form submission of questions is the preferred method of presentation to the jury. The Texas Rules of Civil Procedure explicitly provide that the court “shall, whenever feasible, submit the cause upon broad-form submission.” See Tex.R. Civ. P. 277; Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 855 (Tex.2009) (“A trial court must, when feasible, submit a cause to the jury by broad-form questions.”). Obviously, this preference for broad-form submission must be balanced against the language of Tex. Civ. Prac. & Rem.Code Ann. § 33.003(a). See Isaacs v. Bishop, 249 S.W.3d 100 (Tex.App.-Texarkana 2008). Ultimately, the standard for review is whether the trial court abused its discretion in deciding how to submit the charge. Isaacs, 249 S.W.3d at 108.
Here, all of the other defendants settled with the plaintiffs before trial or were finalizing settlements. Health Net was the only defendant remaining at trial. We find this factor alone distinguishes the present case from Perez v. Weingarten Realty Investors, 881 S.W.2d 490 (Tex.App.-San Antonio 1994), the Texas case relied upon by the appellate panel for its determination that prejudicial error occurred. In Perez, a premises liability suit was filed against multiple defendants who owned an apartment entity. The Texas trial court submitted a negligence question against one defendant only. The Texas jury found that particular entity was not guilty of any negligence and the plaintiff lost her ease. Id., 881 S.W.2d at 492. On appeal, the plaintiff assigned as error the trial court’s failure to submit her proposed jury questions. The Texas appellate court found no error, finding the plaintiffs proposed jury interrogatories attempted to lump all of the defendants together, even though there were questions of fact raised at the trial concerning which of the multiple defendants controlled the premises and was responsible for security. Id., 881 S.W.2d at 494-495. The Texas appellate court also noted a fundamental problem would arise in trying to confect a judgment in such a case, if the questions which lumped the defendants together were submitted to the jury, and the jurors found liability. Perez, 881 S.W.2d at 493-494.
Even in Perez, the Texas appellate court acknowledged that the decision to achieve simplicity instead of specificity is not always incorrect. Id., 881 S.W.2d at 494 (“Perez achieved simplicity at the expense of specificity. There is something to be said for this effort and this Court is not saying it is always incorrect to do so.”). This is such a case. The only question before the jury was the percentage of Health Net’s fault, if any, vis-a-vis any other responsible party. The district *604 court’s jury interrogatory on fault accomplished that goal.
Here, the submission of a broad-form interrogatory on fault allocation did not result in confusion in confecting a judgment, as feared in Perez,[254] nor was there [ 12flconfusion due to multiple causes of action tried against more than one defendant.[255] We find the district court complied with the applicable rules of Texas law. Under the facts of this case, there was no abuse of the district court’s discretion in the manner in which the court framed the jury interrogatory regarding the allocation of fault.[256]

Recap-the Jury’s Verdict

After our examination of the jury charges which were provided to the jury on conspiracy and the substantive torts alleged, we hold the court of appeal erred in finding prejudicial error. Even where error was found, we cannot say, after considering the instructions as a whole and the circumstances of the case, that the jury instructions misled the jurors to the extent they were prevented from dispensing justice. Adams, 2007-2110 p. 7, 983 So.2d at 804. Likewise, we hold there was no prejudicial error in the district court’s jury interrogatory on the allocation of fault. The court of appeal erred in justifying its decision to conduct a de novo review of the evidence on these grounds and the court of appeal ruling must be reversed in this regard. We hold, instead, the findings of fact by the jury should have been reviewed under the manifest error review standard. Adams, 2007-2110 p. 10, 983 So.2d at 806 (“Because we find no error in the jury instructions warranting de novo review, the jury’s determination is subject to review for manifest error.”). Before review under the proper standard may commence, however, we must determine whether merit |iSOexists in several additional issues raised by Health Net which were raised on appeal but pretermitted by the court of appeal.[257]

Additional errors raised with regard to the jury verdict

Health Net argues in this court that there were additional errors in the jury instructions which were raised as assignments of error in the court of appeal as being prejudicial. Health Net claims these additional assignments of error would justify de novo review of the jury verdict, but were pretermitted by the appellate court due to that court’s ruling in its favor. In the event we might find the court of appeal’s de novo review to have *605 been in error, Health Net urges this court to remand the matter to the court of appeal for its consideration of these preter-mitted issues.
Although we find the court of appeal erred in its determination that de novo review of the jury verdict on the claims of the Texas Receiver was justified, we decline to remand this matter for further consideration of the pretermitted issues. This court, like the court of appeal, has appellate jurisdiction of both law and fact in civil matters, may perform an independent review, and may render judgment on the merits. See La. Const. art. 5, § 5(C); Campo v. Correa, 2001-2707 p. 11 (La.6/21/02), 828 So.2d 502, 510. We find the record is sufficient for us to address these issues without remand to the court of appeal.[258]

1. affirmative defenses

On appeal, Health Net raised as assignments of error the district court’s failure to include three of its requested jury charges on affirmative defenses. First, Health Net contends the district court erred in failing to instruct the jury on the doctrine of “in pari delicto,” which precludes from recovery a plaintiff who participated in the tortious conduct. Health Net argues the Texas Receiver sued as defendants the |iai officers and directors of AmCare-Tx, alleging they participated in wrongful conduct. Since the Texas Receiver is considered to have “stepped into the shoes” of AmCare-Tx in the receivership, Health Net asserts the Texas Receiver is barred from recovery based on the wrongful actions of the officers and directors of AmCare-Tx. The proposed instruction stated: “... that one who participates in wrongful conduct is precluded from recovery for the alleged wrong.”[259]
In addition, Health Net argued the jury should have been instructed on the Texas HMO’s duty to mitigate its damages. Health Net proposed jury charges directing the jurors not to award damages “for any item of damage which AmCare-Tx could have avoided through reasonable effort.” Health Net also requested the jury be instructed that “[d]amages that could have been avoided or mitigated are not recoverable. An injured party must use reasonable efforts to avoid or mitigate its losses.” [260] Failure to include these requested instructions, Health Net argues, was prejudicial error.
Finally, Health Net asserted the district court erred in failing to instruct the jury on the issue of regulator fault as an affirmative defense. The background for this assignment of error is found in Wooley v. Lucksinger, et al., 2006-1167 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228, an earlier ruling in this case by the ad hoc panel. Health Net sought appellate review of a judgment sustaining a peremptory exception of no cause of action to its third-party demand against La-DOI and dismissing the demand with prejudice. The court of appeal found the district court correctly dismissed the third-party demand but erred by not designating the allegations of governmental tort, or the fault of the regulators, as an affirmative defense. Id., 2006-1167 p. 24, 961 So.2d at 1245. Based on this ruling, Health Net contends *606 the lack of a jury instruction on regulator fault was prejudicial error.
We find no error in the district court’s failure to include the requested jury charges on these issues. The affirmative defense of in pari delicto is not applicable here. Generally, a receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself. Guardian Consumer Finance Corporation v. Langdeau, 329 S.W.2d 926, 934 (Tex.Civ.App.-Austin 1959). However, Langdeau acknowledges:
[t]he only exception to the general rule is when the receiver acts to protect innocent creditors of insolvent corporations in which instance the receiver acts in a dual capacity, as a trustee for both the stockholders and the creditors, and as trustee for the creditors he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so.
Id.; see also Shaw v. Borchers, 46 S.W.2d 967, 968-969 (Tex.Com.App.1932) (same). While AmCare-Tx and its officers and directors might be precluded from recovery under the doctrine of in pari delicto, the Texas Receiver, acting in her dual role, is not so barred.
Here, the receiver is acting to protect the interests of innocent policyholders and creditors. Thus, there is no question that any fault of AmCare-Tx’s officers and directors should be allowed to preclude recovery by these innocent parties. We hold the doctrine of in pari delicto simply does not apply in this factual situation. For the same reason, we find the proposed instructions on mitigation of damages were similarly inapplicable.
Finally, we hold the district court did not err in failing to instruct the jury as to regulator fault. “An insurance company may not delegate responsibility for valuation of its assets to a state agency, and the mere fact that an insurance commissioner accepts a company’s asset valuation does not immunize the company from liability | issai-ising from that valuation.” Meyers v. Moody, 693 F.2d 1196, 1210 n. 11 (5th Cir.1982), cert. denied, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). As shown by the record in this case, the state insurance regulators must rely on the honesty and integrity of the financial statements filed with them. By accepting these filings, the regulators do not displace the insurance company’s fiduciaries or controlling parties or owners by performing their statutory role. Health Net’s argument in this regard seeks to hold the “police” liable because they did not sooner catch the “robber” or prevent the robbery in the first place. As argued by the Receivers on appeal, “how the regulators performed their respective jobs — whether well or poorly — does not in any way lessen” Health Net’s responsibility for its role in the conspiracy and in its subsequent tortious actions.[261]
We note that the Texas legislature enacted legislation, effective September 1, 2005, after this case was tried, to specifically address the use of these types of affirmative defenses in the context of a receivership proceeding. Tex. Ins. Code Ann. § 443.011, in pertinent part, provides:
§ 443.011. Actions by and Against Receiver
(a) An allegation by the receiver of improper or fraudulent conduct against any person may not be the basis of a defense to the enforcement of a eontrac- *607 tual obligation owed to the insurer by a third party, unless the conduct is found to have been materially and substantially related to the contractual obligation for which enforcement is sought.
(b) A prior wrongful or negligent action of any present or former officer, manager, director, trustee, owner, employee, or agent of the insurer may not be asserted as a defense to a claim by the receiver under a theory of estoppel, comparative fault, intervening cause, proximate cause, reliance, mitigation of damages, or otherwise, except that the affirmative defense of fraud in the inducement may be asserted against the receiver in a claim based on a contract, and a principal under a surety bond or a surety undertaking is entitled to credit against any reimbursement obligation to the receiver for the value of any property pledged to secure the | ^reimbursement obligation to the extent that the receiver has possession or control of the property or that the insurer or its agents commingled or otherwise misappropriated the property. Evidence of fraud in the inducement is admissible only if the evidence is contained in the records of the insurer.
(c) An action or inaction by the department or the insurance regulatory authorities in any state may not be asserted as a defense to a claim by the receiver. ... (Emphasis added)
We hold the district court did not err in failing to instruct the jury on the affirmative defenses of in pari delicto, mitigation of damages, or regulator fault.[262]

2. instructions on damages

With regard to Health Net’s requested instructions on compensatory damages, offset and exemplary damages, we will review these issues in our discussion on damages.

3. inconsistencies between verdicts and judgments

The court of appeal found, as an additional ground justifying de novo review, there were inconsistencies between the jury verdict on the tort claims of the Texas Receiver, the JNOV granted by the district judge, and the district court’s judgment and reasons for judgment on the tort claims of the Louisiana and Oklahoma Receivers.[263] In its brief to this court, Health Net notes this additional ground which was found by the appellate panel to justify its de novo review but fails to present any argument on the matter, relying instead on the strength of the other instructional errors raised but not reviewed by the court of appeal.[264] Under our rules, Health Net ha-has abandoned this issue and we need not consider this alternative ground.[265]
Nevertheless, to remove any doubt whether justification exists for the court of appeal’s de novo review, we will examine these issues. Although this court has yet to consider the issue of the proper stan *608 dard to be applied by the appellate courts reviewing conflicting results by a jury and a judge in a bifurcated trial, we have observed the first question a reviewing court must determine is whether conflicting results, in fact, exist. See Fontenot v. Patterson Ins., 2008-0414, p. 8 (La.12/12/08), 997 So.2d 529, 534. Here, we find any real inconsistency between the jury verdict and the district court judgment on fault allocation was harmonized when the district court granted the JNOV.
Moreover, the several discrepancies noted by the court of appeal are minor and have no significance to the final judgment: (1) We find the district court’s failure to instruct or submit a jury interrogatory on the issue of negligent misrepresentation is, at the most, harmless error in the context of this case, where the jury returned a finding that Health Net’s actions were actually fraudulent. (2) As previously stated, the appellate panel’s finding of patent legal error in the district court’s use of the term “proximate cause” in the judgment in favor of the Louisiana Receiver is an error by the court of appeal resulting from its improper decision to reexamine the district court’s choice of law ruling. (3) That one of the factfinders reached the same determination of Health Net’s liability with a higher burden of proof is, at the most, harmless error. (4) Similarly, the addition of the phrase “or its creditors” in the Louisiana and Oklahoma judgments, but omitted from the jury interrogatories with regard to the claims of the Texas Receiver, is inconsequential. (5) Finally, the court of appeal’s improper use of the district court’s belated reasons for judgment, the basis | iafifor two of the asserted discrepancies, has been previously addressed, and rejected, in this opinion.
Our review convinces us the final jury charge, although not error-free, did not rise to a level which precluded the jurors from reaching a verdict based on the law and facts. Our determination in this regard invalidates this justification for the court of appeal’s de novo review of the record. We reverse these portions of the court of appeal’s decisions.
REVIEW FOR MANIFEST ERROR
We find the court of appeal erred in determining that a de novo review of the record was necessary. We also find the appellate court erred in its conclusions following de novo review. We hold the jury’s verdict and the district court’s judgments in these matters must instead be reviewed for manifest error. We decline, in the instant case, to remand to the court of appeal for its further review, although in general the appellate courts of this state are charged with the primary responsibility of reviewing a trial court’s factual findings. Campo, 2001-2707 p. 11, 828 So.2d at 510.
Here, we find the evidence concerning the issues before us was fully developed at trial. In addition, the attorneys have exhaustively briefed and argued the issues at all stages — in the district court, the appellate court and this court. Considering the passage of time, the complexity of the record, and our present understanding of the record, we now exercise our appellate jurisdiction of both law and fact in civil matters in the interests of judicial economy and efficiency and review the district court’s judgment and the jury’s verdict for manifest error. Id.; see also La. Const. art. 5, § 5(C).[266]
*609 | mIn the trial of these issues, we find the fact-finders were presented with two permissible views of the evidence, even extending to the testimony of the expert witnesses. The judge and jury both concluded the evidence was. sufficient to find in favor of the Receivers’ claims, after weighing the evidence and testimony. We find these findings are entitled to great deference on review. See Rosell, 549 So.2d at 844-845.[267]
In discussing the evidence supporting the factual findings of conspiracy and the substantive tort claims, we recognize the difficulty in neatly compartmentalizing the facts which satisfy the elements of each. There is a great deal of overlap, as the evidence which supports one of the Receivers’ causes of action also satisfies others. Consequently, we will discuss the conspiracy as a whole and the evidence which convince us of the correctness of the factual findings of the judge and jury.
Initially, we note the evidence was sufficient, through both expert and lay testimony, and the documentary evidence admitted, to find proved the recitation of the factual history presented at the beginning of this opinion. The testimony established that Health Net is a sophisticated company with knowledge of the proper methods of accounting and the financial requirements for HMOs. When the HMOs were wholly-owned subsidiaries of Health Net, PDR accounts were always maintained as required by statute and the appropriate accounting practices. The | ^external auditors for Health Net during that time determined a PDR in the aggregate amount of $10.5 million was required. These external auditors also determined there was no significant restructuring liability up to the time of the sale.
The evidence established Health Net wanted to divest itself of the underper-forming HMOs and contracted with SHP, a division of PWC, to develop such a plan. We note the issue of the solvency of the HMOs was raised by the parties in several contexts. The Receivers claimed the HMOs were near or in an insolvent position before their sale “but for” Health Net’s infusions of capital. The Receivers attribute a nefarious motive to Health Net’s capital contributions which serves as a basis for the Receivers’ argument that Health Net attempted to artificially shore-up the HMOs in an attempt to deceive the regulators before the sale. This argument has no merit, as we find Health Net acted, in this instance, merely as a responsible corporate parent. Prior to their sale, there is no doubt the HMOs were, as Dr. Hasan described them, in adverse financial conditions. Their unprofitability was the *610 main reason Health Net wanted to divest them. However, to imply or argue the HMOs were, at that time, insolvent or near insolvency, is nonsense. Nor were the capital contributions of Health Net to the HMOs an attempt to make the HMOs appear better capitalized than they were to induce approval for the sale. The state regulators were well aware of the unprofitable financial history of these HMOs. The actionable activity occurred later, in treating these capital contributions as loans when they were not.[268]
A unique sale strategy was created, which involved selling the HMOs to a newly-created holding company, AmCareco. The evidence showed all of the parties worked closely together to ensure the transaction was approved by the state | ^regulators. Health Net supplied SHP with the financial information which was ultimately provided to the insurance regulators in AmCareco’s Form A filings. Lucksinger worked closely with SHP and members of Health Net’s senior management on the change of ownership. The sale documents were drafted by Health Net and AmCareco’s counsel. Correspondence from all of the regulators was routinely sent to Health Net through AmCa-reco’s regulatory counsel.
As early as April of 1998, Health Net, SHP, AmCareco, Lucksinger and AmCare-co’s counsel were aware that the sale strategy would involve re-characterizing $6.3 million of PDR (which would later be contributed by Health Net), as a restructuring reserve, which would be reversed as of the day before the sale in order to increase what would constitute the “excess” cash which Health Net planned to sweep out of the HMOs. A year before the sale occurred, these persons knew the cash sweep would remove approximately $8.4 million from the HMOs at the time of sale, despite the fact that the HMOs would continue to lose money until that time.[269] Testimony established the amount of money which would be stripped from the companies was never at issue, the focus was only on determining the best way to make the sale palatable to the regulators. To this end, Health Net sought an opinion from its external auditors on what would be required to ensure that the proposed scheme constituted a sale.[270] There was also evidence to support the fact finders’ conclusion that a separate goal of the conspiracy was for Lucksinger to keep the HMOs in business for at least three years. After that time, Health Net would be 114nentitled to withdraw an additional $2 million from AmCareco through the exercise of certain stock rights in the sale agreement.
In order to obtain the approval of the sale by insurance regulators in each state where the HMOs did business, the conspirators relied on a culture which presumed proper disclosure in regulatory filings, as well as the sheer volume of insurance com *611 panies which are regulated by a handful of regulators, and submitted its plan in confusing, ambiguous, multi-part documents.[271] Most importantly, the parties purposely withheld from the regulators the one document which would have disclosed the true nature of the sale scheme, and which was drafted after regulatory approval was obtained, Section 3(q) of the Closing Agreement.
Yet even after withholding the Closing Agreement from the regulators, without which the regulators could not have understood the true nature of the transaction, Health Net and its senior management maintained that the approval of the uninformed regulators legitimized the sale. Westen testified that what was important to him was that the Louisiana regulators looked at the deal and believed it met the requirements.[272] Gellert thought the regulators were responsible to ensure the transaction protected policyholders.[273] Crary testified there would be nothing wrong with the transfer of money out of the HMOs if the regulators approved.[274]
The record shows the regulators were, in fact, confused by the multiple sale documents and deceptive financial information submitted to them. In Texas and Louisiana, meetings were held by the regulators with representatives of AmCareco |141and Health Net before approval was granted in order to have the sale strategy explained. Nevertheless, their trial testimony showed the state regulators were unaware of the true nature of the sale scheme presented to them.
Texas regulators, up to the night before the sale, were told no cash would be taken from the HMOs. When the financial schedule was faxed to the Texas regulator the night before approval was granted, her understanding of the sale was that only a portion of the cash sweep came from the HMO itself, but that the source of the cash consideration was the non-existent $22 million which AmCareco sought to raise through its POM.[275] Other Texas regulators relied upon the initial analysis undertaken.[276] But up to the night before the approval, there was no reason to make further inquiry since they were consistently informed that the change of ownership would not involve removing any assets from the Texas HMO. One Texas regulator admitted she would not have approved the change of ownership if she thought doing so would jeopardize the financial condition of the HMO.[277] Not until several months after the sale did the Texas regulators meet with AmCareco in an attempt to understand what had happened to the PDR in the sale.[278] The Texas regulators *612 received a copy of the Closing Agreement after approval had already been granted.
Based on the financial information and sale documents provided to them, the Louisiana regulators believed approximately $670,000 would be removed from the Louisiana HMO during the change of ownership, and Health Net and AmCareco did __[i42n°t correct that initial interpretation.[279] At a meeting held one week before approval, the Louisiana regulators indicated that amount of cash being removed in the anticipated sale was too high and they could not agree to the change of ownership. The night before the approval, AmCareco’s regulatory counsel faxed over a financial schedule which showed a lesser amount being removed in the cash sweep. Not until an analytical review of the Louisiana HMO’s second quarter financial statement, due August 15, 1999, were the Louisiana regulators aware that the sale resulted in the HMO falling out of compliance with the statutory minimum requirements.[280] If the Louisiana regulator had known $2.3 million would be taken out of the Louisiana HMO with the sale, she would not have approved the Form A.[281] The La-DOI was never sent the Closing Agreement, but having reviewed it, the Louisiana regulator believed Section 3(q) changes the entire transaction.[282] Only Section 3(q) shows the amount of cash that was actually going to be swept out of the HMOs in the sale transaction.[283]
One of the Oklahoma regulators relied on the representations made in the letter and financial schedule faxed to her by AmCareco’s regulatory counsel the night before the approvals were obtained.[284] She understood Health Net was going to be paid back for monies it funded to the HMOs but believed the PDR would remain, thus keeping the Oklahoma HMO in regulatory compliance.[285] She would not have approved the sale transaction if she had believed the reversal of the PDR, or the | usmoney taken out of the HMO pursuant to the cash sweep, would leave the Oklahoma HMO below the minimum regulatory net worth requirements.[286] She did not remember seeing the Closing Agreement or its provision designated as Section 3(q). But after reviewing that provision, she understood how the parties agreed and how the scheme worked.[287] Another of the Oklahoma regulators never fully understood how the cash sweep worked, but relied on others to advise her.[288] However, she saw no reference to the PDR in § 2.1 of the SPA and answered “probably not” when questioned if she would have allowed the cash sweep if she had been aware that the net effect of the cash sweep would leave the Oklahoma HMO out of statutory compliance.[289]
*613 In fact, the documents and financial information which were provided to the insurance regulators immediately before approval were intentionally misleading. There were two versions of the financial schedule showing the cash sweep and Preferred A share calculation. In one version, the true amount of the cash sweep was noted on the line which indicated such. This was the schedule used by the parties to the transaction.[290] The other version, the one sent to the regulators, broke apart the full amount of the cash sweep onto two separate lines-one labeled “FHS Cash Sweep” and the other labeled “Less Cash Contributed by FHS to Fund Premium Deficiency.”[291] Although Health Net (through Westen) claimed the schedule sent to the regulators showed more detail as to how the cash sweep amount was determined, there is no doubt the financial schedule faxed to the state regulators the evening 1144before the approval was intentionally misleading.
Edward Buttner, IV, accepted as an expert in statutory accounting after stipulation by the parties, testified the documents submitted to the regulators were not truthful because a person had to look at each of the documents to understand the transaction, paying close attention to what was not stated. In addition, Buttner testified the documents were misleading due to a number of misrepresentations and that the financial information conveyed to insurance regulators, particularly the estimate of the equity which was left in the HMOs after the transaction, bore no resemblance to reality and did not match the required statutory filings made just prior to the sale.[292] Further, Buttner stated the financial schedule faxed to the insurance regulators on April 29, 1999, just prior to obtaining approval, did not show what the companies were ever going to look like post-sale, which Buttner found misleading.[293]
Mary Keller, accepted as an expert in the practices and policies of the Tx-DOI due to her extensive experience, testified the Form A filing was false and misleading because it basically said the Texas HMO would be in statutory compliance after the transaction and was not.[294] Although she did not think it was honest for the parties to inform the Texas regulators no money would be taken from the HMOs until changing position the night before approval, Keller testified:
But really more important than that, the fact that the Form A basically committed to the Department that this HMO would meet the requirements of Texas law at the change of control and that the commissioner’s order says that it is expected to and that the statute requires it. No matter what was being said about the cash sweep, the understanding by the Department was that there would be a compliant HMO with the change.[295]
In Keller’s expert opinion, the Texas Commissioner would not have approved the transaction had he known what was the true situation.[296]
Thomas Handley, one of the Receivers’ experts, accepted as an expert in actuarial *614 science, testified that maintaining a PDR is either required by statute or an actuarial standard of practice.[297] In his expert opinion, Health Net would be in violation of every state’s rules if Health Net agreed in a written agreement to take the required PDR off the books of the HMOs in the cash sweep.[298]
The Form As, the financial schedules, the multiple documents of sale and the statements made by the parties led the regulators to believe the HMOs would maintain statutory and regulatory requirements after the change of ownership. Not until several months later did the insurance regulators find out that millions of dollars were transferred out of the HMOs to Health Net as a term of the sale. Expert testimony showed Health Net removed in the cash sweep $2,543,000 from the Louisiana HMO, $2,904,000 from the Oklahoma HMO, and $2,920,000 from the Texas HMO, far in excess of what the insurance regulators believed or approved.[299] In addition, Health Net did not convey to the HMOs the offsetting amounts which AmCareco’s regulatory counsel indicated would be sent to settle intercompany debts.[300]
After the sale, the HMOs failed to meet minimum statutory and regulatory requirements for conducting business in their respective states. Expert testimony [ 14fiestablished the minimum statutory capital or equity required for an HMO in Texas was $1.5 million; after the cash sweep, the Texas HMO was [-] $1,632,000. In Louisiana, pursuant to the condition placed on the Louisiana HMO by the regulators, the statutory minimum capital requirement was $4 million; after the cash sweep, the Louisiana HMO was $1,371,000. In Oklahoma, the statutory minimum capital requirement was $750,000; after the cash sweep, the Oklahoma HMO was $102,OOO.[301] From the minute after the cash sweep until the HMOs were made the subject of regulatory action, none of the HMOs ever again met statutory or regulatory requirements.[302]

No manifest error in finding of conspiracy

Here, we find no manifest error in the factfinders’ conclusion that Health Net was involved in a civil conspiracy: [303] Health Net, in combination with SHP, its agent (a division of PWC); Luck-singer; and AmCareco, with its counsel, agreed to the sale of the HMOs with full knowledge of the terms of the sale and the operation of the scheme. In order to obtain approval for the sale as structured, i.e. in order for Health Net to be able to remove $8.4 million from the historieally- *615 distressed companies, the parties knowingly submitted confusing, misleading and deceptive information to the insurance regulators in each of the three states-where the HMOs did business. As a result of the sale strategy, the HMOs were damaged.

No manifest error in finding of fraud

These same facts support the judge’s and jury’s finding that Health Net 1^committed fraud. Health Net and its co-conspirators successfully used cunning, deception or artifice to cheat others to their injury. There was no manifest error in the factfinders’ conclusion in this regard.
The .negligent misrepresentation claim arises from the same facts as, and was asserted in the alternative to, the fraud claim. Although the jury was not instructed as to this cause of action, the district court found Health Net liable for negligent misrepresentation, which we will now review.
To establish liability for negligent misrepresentation, a plaintiff must demonstrate that (1) the defendant made a misrepresentation in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplied “false information” for the guidance of others in their business; (3) the defendant failed to exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff was damaged as a result of relying on that representation. Federal Land Bank Association of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex.1991), relying on Restatement (Second) of Torts § 552 (1977). In Wheeler v. American Nat. Bank of Beaumont, 162 Tex. 502, 347 S.W.2d 918, 925 (1961), the Texas Supreme Court found a receiver for an insurance company could assert a cause of action based on misrepresentations made to regulatory officials.
Here, there is no manifest error in the holding that Health Net was additionally liable for negligent misrepresentation. The evidence and testimony, especially that of the expert witnesses, confirmed that Health Net and its agents provided inaccurate and incomplete information to the regulators before the sale pursuant to a scheme to win the regulators’ approval of the sale. In the absence of accurate and complete information, the regulators were not able to understand the true facts about the transaction they were to examine. Health Net had a substantial pecuniary interest in 114Sthe sale transaction. Health Net and its agents negligently, if not intentionally, communicated inaccurate and misleading financial schedules and other information to the regulators. The plaintiffs’ reliance on these false documents was justified and caused them harm.

No manifest error in finding of unfair or deceptive acts or practices

Similarly, the testimony of both fact and expert witnesses support the judge’s and jury’s finding that Health Net engaged in unfair or deceptive acts or practices under Texas law. By filing, making or publishing untruthful and misleading statements about the financial condition of the HMOs with the intent to deceive, Health Net and its co-conspirators engaged in unfair or deceptive acts or practices as defined by Texas law. Basically, anything which Health Net or its co-conspirators created and filed which implied the HMOs would be compliant after the sale would constitute an unfair or deceptive act or practice under the circumstances of this case. There was extensive evidence that this was so.
The financial information compiled by Crary and his staff was transmitted by Health Net through Coburn at SHP to *616 Conway who filed with the regulators.[304] That information was framed in such a way that the regulators would be induced to approve the sale without knowing the true nature of the transaction.[305] Buttner, the Receivers’ expert, testified the financial schedules were absolutely misleading, in that the numbers were not provided in the proper SAP format and differed materially from the same information provided in the statutorily-mandated financial statements filed by Health Net.[306] Moreover, he believed the information provided to the state [ ^regulators was misleading, dishonest, irresponsible and lacking in integrity.[307] None of the information sent to the regulators informed them the HMOs would be statutorily insolvent or insolvent after the cash sweep.[308] Instead, the state regulators were told the cash sweep would leave enough money in the HMOs so they were statutorily solvent and had an additional $3.5 million collectively.[309] Never had Buttner seen a transaction where more assets were removed from HMOs in a sale where the HMOs were already losing large amounts of money.[310]
Keller, the expert on the Tx-DOI, believed the Form A filing, the product of information supplied by Health Net, was false and misleading because it basically stated the Texas HMO would be in statutory compliance after the transaction, and it was not.[311]
Brignac, one of the La-DOI regulators who approved the sale, believed the financial schedule was misleading.[312] She stated that after their meeting with Health Net and others a week before approval was obtained, Health Net and the others knew the only thing the La-DOI was looking at in the financial schedule was the cash sweep line. Not only did Health Net and the others never correct the regulators’ misinterpretation, the parties to the sale exploited the regulators’ confusion.[313]
Phillip Preis, another of the Receivers’ experts, accepted as an expert in corporate finance and complex corporate transactions, believed the Form A filings represented to the regulators that AmCareco had $22 million in capital, and that was |1finnot so.[314] Because the cash sweep calculation and reversal of the PDR was 75% of the sale agreement, Preis testified these provisions should have been in clear language and highlighted in order to fully disclose to the regulators the true nature of the transaction, especially considering that the transaction was occurring within such a highly-regulated industry.[315] Preis expressed outrage at the testimony of Health Net’s senior management regarding its handling of the $4 million requirement which conditioned the La-DOI’s approval of the transaction. He could not believe the distinction Health Net made to justify its removal of the PDR the day before the sale, when the statutory requirement was $3 million, while ignoring the requirement that there be $4 million *617 the following day.[316]

No manifest error in finding breach of fiduciary duty

Finally, we find the evidence at trial supported the judge’s and jury’s findings that Health Net was liable for the breach of fiduciary duties through both lay and expert testimony. Westen' believed Health Net had a fiduciary duty to the HMOs’ policyholders not to put them into another company that had no chance of survival.[317] He felt Health Net clearly had a fiduciary duty to the policyholders of the HMOs before the closing.[318] He acknowledged the transaction was negotiated by Gellert and Jansen, who had fiduciary duties to both Health Net and the HMOs.[319] But Westen saw no conflict in Gellert voting to approve the SPA and the sale of the HMOs, but Health Net receiving money in the cash sweep that had been booked in the HMOs’ hs1PDR.[320] Westen relied on the fact that the officers and directors of the HMOs aligned with Health Net resigned their positions in late April of 1999, so were not the HMO’s officers or directors at the time the money was transferred.[321]
Gellert testified he owed fiduciary duties to the HMOs before their sale to follow the regulations in the states where the HMOs did business and to meet the HMOs’ contractual commitments.[322] He felt, as a member of the HMOs’ board of directors, that he had a duty to exercise due care in the operations of the companies.[323] He would not want to operate the company in such a way as to put the policyholders at risk for not receiving medical care or not being reimbursed for medical care for which they had paid.[324] He also thought he had a duty to both the members, as well as the creditors, of the companies.[325]
Testimony showed Crary was the Health Net financial person working most closely on the deal, even though he was a Health Net officer, as well as the CFO of the HMOs.[326] Yet, Crary denied knowledge of several key aspects of the sale. He claimed he did not have input into certain aspects of the transaction; did not know how Health Net knew the cash sweep would be $8.4 million a year before the sale; did not know who set up the transaction this way; or whether Health Net came out ahead in taking the PDR, even though he was the person who performed the projections for the wind down.[327] Despite his position as an officer of the HMOs, he h.-^had no specific concern the HMOs would be financially impaired when the money was transferred out of them in the cash sweep.[328]
Preis, the Receivers’ corporate expert, however, believed there was no question *618 but that Health Net put its own interests ahead of the HMOs’ policyholders.[329] Preis testified there were conflicts of interest and self-dealing in the dual roles of the common directors and officers.[330] Luck-singer testified there was never any discussion regarding the fiduciary duties of the common directors in his discussions with Health Net.[331]
Although Health Net argued the directors and officers resigned as of April 30, 1999, and the cash sweep occurred on May 3, 1999, when Gellert, Jansen and Crary were no longer officers or directors, this circumstance does not insulate their actions from constituting a breach of fiduciary duty. The evidence established that the money in the PDR was transferred to Health Net, who still had control of the bank accounts, through the transaction which they negotiated and drafted while they still were officers and directors of the HMOs. These officers and directors of the HMOs acted on behalf of Health Net alone in negotiating and drafting the sale documents which removed the money from the HMOs and transferred it to Health Net; Health Net was liable for their actions.

No manifest error in finding of malice/gross negligence

Because the jury voted unanimously that Health Net was guilty of gross negligence and malice toward the plaintiffs, the jury was entitled to consider whether | lssthe Receivers were entitled to punitive or exemplary damages.[332] We find, after our review of the record, that the evidence was sufficient to support that factual finding, as well.[333]
*619 The evidence showed Health Net always properly accounted for PDR under the statutory and regulatory guidelines when it was the owner of the HMOs. The work papers of its external auditor, Deloitte & Touche, showed $10.5 million in PDR being necessary as of December 31, 1998.[334] Health Net had just made a capital contribution to the HMOs of more than $5 million to keep them in regulatory compliance on March 9, 1999. Consequently, there was no way Health Net could believe the HMOs could sustain a loss of more than that amount less than two months 11Mlater, when the HMOs were continuing to lose money in the interim. Nothing changed from April 30, 1999 to May 3, 1999 with the HMOs. The second after the change of ownership, there were no new contracts and no new providers; the operation was the same with only a name change and a change in control.
Yet Health Net’s senior management ignored these facts. Westen testified he knew of Louisiana’s $4 million requirement for the Louisiana HMO, but said Health Net had no obligation to make sure the Louisiana HMO met that requirement after closing.[335] He agreed that one second after the closing, all of the obligations became AmCareco and Lucksinger’s problem.[336]
As already discussed, Crary had no specific concern the HMOs would be financially-impaired after the transaction, since any concerns the medical bills would be paid was a concern for the buyers.[337] Whether or not the HMOs were insolvent after the sale was, to Crary, a problem with which AmCareco had to deal.[338] Despite knowing that a PDR of $10.5 million was determined by its external auditors, Crary testified “it would have been the responsibility of the buyers to maintain the books and records and determine the need for an ongoing PDR reserve” after the sale.[339]
Expert testimony established that reversing the PDR was not appropriate from an accounting standpoint, recognizing that nothing had changed in the HMOs which could have justified reversing the PDR account. Buttner noted there had been no rate changes, the HMOs had not gotten out of any existing contracts, and the HMOs had | ^not negotiated new provider agreements.[340] The obligation to pay future health care costs which were represented by the PDR was still a real obligation for the HMOs. Since Health Net always complied with the statutory and actuarial standard of practice regarding PDR in the past, it is reasonable to assume they were aware of those requirements, and yet purposely breached them in structuring the sale. We find the evidence supports the judge’s and jury’s conclusion that Health Net had a subjective and actual awareness of the risk of the HMOs’ failure once the PDR was removed, but proceeded with a conscious indifference of the rights, safety and welfare of the HMOs and its members in transferring that money to itself.

Discussion

The genius of this conspiracy was the plausible deniability it gave to its members. Health Net could, and did, argue its decision to sell the HMOs was purely an exercise of sound business judgment. *620 Even the Receivers’ expert, Buttner, testified that any business with an unprofitable operation may want to sell or wind down that operation.[341] Here, it was not the decision to sell which was problematic, but the manner in which the sale was confect-ed.
Health Net could claim it had found, in Lucksinger, a buyer with extensive experience in turning around failing HMOs. Yet Lucksinger acquiesced in Health Net’s scheme to gut the HMOs and improperly remove money set aside to pay future health care costs. Moreover, Lucksinger’s contacts with the Tx-DOI and his good relationship with that agency was useful in soothing the regulators’ concerns regarding the sale transaction.
Health Net could also claim the terms of the sale did not change throughout and that the regulators were not, in fact, misled. However, as we have shown, the 11SB'testimony of the regulators showed they were ignorant of the true nature of the transaction. Several of the regulators testified, similar to the testimony of Health Net senior management, that the financial schedules were only meant to calculate the cash sweep and the value of the Class A stock.[342] Yet the financial schedules were more than the means of calculating a number. They, with the operation of Section 3(q) of the Closing Agreement, showed where the money to pay the cash sweep came from and how much could be considered “excess” under the formula in the sale documents. In the sale, Health Net was authorized to obtain the excess amount of cash in the HMOs above the statutory requirements for the HMOs to do business plus $3.5 million. But by re-characterizing the PDR as a Restructuring Reserve in the Closing Agreement, and reversing the restructuring reserves as of the day before the sale, they dumped $6.3 million in cash into the “excess” while leaving the HMOs with actual liabilities that still had to be paid. As Buttner said, the problem with the sale strategy was that there was no excess.[343] We believe our detailed review of the regulators’ testimony shows they were misled as to the true nature of the transaction and that the Closing Agreement materially affected the earlier sale documents.
The judge and jury, in finding the evidence of the conspiracy and the substantive torts proved, were also able to evaluate the testimony of several key witnesses who claimed to remember none of the details of the transaction. Crary, Coburn and Conway, who testified by videotaped deposition, could not remember pertinent details of their actions which gave effect to Health Net’s scheme. The fact finders rejected Health Net’s justifications, and we find the record supports their credibility determinations.
| ,S7The judge and jury were provided with two opposing views in the expert testimony and chose to believe the Receivers’ expert witnesses. In addition to the expert testimony of the Receivers referred to throughout this opinion, there were several other expert opinions worth noting. Although Buttner agreed several persons and entities shared liability for the failure of the HMOs, he placed Health Net at the top of the list of those responsible because Health Net took the money out of the *621 HMOs’ reserves and left the companies in the condition they were in.[344]
Preis formed two main opinions in this case. First, Preis after working in regulated industries for thirty years, had never seen a transaction where the capital of a company was reduced and paid to a controlling shareholder when there was no actuarial study done to justify the payment of that amount and when the company had experienced losses on an ongoing basis to the degree that these companies had experienced losses.[345] Second, Preis believed Health Net took the money from the PDR accounts for one reason-AmCareco did not raise enough money in its stock offering. Rather than raising the $22 million which AmCareco knew it needed to fund its business plan, AmCareco only raised $7 million. AmCareco, therefore, did not have the money to pay Health Net the amount Health Net wanted out of the deal, and Health Net was not going to leave without that amount of money.[346]
According to Preis, Health Net alone was responsible for the re-characterization and reversal of the PDR account because Health Net was the only party who could have decided, or agreed, to do so. Health Net owned the HMOs; the HMOs were never parties to the agreement.[347] Preis believed the scheme was in place |iasas early as 1998. He based his belief on the fact that Exhibit A to the Letter of Intent assumes the reversal of a $6.3 million restructuring reserve prior to the closing. At that time, there were no significant restructuring reserves on the books of the HMOs, and certainly not in that amount.[348]
By contrast, Health Net’s first expert witness failed to qualify.[349] Health Net’s other expert witness, Bryon Jones, was accepted only as an expert CPA.[350] A review of his testimony shows his sampling of information was extremely limited and insufficient. In fact, he failed to develop opinions on several pertinent issues. Jones declared the HMOs were solvent after the sale, but acknowledged the orders of the insurance commissioners said nothing about solvency.[351] He admitted the HMOs were below statutory minimum requirements immediately after the cash sweep, but had not tried to develop an opinion as to that.[352] Jones found AmCa-reco had a little over $5 million it could have contributed to the HMOs, but admitted he had seen nothing which would have required AmCareco to do so.[353] He admitted he did not know if insurance regulations would allow him to make that assumption.[354] Jones thought a lay person could decide whether the financial schedules were clear, but did not come to any opinion about whether AmCareco was adequately capitalized.[355] In developing his opinion, Jones looked at the sources and uses section of the POM, but did not conduct an analysis or account for the $2 million which would be spent on the 1^computer system.[356]
*622 The record shows the Receivers’ expert rebutted each of Jones’ opinions. Buttner testified Jones’ analysis was incorrect because it was not based on what the companies actually did.[357] Buttner pointed out Jones’ analysis of the intercompany pay-ables was contradicted by the audited financial statement at YE 1999. By contrast, Buttner took his numbers directly from the statutory filings made by the HMOs and did not interpose one scintilla of his own judgment into those numbers.[358] The record supports the judge’s and jury’s determinations to credit the testimony of the Receivers’ expert witnesses over that of Health Net’s expert.
After a painstaking review of the record, we find no manifest error in the factual findings of the judge and jury. We affirm their determinations that Health Net is liable for a breach of fiduciary duty, committed fraud, knowingly engaged in an unfair or deceptive act or practice, conspired with others, made negligent misrepresentations and acted with malice or gross negligence. The factual findings of the judge and jury in this regard are affirmed. We now review the damages awarded and the judgment notwithstanding the verdict.
REVIEW OF DAMAGE AWARDS

Compensatory damages

Health Net argues the compensatory damages awarded to the Receivers must be reversed or reduced. Health Net claims the amounts awarded are excessive, are based upon speculative and imprecise evidence, and should be reduced by certain amounts attributable to other tortfeasors. Finally, Health Net contends the jury instruction with regard to damages was prejudicially erroneous.
| KipUnder Texas law, the plaintiff bears the burden to prove his damages with reasonable certainty to enable a jury to compute them. Ford Motor Co. v. Cooper, 125 S.W.3d 794, 803 (Tex.App.-Texarkana 2004). Although awards should not be based on speculation,
[c]ourts distinguish between uncertainty as to the fact of damages, which may preclude recovery, and uncertainty as to the amount of damages, which will not defeat recovery.... When the fact of damages is clear, the plaintiff is required to prove his damages with only “reasonable certainty.”
Qaddura v. Indo-European Foods, Inc., 141 S.W.3d 882, 890 (Tex.App.-Dallas 2004) (internal citations omitted). Rigid mathematical certainty is not required. Bildon Farms, Inc. v. Ward County Water Imp. Dist., 415 S.W.2d 890, 896 (Tex.1967). Instead,
[i]f an injured party has produced the best evidence available, and if it is sufficient to afford a reasonable basis for determining his loss, he is not to be denied a recovery because the exact amount of the damage is incapable of ascertainment.
Vance v. My Apartment Steak House of San Antonio, Inc., 677 S.W.2d 480, 484 (Tex.1984). Courts may not award damages which would result in an impermissible double recovery. Southern County Mut. Ins. Co. v. First Bank and Trust of Groves, 750 S.W.2d 170, 173-174 (Tex.1988).
With these principles in mind, we will review each of Health Net’s contentions regarding the compensatory damages awarded.

*623
1. Jury charge

Health Net argues the district judge gave only a brief, vague instruction on compensatory damages, essentially telling the jury to award a “just and adequate compensation.” [359] Health Net complains the district court failed to instruct the jury on the proper measure of damages, even though Health Net provided fuller | ^instructions ⅛ its proposed charges. Health Net contends such a vague, stan-dardless instruction is reversible error. Additionally, Health Net argues the district court refused to instruct at all on offset, even though Health Net proposed such an instruction. Health Net claims the result was a lawless damage verdict.
We find Health Net misrepresents the entirety of the court’s instruction on damages and we hold its contentions have no merit. The district court instructed the jury:
Damages. If you find that defendant breached this standard of care and this breach caused the plaintiff harm, the next thing you must decide is what the measure of damages should be.
In regard to damages, the law contemplates at this juncture simple reparation or, in other words, a just and adequate compensation for damages. This rule of law does not suggest or abide any idea of revenge or punishment.
Accordingly, you should not include any element in your verdict of such pu-nitives. Your award, if you should decide that one is appropriate, should be designed to fairly compensate the plaintiff for the damages actually suffered.
The proper goal of a damage award is to restore the plaintiff as closely as possible to the position which they would have occupied had the injury never occurred.
In the process of reaching a verdict on the question of damages, do not include anything for the payment of court costs or attorney fees. The law does not consider these as damages suffered by the plaintiff. If you decide to make an award, follow the instruction that I have given to you and do not add or subtract from the award on account of federal or state income taxes.
Let me also say that it may be necessary to charge you further with respect to damages, should your verdict permit a further review or further aspect of this case.
Let me also say the fact I have given you all these statements about the law does not in any way imply or suggest that the court feels or does not feel that any damages are due in this case, for whether or not damages are due is solely for you to determine.
Statements of any attorney in this case as to his estimate of dollar amounts to be awarded and similar claims are not evidence and are to be | ^ ^disregarded by you unless supported by the evidence. The determination of damages is solely your function and must be based upon competent evidence and not upon mere suggestion.[360]
The district court also read to the jury the interrogatories which it had to answer after its deliberations, including Interrogatory # 10, which questioned the jury about damages:
*624 In a like manner you then move to Interrogatory ten which says, what sum of money will fairly and reasonably compensate the Texas HMO and their creditors for the actual damage proximately caused by the fault of defendant Health Net, Incorporated. There is a line for you to complete.[361]
A review of the two jury instructions Health Net proposed which were not used by the district court shows the charge which was provided to the jury was substantially similar.[362] We hold the district court properly instructed the jury it could only award compensatory damages, described as damages which contemplated simple reparation only, or a just and adequate compensation, for actual damages proximately caused by the fault of Health Net alone. The instruction informed the jury it should award compensatory damages only if the jury believed a damage award was appropriate in this case. Finally, the jury was instructed that any compensatory damages which it awarded had to be based upon competent evidence, and not upon suggestion.[363]
11B3With regard to Health Net’s proposed instruction on offset, we find the proposed charge sought to reduce any compensatory damages awarded by the amount of two promissory notes given by “the AmCareco single business enterprise” to Health Net. Although the evidence showed AmCareco operated the HMOs in a concerted fashion, the expert testimony at trial was undisputed that the shifting of assets between and among the regulated insurance companies and the unregulated parent company and management company was improper under accounting principles and contrary to the statutes and regulations in each of the states where the HMOs conducted business. Thus, the requested instruction was contrary to the applicable law.[364] We find the district court did not err in failing to present such a charge to the jury. 2. The Texas award
Health Net contests the amount of the compensatory damages awarded to the Texas Receiver. Health Net argues the award is excessive, in that there was evidence showing the amount awarded by the jury, $52,400,000, should have been reversed or reduced.[365] Health Net also con *625 tends the compensatory damages were not proved with reasonable certainty. We will consider the evidence supporting the jury’s award, as well as each of Health Net’s arguments.
The Texas Receiver testified about the receivership process in Texas and her receipt of proof of claims with regard to the AmCare-Tx receivership. In Texas, if |1Ma creditor does not meet the claim filing deadline, that claim is not considered.[366] After receipt of approximately 25,000 proof of claims amounting to $163 million, the Texas Receiver adjudicated the claims over a two and a half year period to conclude the total amount of unpaid claims was $52,403,000.[367] In order to adjudicate the claims, the Texas Receiver had to draft a plan and methodology which would be used tó determine the amount of total unpaid claims. That plan and methodology were approved by the receivership court.[368]
The Texas Receiver had been able to marshal assets of AmCare-Tx from others in the amount of a little over $5 million, and had approximately $12 million in the bank at the time of her testimony. However, she testified she was also obligated to pay the expenses for the claims adjudication, for litigation and for experts from the receivership’s assets.[369]
The Texas Receiver affirmed that Mark Tharp was hired as an expert in the litigation to review the claims adjudication procedures of the HMOs.[370] After Tharp’s review, he rendered a report on the potential duplicate payments and overpayments.[371] After he received further information, he adjusted those potential figures downward.[372] However, he never had the actual proofs of claim that were obtained by the Receivers, and so deferred to their actual adjudication of the claims made as |1(Wfar as the amounts of duplicate payments and overpayments.[373] In her testimony, the Texas Receiver stated she had already offset duplicate payments or overpayments to reach the $52,403,000 figure in determining the total amount of unpaid claims.[374]
The Texas Receiver had not yet obtained court approval as required before payment of the unpaid claims.[375] However, immediate approval of claims had not been sought because she believed the more prudent and reasonable course was for a receiver to wait until all of the assets can be determined. Once all the assets are determined, the receiver can go to the receivership court and state definitively the amount of claims and the money which is available to pay the claims. If a distribution less than total is necessary, ie. the claims exceed the available recovery so that the receiver will be able to pay only *626 cents on the dollar per claim, the court can at that time determine what will be the rate at which the claims are paid.[376] Due to a 90 day period during which claimants can protest the number of unpaid claims, the Texas Receiver admitted the number could change.[377]
Health Net argued the testimony of the Texas Receiver, as a verbal estimate of the amount of the total unpaid claims is not “reasonably certain” evidence upon which the jury could based its compensatory damage award. Health Net also contends, since the Texas Receiver has not yet obtained court approval to pay these claims, the total amount of unpaid claims about which she testified is, at this time, wholly speculative and cannot support a compensatory damage award. We find to the contrary. The Texas Receiver’s explanation of the claims process in Texas, the work done by her | ^staff in processing the proofs of claims, and her determination of the total amount of unpaid claims produced the best evidence available to quantify the amount of the damages suffered; we find the question of the amount of compensatory damages was properly submitted to the jury. Vance, 677 S.W.2d at 484 (where an estimate was sufficient to raise a question of fact to defeat a directed verdict on the question of damages); Bildon Farms, 415 S.W.2d at 897 (“All that the law requires is that the best evidence of which a case is susceptible be produced, and if from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury.”).
Health Net additionally argues the amount of the total unpaid claims should be reduced by the $12 million which the Texas Receiver has in the bank on behalf of AmCare-Tx. The district court specifically denied Health Net this reduction in her ruling on JNOV.[378] We agree that the compensatory damage award should not be reduced by this amount. In addition to the total amount of unpaid claims, the Texas Receiver testified she was also obligated to pay the expenses for the claims adjudication, for litigation and for experts from the receivership’s assets.[379]
Finally, Health Net argues the amount of compensatory damages should be reduced by Tharp’s original estimate of potential duplicate payments and overpay-ments. The testimony was clear at trial, however, that Tharp’s original estimate was further reduced after further information was conveyed to him, and that hi^his estimate of potential duplicate payments and overpayments were not as precise as the Receivers’ own adjudication of the proofs of claims. The Texas Receiver testified she had already accounted for duplicate payments and overpayments in her determination of the total unpaid claims. Consequently, there should be no further reduction in the compensatory damages awarded by the jury to the Texas Receiv *627 er; we affirm that award, subject to our analysis of the district court’s JNOV.

3. The Oklahoma award

On appeal, Health Net contested the amount of compensatory damages awarded to the Oklahoma Receiver. Health Net argues the award is excessive, in that there was evidence showing the amount awarded by the judge, $24,426,005,[380] should have been reduced for various reasons.[381] We will consider the evidence supporting the judge’s award, as well as each of Health Net’s arguments.
As in Texas, everything the Oklahoma Receiver does is supervised by the receivership court in Oklahoma. All bills have to be submitted for approval; all claims have to be approved before paid.[382]
Barry Bostick, the Assistant Receiver for AmCare-Ok testified that 82,400 proofs of claims remained unpaid in Oklahoma.[383] The Assistant Receiver testified about the claims review process which was conducted, which resulted in a report submitted to the receivership court.[384] The Assistant Receiver testified the total amount of unpaid claims in Oklahoma, for which proofs of claims had been received |1(iSas of the time of his testimony, was $24,426,005.[385] This number includes both timely filed claims and untimely filed claims and has been approved by the receivership court. The Assistant Receiver explained that, in Oklahoma, untimely filed claims can be filed up until the time the receivership court makes a distribution, and the court, at its option, can accept them. The untimely filed claims will be paid only if funds remain after paying timely filed claims.[386]
As of that time, the Oklahoma Receiver had recovered between $6-7 million in the bank for the estate of AmCare-Ok.[387] The Assistant Receiver testified the receivership estate was responsible for other expenses that still had to be paid out of those sums.[388] Some of these items were legal fees, expenses, expert expenses, the administrative costs of the receivership, record storage facilities and phone bills.[389]
Health Net argues the compensatory damage award should be reduced by the amount of funds which the Oklahoma receivership has on hand for AmCare-Ok. We agree with the district judge that no reduction in this amount should be made in the compensatory damages. In addition to the total amount of unpaid claims, the Oklahoma Receiver is also obligated to pay the expenses for the claims 'adjudication, for litigation and for experts from the receivership’s assets.
As with the Texas award, Health Net urges the compensatory damage award should be reduced by the amount of *628 Tharp’s estimate of the potential duplicate payments and overpayments. However, the Assistant Receiver stated he would not defer to Tharp’s amount of duplicate payment or overpayment in Oklahoma. Instead, 11fiahe would rely on the detailed line item work that he did in determining these amounts, “because I know this is the right number.” [390] Even Tharp deferred to the final determinations of those numbers by the Oklahoma Receiver.
Health Net claims a reduction should be made in the amount of $1,056,000, which the Assistant Receiver believes is owed to the Oklahoma HMO by individuals who have submitted proofs of claim to the Oklahoma Receiver. The Assistant Receiver acknowledged approximately $1,056,522.21 were duplicate payments or overpayments which the Oklahoma Receiver would attempt to collect either outright, or through offsetting other payments. However, he cautioned that those amounts may not be collectible.[391] Under these circumstances, we do not believe a reduction in the compensatory damages in this amount is warranted.
Finally, Health Net contends the Oklahoma compensatory damages should be reduced by $1.5-$1.8 million which the Oklahoma HMO believes was improperly paid to AmCare-Mgmt. The Assistant Receiver indicated that AmCare-Ok filed a proof of claim against AmCare-Mgmt in that amount.[392] In a somewhat confusing exchange with Health Net’s counsel about this issue, the Assistant Receiver indicated the amounts that they believed AmCareco paid AmCare-Ok were, in fact, bogus capital contributions.[393] Although not fully fleshed-out, it appears the basis for Health Net’s argument in this respect is that Am-Careco and AmCare-Mgmt were companies allegedly controlled by others, and so this amount should be offset against the total award of compensatory damages. However, the district court’s judgment shows the amount of compensatory damages awarded to the Oklahoma HMO was based solely li7non damages the district judge believed AmCare-Ok sustained “as a result of defendant Health Net, Inc.’s fault.” [394] The compensatory damages were then reduced by the amount of fault allocated to other persons or companies.
We find there was sufficient evidence supporting the district court’s award of compensatory damages to the Oklahoma HMO and affirm that award. The reductions asserted by Health Net are not warranted.
A The Louisiana award
On appeal, Health Net contested the amount of compensatory damages awarded to the Louisiana Receiver. Health Net argues the award is excessive, in that there was evidence showing the amount awarded by the judge, $9,511,624.19,[395] should have been reduced for various reasons, and ultimately reversed, as the asserted reductions are greater than the total amount.[396] We will consider the evidence supporting the judge’s award, as well as each of Health Net’s arguments.
The Deputy Receiver for AmCare-La, L.D. Barringer, testified about receiver *629 ship proceedings in Louisiana.[397] All funds which are spent by the receiver must be authorized by the receivership court, including all claims that will be paid.[398] At that point, the receivership court had not yet approved the payment of any claims.[399]
The Deputy Receiver testified that after months of work, the receivership 1,71 determined there were $490,000 duplicate payments or overpayments.[400] However, he had not yet made an analysis as to how much of that amount applied to what was owed to AmCare-La.[401] It was the receivership’s intention to either recover those funds directly or offset those amounts when appropriate where the overpayment was made to someone who has filed a proof of claim.[402] He believed the majority of the duplicate payments and overpayments had been made to persons who had filed proofs of claims.[403] However, he indicated it would not be correct to simply setoff that amount against the total of the unpaid claims. He would hot know if the breakdown of unpaid claims was made up of claims having the same offset until further work was done in the receivership.[404]
The Deputy Receiver stated there were about 40,000 unpaid claims which the Louisiana receivership had to process.[405] The unpaid claims in Louisiana were broken down into three subsets — timely filed proofs of claims, untimely filed proofs of claims, and unpaid estate medical claims.[406] A summary of those claims, as well as a printout of all of the proofs of claims, was admitted in evidence.[407] The Deputy Receiver testified the total of all unpaid claims up until that point is $9,511,624.19; _jjj2however, the receivership was still receiving claims.[408]
A proof of claim on behalf of AmCare-La was filed in the receivership in Texas of AmCare-Mgmt in the amount of $17 million.[409] After considerable discussion about the nature of the items supporting the $17 million claim, the Deputy Receiver testified AmCare-La’s proof of claim had not been approved to be paid by the Texas receivership court, and the Deputy Receiver had no hope the claim could ever be paid.[410]
Health Net contends the amount of compensatory damages should be reduced by the amount of estate medical claims, because no proofs of claims had yet been filed, and by the amount of duplicate payments or overpayments which have not yet been processed. We disagree. The Loui *630 siana Deputy Receiver’s explanation of the claims process in Louisiana, the work done by his staff, and still to be done, in processing the proofs of claims, and his determination of the total amount of unpaid claims produced the best evidence available to quantify the amount of the damages suffered. See Vance, 677 S.W.2d at 484; Bildon Farms, 415 S.W.2d at 897.
Health Net also contends the damage award should be reduced by the amount of potential duplicate payments and overpay-ments found by Tharp. As with the identical claim made with respect to the Texas and Oklahoma compensatory damage award, we find no reduction is necessary. The testimony at trial was clear that Tharp determined only the potential amount of duplicate payments and over-payments. Tharp himself deferred to the actual amounts of duplicate payments and overpayments determined by the Receivers who analyzed the actual proof of claims.
Finally, Health Net claims the compensatory damage award should be reduced 1178in the amount of the proof of claim which AmCare-La filed in the receivership proceeding of AmCare-Mgmt, claiming Health Net had nothing to do with improper payments made by others. We disagree. Not only are the compensatory damages awarded here “as a result of defendant Health Net, Inc.’s fault,” the testimony was clear that the Texas receivership court had not approved payment of the Louisiana HMO’s proof of claim, nor did the Deputy Receiver have any hope such a claim would be paid.[411]
We find there was sufficient evidence supporting the district court’s award of compensatory damages to the Louisiana HMO and affirm that award. The reductions asserted by Health Net are not warranted.

Punitive Damages

Health Net argues the jury instructions provided to the jury before its consideration of punitive or exemplary damages was prejudicially erroneous, as the charge failed to adequately inform the jury about several aspects of Texas law. In addition, Health Net contends the punitive damage award was excessive and violated its right to due process.

1. Jury charge on punitive damages

Health Net asserts the instructions given by the district court for the jury’s consideration of punitive or exemplary damages were prejudicially erroneous because the district judge failed to give several specific instructions required by Texas law.[412] We will examine the law of Texas with regard to punitive or exemplary damages and the jury charge to determine the correctness of Health Net’s complaint.
The record shows that after the jury returned with its verdict on the tort claims | ¶ 74 of the Texas Receiver, the district court held a conference in chambers with counsel during a brief recess. When court was back in session, the district court informed the jury that there had been a bifurcation of certain issues and that the remaining issue concerned exemplary damages, which would now be submitted to them for their consideration.[413] At that time, a stipulation was placed on the record that the jury could consider in its computation of *631 damages the fact that the financial net worth of Health Net was $500 million.[414]
Thereafter, counsel for the Texas Receiver and Health Net were allowed to present a short argument on the issue of punitive damages. Counsel for the Texas Receiver stated the jurors’ unanimous finding that Health Net was guilty of gross negligence and malice against the plaintiffs allowed them to consider whether punitive or exemplary damages should be awarded. The Texas Receiver’s counsel argued such damages were to punish and to “send a message” to litigants whose conduct was egregious. Rather than suggest an amount of damages to punish Health Net, counsel for the Texas Receiver left that consideration for the jury.[415] Counsel for Health Net stressed that any message the jurors had wanted to send was made with their award of $52.4 million in compensatory damages. Health Net’s counsel argued that Health Net was “rocked” by their earlier award and urged that the jury seriously consider no further award.[416]
The district court then instructed the jurors what Texas law required them to consider in determining the amount of exemplary damages:
In determining the amount of exemplary damages the trier of fact shall consider evidence, if any, relating to the nature of the wrong, the 117ficharacter of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties con-
cerned, the extent to which such conduct offends a public sense of justice and propriety, and the net worth of the defendant. Evidence that is relevant only [to] the amount of exemplary damages that may be awarded is not admissible during the first phase of a bifurcated trial.
That is your charge and the court is going to retire the jury. You must be unanimous in this decision as to whether or not to award exemplary damages. Anything further, counsel?[417]
At this point, counsel for the Texas Receiver pointed out to the court the requirement under Texas law that a jury be unanimous as to the amount of any exemplary damages awarded.[418] Thereafter, the district judge instructed the jurors: “As to the amount. The court stands corrected. As to the amount of exemplary damages that you award it must be unanimous. Does that correct the record?”[419] There were no objections to the jury charge which the district court provided.
Health Net’s failure to object to the jury instruction on punitive damages either before the jury retired to deliberate or immediately thereafter waives this ground for review. See La. C.C.P. art. 1793(C).[420] However, since Health Net raises due process concerns with regard to this issue, we will briefly consider the sufficiency of the court’s charge. According to Texas law, “[i]n a trial to a jury, the *632 court shall instruct the jury with regard to Sections 41.001, 41.003, 41.010, and 41.011.” Tex. Civ. Prac. & Rem.Code § 41.012.
Tex. Civ. Prac. & Rem.Code § 41.001 provides definitions of various words or types of damages which may arise in a damages jury instruction. Considering 117fiHealth Net’s argument, we discern the specific definition which Health Net claims was omitted from the jury’s charge was a formal definition of “exemplary damages.” [421] “Exemplary damages” is defined at Section 41.001(5) as “any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages are neither economic nor noneconomic damages. ‘Exemplary damages’ includes punitive damages.”
While the district court did not provide the jurors with a formal definition of exemplary damages at this time, we note her instructions on compensatory damages, which the jury heard directly before this portion of the trial, made the distinction between compensatory damages and punitive damages. Compensatory damages were defined as those for “simple reparation,” “to fairly compensate the plaintiff for the damages actually suffered,” and “to restore the plaintiff as closely as possible to the position which they would have occupied had the injury never occurred,” distinct from “any idea of revenge or punishment. Accordingly, you should not include any element in your verdict of such punitives.” [422] We find the jury was actually instructed as to the meaning and purpose of punitive damages. See La. C.C.P. art. 1792(A).[423]
Although we cannot consider the argument of counsel as a substitute for the court’s instruction, we note that the purpose and meaning of exemplary or punitive damages constituted the major theme of the brief argument by both counsel provided immediately before the jurors’ deliberation. We also consider the lack of objection by Health Net’s counsel at that time. We find, on this record, that the jurors were adequately informed about the nature and purpose of the punitive damages which | mthey were instructed to consider.
Tex. Civ. Prac. & Rem.Code § 41.003 provides the standards for recovery of exemplary damages:
§ 41.003. Standards for Recovery of Exemplary Damages
(a) Except as provided by Subsection (c), exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:
(1) fraud;
(2) malice; or
(3) gross negligence.
(b) The claimant must prove by clear and convincing evidence the elements of exemplary damages as provided by this section. This burden of proof may not be shifted to the defendant or satisfied by evidence of ordinary negligence, bad faith, or a deceptive trade practice.
(c) If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a *633 specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages result from the specified circumstances or culpable mental state.
(d) Exemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages. -
(e) In all cases where the issue of exemplary damages is submitted to the jury, the following instruction shall be included in the charge of the court:
“You are instructed that, in order for you to find exemplary damages, your answer to the question regarding the amount of such damages must be unanimous.”
Because the issue of liability and compensatory damages was bifurcated from the issue of punitive or exemplary damages, the district court was not required to instruct the jurors as to the provisions of Tex. Civ. Prac. & Rem.Code § 41.003(a), (b) and (d). At the time the jurors considered awarding punitive damages, they had already unanimously found, by clear and convincing evidence, and after proper 117Sinstruction, that Health Net acted with malice or gross negligence.[424] See Tex. Civ. Prac. & Rem.Code § 41.009(d) (“If liability for exemplary damages is established during the first phase of a bifurcated trial, the trier of fact shall, in the second phase of the trial, determine the amount of exemplary damages to be awarded, if any.”). Subsection (c) is inapplicable to the facts of this case; consequently, there was no need for the district court to give an instruction consistent with that subsection. Finally, we find the district court affirmatively instructed the jurors in compliance with Subsection (e) that their decision on punitive damages had to be unanimous as to the amount awarded.
Tex. Civ. Prac. & Rem.Code § 41.010(a) has already been discussed. Subsection (b) provides: “[s]ubject to Section 41.008 [which provides limitations on the amount of recovery for use by the court alone], the determination of whether to award exemplary damages and the amount of exemplary damages to be awarded is within the discretion of the trier of fact.” We find the district court instructed the jurors that “[t]he question of exemplary damages or punitive damages belongs to the jury.” We find the district court also instructed the jurors on the factors they should consider “whether or not” they awarded exemplary damages. We hold the district court. substantially complied with the provisions of Section 41.010.
Tex. Civ. Prac. & Rem.Code § 41.011 details the type of evidence the trier of fact shall consider in determining the amount of exemplary damages to award, if any. We find the district court repeated the provisions of this Section verbatim to the jurors. There was no violation of Texas law.
Having considered the requirements of Texas law for instructing a jury on the issue of punitive or exemplary damages, and the jury charge actually provided to the |17ajurors in this case, we hold there was no error which acted to Health Net’s prejudice; Health Net’s assignments of error in this regard have no merit.

2. Excessiveness/'due process

Health Net contends the punitive damages awarded in this case were excessive as a matter of law. In Mosing v. Domas, 2002-0012 (La.10/15/02), 830 So.2d 967, *634 this court considered the appropriate standard of review to apply in evaluating the amount of exemplary damages awarded by a jury or trial court challenged as being excessive under federal due process, the law of this state, and/or the common law. In its extensive analysis, Mosing discussed the U.S. Supreme Court’s most recent cases on this issue:
In recent years, the U.S. Supreme Court has decided a number of cases raising exemplary damages issues. Most significantly, in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court ruled that exemplary damage awards that are “grossly excessive” violate the Due Process Clause of the Fourteenth Amendment. The Court then provided three “guideposts” for gauging when an exemplary damage award crosses the constitutional line: (1) the reprehensibility of the defendant’s conduct; (2) the ratio between the exemplary damage award and the harm the defendant’s conduct caused, or could have caused; and (3) the size of any civil or criminal penalties that could be imposed for comparable misconduct. These constitutional constraints on the amount of exemplary damage awards were afforded more significance in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., [532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)], supra. Therein, the Supreme Court ruled that state and federal appellate courts must conduct a de novo review of claims that exemplary damage awards are grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Cooper, 532 U.S. at 433-434, 121 S.Ct. at 1685-1686.
Id., 2002-0012 p. 6, 830 So.2d at 972-973.
Mosing concluded “that when an appellant has properly raised a federal due process claim, pursuant to Cooper, the reviewing court must conduct a de novo review of the exemplary damage award, utilizing the three ‘guideposts’ set out in BMW of North America v. Gore, supra.” Id., 2002-0012 p. 10, 830 So.2d at 975.[425] Our review of the record reveals Health Net raised its federal due process excessiveness claim in both the trial court, in its motion for JNOV, and on appeal, in its brief contesting the Texas judgment.[426] Consequently, this court will conduct a de novo review of the exemplary damage award under the factors set forth in BMW.
First, we will examine de novo the degree of reprehensibility of Health Net’s conduct. “[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” BMW, 517 U.S. at 575, 116 S.Ct. at 1599. In making this examination, we will consider whether:
the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated inci *635 dent; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003), citing BMW, 517 U.S. at 576-577, 116 S.Ct. at 1599-1600.
Based on the evidence, we find Health Net’s conduct had an enormous economic impact on the fate of the Texas HMO. By orchestrating a scheme to divest itself of the financially-distressed HMO, while at the same time removing a substantial amount of the assets remaining in the company, Health Net' essentially gutted the foundering HMO before leaving it in the hands of an undercapitalized holding company. But economic harm was not the only result of Health Net’s |1slconduct. Since the economic harm was caused to an HMO, Health Net’s conduct also evinced an indifference to or a reckless disregard of the health and safety of others, namely the HMO’s members and policyholders.
There were actually two financially-vulnerable targets of Health Net’s conduct— the HMO itself, and the members and policyholders it serviced. The HMO was financially-vulnerable to Health Net’s conduct because the HMO was Health Net’s wholly-owned subsidiary. In addition, some of the officers and directors of the Texas HMO, who should have been acting with due care for the interests of the HMO, were subverted by their dual loyalty to Health Net to create and work on the scheme which resulted in the HMO’s financial harm. The members and policyholders of the HMO were financially-vulnerable, as well. Since the parties to the sale were Health Net and AmCareco only, with no participation by the Texas HMO, the members and policyholders of the HMO had no say whatsoever in the terms of the transaction.
Although the sale transaction was a single occurrence, we find there were multiple instances of concerted effort where Health Net and its agents acted to bring the improper sale scheme into existence.
Finally, we believe the evidence was overwhelming that the harm which occurred was the result of intentional malice, trickery or deceit. For all of the reasons expressed in our manifest error review of the jury’s findings of fraud, malice or gross negligence, we find, upon our de novo review of that same evidence, that Health Net’s conduct was malicious and deceitful.
We now examine the second factor for determining whether the exemplary damage award was constitutionally excessive— the ratio between the compensatory damages awarded and the exemplary damages awarded in this case. In the BMW 1182case, we noted “the Supreme Court was troubled by the 500 to 1 punitive to compensatory damages ratio presented in that case.” Mosing, 2002-0012 p. 20, 830 So.2d at 981. However, the Supreme Court cautioned “we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula.” BMW, 517 U.S. at 582, 116 S.Ct. at 1602. We have previously held an award of exemplary damages “must be viewed in its unique context, in light of the facts of the case and with reference to the actual damages awarded and the potential harm that could have resulted from the defendant’s conduct.” Mosing, 2002-0012 p. 21, 830 So.2d at 981, citing BMW, 517 U.S. at 580-583, 116 S.Ct. at 1601-1603.
Here, the ratio of compensatory to exemplary damages is 1:1.24. We see no “shocking disparity” inherent in this figure. We note the amount of punitive damages awarded in this case does not violate the limitations on the amount of recovery *636 found in Tex. Civ. Prac. & Rem.Code § 41.008(b), which provides:
Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of: (1)(A) two times the amount of economic damages;[427] plus (B) an amount equal to any noneco-nomic damages found by the jury, not to exceed $750,000; [428] or (2) $200,000.[429]
The actual economic harm suffered by the members, policyholders and creditors of the Texas HMO was extensive, not to mention the possibility of significant harm to the health, safety and well-being of the HMOs members and policyholders.
| ^Finally, comparing the exemplary damage award to the civil or criminal penalties that could be imposed for comparable misconduct is not easily accomplished. Although the insurance industry is highly regulated, the “penalty” which the regulators would have imposed had they been aware of the true nature of the transaction and the fraudulent and deceitful conduct of Health Net would have been a rejection of the change of control of the HMO. The record lacks any indication that criminal sanctions were sought for the fraudulent conduct of the defendants. Consequently, we do not find our analysis of this factor aids our determination whether the exemplary damages are excessive.
We additionally consider the wealth of the defendant, as this court has held that information is an appropriate factor to consider. Mosing, 2002-0012 p. 10, 830 So.2d at 975. The parties stipulated the financial net worth of Health Net was, at that time, $500 million. The award of exemplary damages is 13% of the financial net worth of Health Net. While we concede that this award is large, it is well within Health Net’s ability to pay.
Considering the above factors in our de novo review of the exemplary damage award, we conclude that the award of punitive damages, under the facts of this case, is not so excessive as to constitute a violation of Health Net’s rights to due process.

3. Due process/Louisiana evidence

Health Net argues its due process rights under the Fifth and Fourteenth Amendments were also violated because the jury in the Texas case was improperly permitted to punish Health Net for alleged “unlawful acts committed outside” Texas, in violation of State Farm, 538 U.S. at 421-422, 123 S.Ct. at 1522. Health Net contends the district court allowed the jury to hear and consider evidence from the Louisiana regulator, over objection, that concerned conduct that occurred wholly 1184outside of Texas and that was relevant only to the Louisiana case.
*637 The record shows that Denise Brignac, the Louisiana regulator, testified before the jury, over the objection of Health Net.[430] Her testimony generally consisted of her review of the Louisiana Form A filing, which was the same as the Form A filed in the other states; her dealings with AmCareco’s regulator counsel, Susan Conway; her receipt of the identical financial schedules and information which was used in all three states; her lack of understanding of the terms of the sale; and her belief that she was misled by the information conveyed to her. Health Net claims allowing this testimony before the jury was prejudicial error. Health Net further claims the district court compounded this error by failing to instruct the jury what they could properly consider for purposes of awarding exemplary damages. Health Net asserts the jury was effectively permitted to consider Health Net’s alleged actions in Louisiana in awarding exemplary damages in the Texas case.
Health Net relies on BMW, supra, and State Farm, supra, for the proposition that due process requires that punitive damages cannot be imposed on a defendant for unlawful acts committed outside of the State or for conduct that does not have a nexus to the specific harm suffered by the plaintiff. The factual circumstances here distinguish this case from either State Farm or BMW. At issue in both BMW and State Farm was evidence submitted in support of an award of punitive damages of the defendant’s conduct out-of-state that was lawful in that jurisdiction. In that context, State Farm held “[ljawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant’s action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.” Id., 538 U.S. at 422, 123 S.Ct. at 1522. This was based on the |iSS“basic principle of federalism ... that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction.” Id., 538 U.S. at 422, 123 S.Ct. at 1523.
Not only were the out-of-state actions in State Farm lawful in the state where they were committed, but the conduct bore no relation to the plaintiffs harm and, in fact, were dissimilar acts. Under these circumstances, the Supreme Court held:
A defendant’s dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages. A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties’ hypothetical claims against a defendant under the guise of the reprehensibility analysis ... [which the Supreme Court had no doubt the reviewing court did here].
Id., 538 U.S. at 422-423, 123 S.Ct. at 1523.
The Supreme Court cautioned “[punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains.” Id., 538 U.S. at 423, 123 S.Ct. at 1523. Although normally recidivist actions may serve as justification for exemplary damage awards, the Supreme Court warned that, “in the *638 context of civil actions courts must ensure the conduct in question replicates the prior transgressions.” Id. Since the plaintiffs in that case “identified scant evidence of repeated misconduct of the sort that injured them,” the Supreme Court was not convinced “that State Farm was only punished for its actions toward the [plaintiffs].” Id. In conclusion, the Supreme Court directed “[t]he reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this ease extended for a 20-year period.” Id., 538 U.S. at 424, 123 S.Ct. at 1524. The plaintiffs had shown “no conduct [out-of-state] by 11SfiState Farm similar to that which harmed them, [and] the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.” Id.
Similarly, in BMW, the Supreme Court accepted “the Alabama Supreme Court’s interpretation of the jury verdict there as reflecting a computation of the amount of punitive damages ‘based in large part on conduct that happened in other jurisdictions.’ ” Id., 517 U.S. at 573, 116 S.Ct. at 1598. In that case, neither the jury nor the trial court was presented with evidence that any of the defendant’s out-of-state conduct was unlawful. Id. Although the Alabama Supreme Court “eschewed reliance on BMW’s out-of-state conduct” and based its review of the award “solely on conduct that occurred within Alabama,” the Supreme Court found that when the award was properly reviewed in this more limited manner, the exemplary damage award was grossly excessive. Id., 517 U.S. at 573-574, 116 S.Ct. at 1598.
The considerations in State Farm and BMW are not present here. While Brignac was testifying about the defendant’s conduct in Louisiana, those actions were the same as its actions in Texas and were, moreover, a part of a single conspiracy for which the defendant was being tried. Thus, the Louisiana conduct of the defendant which the jury heard was the same unlawful conduct in Texas for which they were asked to consider punitive damages. Since all of Health Net’s actions were part of the same conspiracy, the conduct in Louisiana had a direct nexus to the specific harm suffered by the Texas HMO. We find there was no violation of Health Net’s due process rights under these circumstances. We note the Supreme Court’s recognition of the possibility of multiple punishment for the same conduct was not an issue in this case, where the jury considering the claims of the Texas Receiver awarded punitive damages, but the judge considering the claims of the Louisiana and Oklahoma Receivers failed to award punitive damages.
| m3. Lack of a punitive damage award for the Louisiana and Oklahoma Receivers
In its November 4, 2005 judgments regarding the tort claims of the Louisiana and Oklahoma Receivers, the district court indicated that its finding of Health Net’s liability for knowingly engaging in an unfair or deceptive act or practice that was a proximate cause of the HMOs’ damages entitled the plaintiffs to an award of attorneys fees, treble compensatory damages or punitive damages. Similarly, the district court indicated its finding that Health Net engaged in fraud, malice and gross negligence, and that this conduct was sufficiently egregious, warranted an award of punitive damages. Both issues were set to be determined at a later-held hearing. These judgments were designated as final judgments.[431] Health Net sought suspensive *639 appeals of the separate judgments.[432]
After the hearing, the district court, in oral reasons, ruled that the Louisiana and Oklahoma Receivers failed to meet the required burden for a determination of the proper amount of an award for attorneys fees and later signed separate judgments on December 6 and 12, 2005.[433] The Louisiana and Oklahoma Receivers appealed that decision.[434] Likewise, in oral reasons, the district court denied awarding separate and additional punitive damages to the Louisiana and Oklahoma Receivers and signed a judgment accordingly on December 20, 2005.[435] After a later hearing, the district court denied the Louisiana and Oklahoma Receivers’ election to receive, under Texas |1SRlaw, treble compensatory damages as an exemplary award.[436] The Louisiana and Oklahoma Receivers filed separate devolutive appeals from the district court’s judgments denying them punitive damages and treble damages.[437]
On appeal, the ad hoc panel issued show cause rules to determine whether the district court’s December rulings improperly affected the substance of the original November judgments on punitive damages and attorneys fees. While we find no fault with the court of appeal’s recitation of the procedural facts, we do not agree with its legal reasoning, or with its resolution of the issue.[438]
The court of appeal correctly found the November judgments substantively decreed the liability of Health Net for punitive damages and attorneys fees.[439] However, the appellate panel found the December judgments on attorneys fees constituted a substantive reversal of the November judgment.[440] The appellate court found the December judgment on punitive damages, which referred to the codal article regarding involuntary dismissals upon application of a party, utilized an improper procedure to substantively change a final judgment.[441] Finding the December judgments were a substantive reversal of the final November judgments, the ad hoc panel vacated the December judgments as absolute nullities and reinstated the district court’s November judgments, which found Health Net to be liable for these awards without fixing an amount. The court of appeal declined to remand the matter for another hearing at that time, waiting instead to see if such a hearing was | ^necessary after review of the liability issues.[442]
In its reasoning on the attorney fee issue, the appellate panel inferred that when the trial judge ruled the Louisiana and Oklahoma HMOs failed to meet their burden of establishing the award, “she was referring to the liability judgment and not a quantum ruling” because the plaintiffs *640 had presented evidence and documentation on the attorney fee issue.[443] Yet the appellate court acknowledged that no evidence relevant to liability was presented.[444] We make no such inferences as made by the court of appeal, but believe instead the district judge was indicating her belief that, in the absence of concrete evidence on which she could render a ruling, her ruling on the amount of attorneys fees was $0.
In its reasoning on the punitive damages issue, the appellate panel was distracted by the judge’s inclusion of the phrase: “... grants judgment in accordance with C.C.P. Art. 1672(B)” in its judgment. As found by the appellate court, there was no motion for involuntary dismissal filed by any party to this litigation.[445] Rather than believe the district court based her judgment on a non-existent motion, we find instead that the district judge simply erred in including the aforementioned phrase in her judgment and in involuntarily dismissing the claim for punitive damages.
We find our beliefs are supported by the district judge’s oral reasons in the record. At the hearing on attorneys fees and punitive damages held on November 21, 2005, the district court was informed that the three Receivers had signed a fee sharing agreement.[446] The implication of the testimony was that the Receivers likewise 11iinagreed to share in any recovery in the same proportion. On January 23, 2006, the district court held a hearing on the Oklahoma Receiver’s motions for new trial on attorney fees. After discussion of the fee sharing arrangement, the district court ruled on the motion for new trial:
[Speaking to counsel for the Louisiana Receiver] You don’t think eleven per cent of $54 million [447] is a substantial punitive award, you awarded yourselves? And I affirmed you. Therefore, the court is of the opinion that the Receivers have been fairly and adequately awarded, by their own measure, punitive damages. Therefore, the court is going to deny the motion for new trial.
With respect to the motion to strike the election [of treble compensatory damages], the court is going to sustain the motion, being firmly of the opinon that the bifurcated trial in the bench trial, the same as in the jury trial, was to address the issue of punitive damages.
To their credit, the Texas plaintiffs did not even take their request for attorney fees to the jury, having clearly understood that the amount recovered was substantial, far beyond their wildest dreams.
Therefore, the court is of the opinion that the rulings made pursuant to those two issues were correct and hereby maintains them.[448]
We find it clear from the district court’s oral reasons that she believed the punitive damages awarded by the jury on the claims of the Texas Receiver were adequate punitive damages for the entirety of Health Net’s actions. While in her November judgments she indicated that her findings warranted the imposition of punitive damages for the Louisiana and Oklahoma Receivers, upon consideration of a *641 separate award and the agreement among the Receivers to share in any recovery, her ruling on the amount for such a separate award of punitive damages was $0.
We find the district court’s rulings on punitive damages and attorneys fees for the Louisiana and Oklahoma Receivers are supported by the record and are not an 1191abuse of discretion.[449]
After review of the issues raised with regard to the award of punitive damages, we hold the district court did not prejudi-cially err in providing instructions to the jury considering exemplary damages for the claims of the Texas Receiver. The punitive damages awarded by the jury were not unconstitutionally excessive and were based on a proper consideration of factors. We also hold the district court’s judgment denying the Oklahoma and Louisiana Receivers an award of attorneys fees and a separate award of punitive damages was supported by the record.[450]
REVIEW OF JNOV
The district court granted Health Net’s motion for judgment notwithstanding the verdict regarding the jury’s verdict on the tort claims of the Texas Receiver. Specifically, the district court apportioned an additional 15% fault to “other persons” and reduced the punitive damage award by 30%. The district court denied Health Net’s alternative motions for new trial and remittitur, finding no grounds for such relief.
The standard of review for a JNOV was described in Forbes v. Cockerham, 2008-0762 p. 31 (La.1/21/09), 5 So.3d 839, 858. La. C.C.P. art. 1811 provides the procedural rules for such a motion, which is warranted
when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party | 192that reasonable persons could not reach different conclusions.[451]
After listening to the arguments of counsel at a hearing held on August 19, 2005 on the motion for JNOV, the district court found:
Well, as counsel knows, this case has been hotly contested from the outset, throughout the pendency, motion practice, the trial itself, and so the court is not and was not unaware that it would be hotly contested post-trial practice.
The court expected to receive a motion for new trial and/or a JNOV. The court made arrangements to make sure that it was heard expeditiously.
As the court indicated to counsel, this case was on the front burner and the court was going to make certain that it received the requisite attention, for many reasons, particularly because it involved not just an insurance company or an HMO but certainly public entities. Also because of the expense, the im *642 mense expense involved. Court costs in this matter alone ha[ve] exceeded what most of the judgments are that this court renders.
Doctors and patients and nurses have not been paid in over three years. Most people, other than lawyers, cannot afford to wait three years to be paid. Most people need to be paid within two weeks.
The testimony in this case that this jury heard involved conduct by sophisticated businessmen, accountants, lawyers, liquidators, receivers, people who are well positioned, well educated, and focused. The jury found, after extensive deliberation and weeks of testimony and hundreds of exhibits, that the defendants were liable based upon that evidence and that there should be an allocation of fault to others.
There is evidence in the record that other entities were at fault, and there is also evidence in the record that other persons were at fault and, therefore, should be allocated some degree of fault.
This court recalls very vividly the testimony of Mr. Lucksinger, Mr. Na-zarenus and their efforts to take these orphan HMOs and adopt them; thereafter, mistreated them. This court is firmly of the opinion that that conduct requires some allocation of fault.
The court heard the testimony of Susan Conway, high-powered counsel, less than honest, less than exemplary, less than candid. Many actors, many actors in this case all with a view towards lining their pockets, receiving some benefit under the pain of some unsuspecting patients and policyholders and state agencies.
1 19SThe court is of the opinion that there should be apportionment of fault to other persons in the full sum of fifteen per cent. The court hereby imposes that sum and grants the motion for JNOV specifically answering the interrogatory and specifically assessing whether or not reasonable men and women, viewing the evidence in the light most favorable to the non-moving party, could reach a contrary result.
Judgment to be signed accordingly with respect to that issue.[452]
Finding that very little information or argument was presented to the court on the separate issue of the correctness of the punitive damages, the district court allowed counsel further argument on that issue.[453] During their argument, counsel admitted to confusion with regard to which damages the 15% fault allocation for “other people” would attach. The district court cleared up any confusion:
Let me state for the record. The court allocates fault at the rate of fifteen per cent as against other persons. That addresses, in this court’s view, the compensatory damages. Now we are on the issue of motion for JNOV, new trial or remittitur on the issue of punitive damages. And for the last hour or so we have been talking about punitive damages.[454]
After considering counsel’s arguments, the district court ruled on the second issue raised in the motion for JNOV, the request for reduction in the punitive damages awarded by the jury:
This court has carefully considered the factors requisite in this matter, particularly the degree of reprehensibility of defendant’s conduct, the harm caused, the indifference, reckless disregard of *643 the health and safety of others, financial vulnerability of the plaintiffs and its creditors, the fact that the conduct involved repeated action and that the harm was the result of intentional actions.
In viewing that evidence in the light most favorable to the non-moving party, this court is of the opinion that the award of punitives, the amount of the punitives in this matters [sic] is nonetheless excessive.
Therefore, the court hereby reduces that amount by thirty per cent. 1 ^Judgment to be signed accordingly.[455]
After our review of the record, we find the district court’s judgment on JNOY with regard to the fault allocation was supported by the evidence in this case and conclude that reasonable persons could not reach a different result. The jury found 15% of the fault should be allocated to “other companies,” and there was sufficient evidence presented at trial regarding the gross mismanagement of the HMOs by AmCareco and the negligence or complicity of PWC and AmCareco’s attorneys which led to the eventual failures of the HMOs.
There was also evidence of the liability of “other persons” in their individual capacities which support the district judge’s allocation of 15% of the fault to those persons. The district judge mentioned Lucksinger, Nazarenus and Conway as three individuals whose actions resulted in the damages sustained by the HMOs for which liability should be allocated. We find the record fully supports the district judge’s ruling in this regard.
Lucksinger claimed he thought the cash infusions into the HMOs by Health Net in March of 1999 were excess wind down reserves. He claimed he did not know the HMOs needed a PDR until computations were made after the sale in June or July of 1999. However, his testimony about his lack of understanding of the terms of the sale conflicted with that of every other person testifying. The members of Health Net’s senior management who worked on the transaction with him, as well as AmCa-reco’s counsel, testified Lucksinger fully understood the terms of the deal and emphasized he was sophisticated about all aspects of the business and industry. Even Preis, the Receivers’ expert on corporate transactions, had no doubt Luck-singer understood the terms of the sale transaction and fully acquiesced in the deal. Lucksinger’s reliance |19fion Health Net to bail out AmCareco was completely rejected by both Dr. Hasan and Westen. The judge was also entitled to consider the fact that Lucksinger personally lost nothing in these transactions. Lucksinger acquiesced in the sale strategy developed by Health Net; was the driving force for incorporating AmCareco; was a key player in the negotiation of the sale, including using his influence with the Texas regulators. He continuously told Nazarenus to keep AmCareco going in any way possible and prevented others from understanding the true nature of the companies’ insolvency by his insistence that Health Net would ultimately provide the capital needed to save the insolvent companies.
Nazarenus, as CFO of AmCareco and the HMOs, was in charge of the improper accounting developed to hide the insolvency of the companies from the regulators. He made up phony intercompany receivables, lied to or misled regulators, improperly moved cash from one company to *644 another and allowed the insolvency to become greater without notifying the regulators.
Conway, as regulatory counsel for Am-Careco, timed the disclosure of the financial schedule to the night before the approvals were scheduled. Although Conway denied any knowledge of key aspects of the sale strategy, the record shows she participated in meetings with the architects of the sale and passed along the correspondence from the regulators to Health Net. The plausible deni-ability the conspiracy afforded her was her claim that her engagement ended at the time the change of ownership was approved. Consequently, she could claim her involvement ended on April 30, 1999, before the Closing Agreement was drafted by others. The district judge obviously found her testimony to be less than honest and her participation as more than she would admit. We find no error in the district court’s granting of Health Net’s motion for JNOV and affirm that ruling in this regard.
 Ab for the district court’s reduction in punitive damages by 30%, we find the district court failed to use the proper standard of review for a JNOV. Instead of determining whether reasonable persons could reach a contrary decision, she viewed the evidence in the light most favorable to the non-moving party. The district court found Health Net was liable for 70% of the compensatory damages and reduced the punitive damage award in the exact proportion as the reduction in actual damages. The record shows no further evidence was submitted on this issue. In reviewing the punitive damage award for excessiveness, the district judge used no standard other than the one already used by the jury in determining the amount of its punitive damage award. Consequently, we hold that reasonable minds could differ as to the need for a reduction in the punitive damage award and reverse the district court’s JNOV in this regard.
ALLOCATION OF COSTS
In each of the three consolidated district court cases, the district court rendered judgments which cast Health Net with all costs and provided that the amount of the costs would be determined at a subsequent rule to tax costs. The court of appeal, based on its reversal of the district court’s liability determinations, cast the Texas and Oklahoma Receivers with a portion of the costs and Health Net with a portion of the costs.[456] Based on our determination of Health Net’s liability, we reverse the court of appeal with regard to its allocation of costs, and reinstate the district court’s judgment, pursuant to La. C.C.P. art. 1920,[457] and remand this matter to the district court for its prompt consideration.
1197DECREE
For the foregoing reasons, we rule, as follows:
1. The court of appeal’s ruling on the contract claim of the Louisiana Receiver regarding the parental guarantee is affirmed;
2. The court of appeal’s ruling on liability for the tort claims of the Louisiana and Oklahoma Receivers is reversed and the district court’s judgment on the liability for the *645 tort claims of the Louisiana ■ and Oklahoma Receivers is reinstated;
3. The court of appeal’s ruling on liability for the tort claims of the Texas Receiver is reversed and the jury’s verdict on the liability for the tort claims of the Texas Receiver is reinstated;
4. The amount of compensatory damages awarded to the Louisiana and Oklahoma Receivers by the district court is reinstated;
5. The amount of compensatory damages awarded to the Texas Receiver by the jury is reinstated;
6. The amount of punitive damages awarded to the Texas Receiver by the jury is reinstated;
7. The district court’s ruling on attorneys fees and punitive damages for the Louisiana and Oklahoma Receivers is affirmed;
8. The district court’s ruling on the motion for JNOV is affirmed in part and reversed in part; and
9.The district court’s ruling on the allocation of costs is reinstated and remanded to the district court for a determination of quantum.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED IN PART
WEIMER, J., additionally concurs and assigns reasons.

. Retired Judge Robert J. Lobrano, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. As will be described in more detail in the procedural history, the three lawsuits filed in the 19th Judicial District Court by the Louisiana Commissioner of Insurance were assigned Docket Numbers 499,737, 509,297 and 512,366. After consolidation, all of the subsequent pleadings referenced all three docket numbers, but were generally filed into the record of Docket Number 499,737. The appellate record consists of the pleadings filed in the three district court actions, the transcripts of hearings and of trial, and exhibits.
In Docket Number 499,737, there are 89 volumes of pleadings, including the pleadings filed after consolidation, which will be referred to herein as Vol. # (89), p. #. In Docket Number 509,297, there are 7 volumes of pleadings, which will be referred to as Vol. # (7), p.# . In Docket Number 512,366, there are 5 volumes of pleadings, which will be referred to as Vol. # (5), p. # . The transcripts of hearings and of trial are contained in 20 volumes. The first 19 of those volumes are designated as Vol. # of 19, as the 20th volume was added later as a supplement. The transcripts will be referred to herein as Tr. # (19), p. # , consistently with the manner in which the volumes are marked. The 20th volume of the transcripts will be referred to as Tr. 20(20), p. #, as it is marked. All exhibits will be referred to with their trial exhibit number, as Ex. # .
In addition, this court requested the record be supplemented with certain pleadings filed in the court of appeal and rulings from that court. This information will be referred to *527 herein as Supp. R., with a description of the document.

. For ease of understanding, the name "Health Net” may be used throughout this opinion to refer to any of the corporation’s previous corporate forms, as well as its current form.

. Deloitte & Touche, the external auditors for Health Net, calculated a PDR of $10.5 million would be necessary through the end of fiscal year 1998. Curtis Westen, Health Net's general counsel, told Thomas Lucksinger, who put together the holding company which ultimately purchased the HMOs, that a wind down would cost Health Net between $5-7 million.

. Gellert previously worked for SHP.

.Health Net paid SHP a retainer of $50,000 to find a buyer and develop a sale strategy, but agreed to pay an additional $450,000 as a success fee. Even Health Net and SHP acknowledged the difficulty SHP would have in earning the success fee, as their contract estimated those chances as less than 75%.

. Several witnesses commented the structure of the sale was “unique,” never having seen anything like this before.

. As will be explained more fully infra, the money for AmCareco to purchase the HMOs actually came from the HMOs themselves.

. Testimony established that as long as Health Net retained less than a 50% interest in Am-Careco, Health Net would be insulated from liability for the HMOs and their financial ill-health, • and would not have to carry the HMOs’ financial reverses on its own balance sheet.

. Ex. 339.

. The Term Sheet was also filed in evidence separately as Ex. 725. Several documents are duplicates of each other, and bear different exhibit numbers, but were introduced through different witnesses. There are also different versions of the same documents, which bear different exhibit numbers.

. The reason this is important is that, at this time, according to the Deloite & Touche audits of Health Net, there was only a little over $8000 designated as a Restructuring Reserve in the Texas HMO.

. A "put” is an option that entitles the holder (here, Health Net) to require that the writer of the option or counter-party (here, AmCa-reco) purchase a specified number of shares for a stated price per share. See "Pretrial Memorandum by Health Net, Inc.,” Vol. 53(89), p. 11335 n.4.

. Ex. 652 and Ex. 765. At that time, the corporate relationship of what became Health Net was explained as: "[Foundation Health Systems, Inc.] is the sole stockholder of Seller [Foundation Health Corporation] and Seller is the sole stockholder of [the three HMOs], Ex. 652, p. 1.

. Section 2.1 of the SPA provided:
"2.1 Cash Payment. The Acquired Corporations [the three HMOs] shall distribute or pay to Seller [Foundation] an aggregate amount of cash (the "Cash Payment”) equal to the excess, if any, of (a) the sum of (x) all cash, cash equivalents, certificates of deposits and marketable securities (current or long-term) of the Acquired Corporations in the aggregate as of the close of business of the day preceding the date of the closing (subject to the provisions of Section 8.1 (i) (the "Effective Time”), and (y) all items in the form of property, plant and equipment of the Acquired corporations in the aggregate that may be included as an admitted asset as of the Effective Time (based on then current insurance regulations), provided that the amount of such items of property, plant and equipment shall not exceed $250,000, $200,000 and $50,000 for each of the Oklahoma Plan, the Texas Plan and the Louisiana Plan, respectively, over (b) the Required Amount, all as determined as provided below. The Required Amount equals the sum of (a) all liabilities of the Acquired Corporations as of the Effective Time determined as provided below, plus (b) the aggregate amount of all statutory and regulatory capital and other deposit requirements of the Acquired Corporations as of the Effective Time, plus (c) all additional local deposit/escrow requirements (not included in statutory or regulatory capital) of the Acquired Corporations as of the Effective Time, plus (d) $3,500,000. Immediately prior to the closing, the Acquired Corporations shall distribute to Seller an estimate of the Cash Payment as of the Effective Time, based on a balance sheet (the "Estimated Balance Sheet”) of the Acquired Corporations as of the Effective Time prepared by the chief financial officer or the treasurer of FHS [Foundation Health Systems, Inc.] (or a designee acceptable to Buyer) in accordance with generally accepted accounting principles ("GAAP”) consistently applied (the parties acknowledging that the exceptions set forth in schedule 4.6(b) or elsewhere in the schedules are irrelevant for this purpose, and GAAP as of the Effective Time shall determine the amounts on the Estimated Balance Sheet) and with Reserves for Claims, Losses and LAE ("IBNR”) that are reasonable based upon the information available at the time prepared, determined using methods within the range of generally accepted industry practices and consistent with the Acquired Corporations’ practices, except that, regardless of GAAP, (i) all marketable securities shall be marked to market (with appropriate effect reflected in Deferred Tax Liabilities for the difference between value and adjusted tax basis), (ii) all accrued vacation and sick pay and all other employee benefits accrued as of the Effective Time shall be refle cted as a liability, (iii) all liabilities for litigation and/or penalties for which Seller and FHS will fully indemnify Buyer and the Acquired Corporations pursuant to section 10.2 hereof shall be reversed and (iv) all non-cash restructuring and merger related liabilities and reserves (the "Restructuring Reserves”) shall be reversed (items (i) through (iv), collectively, the "Adjustments”), and the chief financial officer or the treasurer (or his designee) shall deliver to Buyer a certificate to that effect at the closing, together with a copy of the Estimated Balance Sheet. The Acquired Corporations shall consult with buyer in the preparation of the Estimated Balance Sheet, and shall make their books and records relating to the Estimated Balance Sheet available to Buyer for its review in the preparation of the Estimated Balance Sheet. Prior to the Effective Time, all inter-company accounts between an Acquired Corporation and FHS, Seller or an affiliate of FHS shall be settled; provided that any amounts not known at the Effective Time shall be settled within sixty days thereafter. Within 10 days after agreement on the Final Balance Sheet (as provided in Section 2.3), if the actual Cash Payment, based on the Final Balance Sheet, exceeds the amount of the Cash Payment made immediately prior to the closing, based on the estimated Balance Sheet, the Acquired Corporations shall pay to Seller an amount equal to such excess, together with interest on the amount paid at the rate of 6% per year from the date of the closing and the date of payment.”

. See Ex. 652, Section 4.8(e).

.A representative of Foundation Health Systems, Inc. signed on behalf of that corporate entity.

. Ex. 288 and Ex. 402.

. Section 6 provides:
In the event that it appears Closing will not take place on or before January 15, 1999 (and Seller will thereby likely be required to establish prior to the issuance of its 1998 audited financial statement an additional premium deficiency reserve (the "Additional PDR”) for any of the Acquired Corporations as of December 31, 1998), then Buyer and Seller shall 'negotiate in good faith a mechanism (and an appropriate amendment to the Agreement including appropriate adjustments to the Cash Sweep) whereby (i) Seller would be able to receive back any cash contributed to the Acquired Corporations in establishing the Additional PDR (whether or not a Cash Sweep is otherwise available) to the extent such Additional PDR relates to periods after the Effective Time; (ii) Seller would receive such cash either through the Cash Sweep procedure of the Sweep Shortfall procedure described at item 5 above; (iii) the resulting liability and any related assets contributed to the Acquired Corporations with respect to the Additional PDR relating to periods after the Effective Time would not be considered when determining whether the $10 million Adjusted Book Value closing condition has been met; and (iv) Buyer would not have any materially adverse tax or capital consequences because of such mechanism. It is agreed that the parties shall negotiate in good faith such mechanism over a period of ten business days after notice by a party that it reasonably believes Closing will not take place on or before January 15, 1999 and the Additional PDR will likely be required. In the event agreement is not reached during such ten business day period, then either Buyer or Seller shall have the right to terminate the Agreement under Section 6 thereof.

. Testimony showed at least one regulator was tripped up by this particular language.

. Ex. 331, 331A.

. AmCareco estimated the legal, accounting and other expenses of the offering would be $500,000. Ex. 331A, POM, p. 3.

. Ex. 331A, POM, p. 3.

. Ex. 331A, POM, p. 16.

. Id.

. Id.

. Ex. 331A, POM, p. 17. This section continues: "However, there can be no assurance that the proceeds of this Offering will satisfy the Company’s requirements for any particular period of time. Additional equity infusion or financing may be required, either in the near-term or in the long-term, to provide funding for acquisitions or major-account administration occurring in a shorter than estimated time frame and/or to implement the Company’s long-term business plan."

. This breakdown of capital does not take into consideration the estimated $500,000 in the expenses of the offering.

. This was the law firm where Lucksinger had been a partner.

. Of course, Coburn received the information he imparted directly from Health Net.

. See Ex. 10.

. Id.

. Ex. 10, p. 7 of 16.

. Id.

. Ex. 10, p. 8 of 16.

. See Ex. 749. Health Net contributed $700,000 to the Texas HMO in December 1998, $3.3 million to the Texas HMO in March, 1999, and $2.3 million to the Louisiana HMO in March, 1999, for a total of $6.3 million.

. See Ex. 749. Coburn suggested four scenarios for the cash sweep and share allocation based on the February 1999 balance sheets, including Health Net’s recent infusion of cash to the HMOs. Scenario B, where the cash contributed to fund the PDR was not removed prior to the calculation of the cash sweep, was described by Coburn as "may be more palatable to the regulators.”

. See Ex. 44, answer to Inquiry # 4.

. At the time, there was a $2 million statutory minimum capital and surplus requirement, as well as a statutory requirement of a $1 million deposit.

. See Ex. 568.

. See Ex. 686.

. See Ex. 46, 46A.

. Ex. 38 and Ex. 575.

. These findings of fact note the change of control would not result in harm to the Texas HMO:
14. No evidence was presented that immediately upon the change of control [the Texas HMO] would not be able to satisfy the requirements for the issuance of a new certificate of authority to operate as a health maintenance organization as it is presently licensed to do.
16. No evidence was presented that the financial condition of [AmCareco] is such as might jeopardize the financial stability of [the Texas HMO] or prejudice the interest of its enrollees or the interests of any remaining shareholders who are unaffiliated with such acquiring party.
*540 18. No evidence was presented that the competence, trustworthiness, experience and integrity of those persons who would control the operations of [the Texas HMO] are such that it would not be in the interest of the enrollees of [the Texas HMO] and of the public to permit the acquisition of control.
19. No evidence was presented that the acquisition of control would violate any laws of this State, any other state, or the United States.
See Ex. 38, p. 5-7.

. Ex. 574.

. Ex. 574, p. 2.

. Ex. 682.

. See Ex. 682, p. 1, Finding of Fact # 1 and p. 2, Finding of Fact # 9. In an apparent misunderstanding of the interrelationships of the parties, the Ok-DOH began Finding of Fact # 9 with the following sentence: “Am-Careco, supported by the resources of its parent organization, can be expected to meet its obligations to enrollees.” (Emphasis added). In actuality, AmCareco did not have a parent corporation, but in fact, became the parent of the Ok-HMO. Insofar as the Ok-DOH may have thought that Health Net was the parent corporation of AmCareco, the Ok-DOH was in error.

. See Ex. 682, p. 2, Finding of Fact # 6.

. See Ex. 682, p. 3, Condition # 2.

. See ex. Ex. 3174 (Gellert-Texas HMO); Ex.2068 (Crary-Louisiana HMO)

. See Ex. 733.

. Tr. 16(19), p. 3139-3142, 3154.

. Ex. 574; Tr. 8(19), p. 1334.

. Tr. 8(19), p. 1328.

. Ex. 288, Section 7.

. Tr. 8(19), p. 1328.

. Tr. 8(19), p. 1339.

. Tr. 8(19), p. 1328.

. Tr. 8(19), p. 1335, 1337, and 1339.

. Ex. 549. The final draft of the Closing Agreement was not complete until the afternoon on May 3, 1999. Tr. 14(19), p. 2593.

. Ex. 447 and Ex. 549.

. See Ex. 549, p. 6.

. Even the regulators who noted this feature failed to realize the parties meant to remove this money from the HMOs in the cash sweep. Some testified, consistently with the testimony of Health Net's senior management, that this feature was only part of a calculation to arrive at a number. The explanation of what would happen to that amount of money was explained only in the subsequently-drafted Closing Agreement.

. One example of this was the cash reconciliation made by the companies for July 17, 2001. This “cash swirl” consisted of multiple, separate cash shuffles between the companies and occurred because PWC, the outside auditor of the HMOs and AmCareco, refused to sign an audit report until a large receivable was paid off. This accounting “maneuver” attempted to address that problem. Tr. 8(19), p. 1390, Tr. 11(19), p. 1884-1887; Ex. 3100.

. 11(19) p 2075

. See Tr. 15(19), p.2889.

. Tr. 9(19), p. 1568.

. Ex. 335. Note that this was in 2001, when AmCareco was no longer obligated by the provisions of the SPA to send Health Net its financial information.

. Ex. 360 and Ex. 781.

. Id. (emphasis added).

. Tr. 8(19), p. 1377.

.At that time, J. Robert Wooley was Acting Commissioner of Insurance for the State of Louisiana. Thereafter, he became the Louisiana Commissioner of Insurance.

. Carroll Fisher was the original receiver for AmCare-Ok. Upon his resignation, he was replaced temporarily by Daryl England as Interim Insurance Commissioner. Kim Holland was appointed as the new Insurance Commissioner for the State of Oklahoma on January 21, 2005, and was thereafter the statutory Receiver for AmCare-Ok. Vol. 17(89), p. 3517 n.1. See also Vol. 37(89), p. 7778.

. This suit was entitled "J. Robert Wooley, as Commissioner of Insurance for the State of Louisiana v. Thomas S. Lucksinger et al." Named defendants in this action were: Thomas S. Lucksinger; Michael D. Nadler; Stephen J. Nazarenus; Scott Westbrook; Michael K. Jhin; William F. Galtney; John P. Mudd; Executive Risk Indemnity, Inc.; Executive Risk Management Associates; Executive Risk Specialty Insurance Company; Executive Liability Underwriters; Greenwich Insurance Company; AmCareco, and AmCare-Mgmt. Vol. 2(89), p. 211-221. This petition was amended on September 17, 2003, and on October 31, 2003, to add as defendants Am-Care-Mgmt in Receivership and XL Specialty Insurance Company, respectively. Vol. 3(89), p. 345-352 and Vol. 5(89), p. 798-802.

. This suit was entitled "J. Robert Wooley, Commissioner of Insurance for the State of Louisiana in his Capacity as Liquidator of AmCare Health Plans of Louisiana v. Foundation Health Corporation, Foundation Health Systems, Inc., and Health Net, Inc." Vol. 1(7), p. 35-50. This petition was amended on February 10, 2004. Vol. 1(7), p. 91-97.

. This suit was entitled "J. Robert Wooley, Commissioner of Insurance for the State of Louisiana, as Liquidator for AmCare Health Plans of Louisiana, Inc., in Receivership v. PriceWaterhouseCoopers, LLP." Vo. 1(5), p. 35-49.

. PWC actually performed work as the accounting and auditing firm for all three HMOs; the parent company, AmCareco, and the management company, AmCare-Mgmt.

. See Vol. 7(89), p. 1318 et seq. and Vol. 1(5), p. 87 et seq. (Okla.) and Vol. 8(89), p. 1351 et seq. and Vol. 1(5), p. 106 et seq. (Tex.). The Oklahoma Receiver brought tort causes of action in its petition-in-intervention for negligent misrepresentation, breach of fiduciary duty, negligence and fraud against named de *547 fendants Thomas S. Lucksinger, Michael D. Nadler, Stephen J. Nazarenus, John P. Mudd, Michael K. Jhin, William F. Galtney, AmCare-co and PWC. Although "HealthNet/Foundation” was named as part of “the Control Group” in the Oklahoma Receiver's assertions against the defendants-in-intervention, Health Net was not, at that time, named a defendant. See Vol. 7(89) p. 1321 ¶ 15. The Texas Receiver asserted causes of action for conspiracy, fraud, negligent misrepresentation, breach of fiduciary duty, negligence, and violations of Texas law in its petition-in-intervention and named the same defendants-in-intervention as the Oklahoma Receiver. Although the Texas Receiver asserted that the defendants-in-intervention were joined by "Stuart Rosow of Proskauer Rose LLP and HealthNet, Inc.” in committing the various tort actions asserted, the Texas Receiver specifically indicated that it was not, at that time, asserting claims against Health Net/Foundation, Rosow or the lawfirm of Proskauer Rose. See Vol. 1(5), p. 108 ¶ 9 n.2.

. The Texas Receiver did not file suit against Scott Westbrook, AmCareco or any of the "insurer” defendants.

. The record does not contain a signed order granting the motion to consolidate; however, the minute entry for November 8, 2004 indicates the motion was granted. See Vol. 1(89), p. 24. An amended minute entry for that date specifically addresses the granting of the motion to consolidate, and states: "Pursuant to the Joint Motion to Consolidate ... filed in this matter on October 15, 2004, this Minute Entry Amends the Minute Entry of November 9[sic], 2004 to reflect the filing by and grant thereof to be in favor of movers Oklahoma Receiver (AmCare-Ok), Louisiana Receiver (AmCare-La) and Texas Receiver (AmCare-Tx).” Vol. 68(89), p. 14496A.

. See Vol. 68(89), p. 14455.

. The record indicates either signed settlement documents or indications that settlements were reached or pending with all of the defendants except Health Net.

. Vol. 57(89), p. 12281-12326. The D & O defendants and their insurers included AmCa-reco, Inc., Thomas S. Lucksinger, Michael D. Nadler, Stephen J. Nazarenus, Scott West-brook, William F. Galtney, Michael K. Jilin, John P. Mudd, Executive Risk Specialty Insurance Company, Executive Risk Indemnity, Inc., Executive Risk Management Associates, XL Specialty Insurance Company and Greenwich Insurance Company.

. Vol. 59(89), p. 12657-12665.

. Vol. 58(89), p. 12373.

. Vol. 63(89), p. 13576; Ex. PWC-1.

. See Vol. 59(89), p. 12641-12643; Tr. 17(19), p. 3307.

. See Tr. 17(19), p. 3308-3316.

. See Vol. 59(89), p. 12748-12749.

. See Vol. 59(89), p. 12714-12717, 12733-12738; Vol. 61(89), p. 13075-13081; Tr. 17(19), p. 3356.

. See Vol. 60(89), p. 12750-12753.

. Tr. 17(19), p. 3371, 3392.

. Vol. 63(89), p. 13626-13627.

. See Vol. 63(89), p. 13628 and Vol. 65(89), p. 14029.

. Vol. 63(89), p. 13642.

. See Vol. 63(89), p. 13632-13633, 13639-13641.

. Vol. 65(89), p. 14044-47 and p. 14048-51.

. Vol. 50(89), p. 10637-40 and Vol. 67(89), p. 14410.

. The Texas Receiver did not seek an additional award of attorneys fees.

. Vol. 64(89), p. 13834-35.

. Vol. 65(89), 14042-43.

. Vol. 65(89), p. 14057-58.

. Vol. 89(89), p. 19194-19207.

. Vol. 67(89), p. 14403-04.

. Vol. 67(89), p. 14411-17.

. Vol. 66(89), p. 14094.

. Vol. 66(89), p. 14099-14112.

. Vol. 66(89), p. 14125-34 and p. 14135-50.

. Vol. 67(89), p. 14313-24.

. Vol. 66(89), p. 14129, 14139-40.

. Vol. 67(89), p. 14403-04.

. Vol. 67(89), p. 14419-21, 14431-34.

. In Wooley v. AmCare Health Plans of Louisiana, Inc., 2005-2025 (La.App. 1 Cir. 10/25/06), 944 So.2d 668, the court of appeal affirmed the district court’s ruling which had overruled Health Net’s declinatory exception of improper venue to the claims of the Texas Receiver.
In Wooley v. Lucksinger, 2006-1164, 2006-1165, 2006-1156 (La.App. 1 Cir. 5/4/07), 961 So.2d 1225, the court of appeal dismissed as moot appeals which related to a preliminary injunction granted Health Net involving the Texas and Oklahoma Receivers and lawsuits proceeding in Texas.
In Wooley v. Lucksinger, 2006-1167, 2006-1168, 2006-1169 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228, the court of appeal affirmed the district court’s dismissal of Health Net’s third party demand against the La-DOI, asserting a detrimental reliance cause of action, and a cause of action for regulator fault. The court of appeal referred the regulator fault claims to the merits as an affirmative defense.

. Wooley v. Lucksinger, 2006-1140, 2006-1141, 2006-1142 (La.App. 1 Cir. 12/30/08), 7 So.3d 660.

. Wooley v. Lucksinger, 2006-1140, 2006-1141, 2006-1142, 2006-1143, 2006-1144, 2006-1145, 2006-1158, 2006-1159, 2006-1160 (La.App. 1 Cir. 12/30/08), 14 So.3d 311.

. Twenty percent of the appellate court costs was allocated to Health Net. Wooley II, p. 411, 14 So.3d at 575.

. Wooley v. Lucksinger et at, 2009-0571 (La.12/18/09), 23 So.3d 953; 2009-0584 (La.12/18/09), 23 So.3d 952; 2009-0585 (La.12/18/09), 23 So.3d 951; and 2009-0586 (La.12/18/09), 23 So.3d 951.

. La. Const. art. 5, § 10(B) in pertinent part provides: "(B) Scope of Review. Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts.... ”

.The original guarantee referred to the Louisiana HMO as "FHLHP/' for “Foundation Health, a Louisiana Health Plan, Inc.”

. See Ex. 867.

. See Ex. 868 and Ex. 3191.

. See Ex. 652, SPA, § 4.28 ("[a]U inter-company agreements and arrangements shall terminate as of the closing, except as provided in section 7.14.”)

. Wooley I, p. 13, 7 So.3d at 667-668.

. See Ex. 700; Certificate of Authority for Foundation Health, a Louisiana Health Plan, Inc. (loose attachment); Wooley I, p. 10, 7 So.3d at 666.

. Wooley I, p. 13, 7 So.3d at 668.

. Brief on the Merits of the Louisiana Receiver Regarding Contractual Guarantee, p. 12 (emphasis in original).

. Id., p. 12 n. 17.

. Acts 2008, No. 415, § 1, effective January 1, 2009, amended and reenacted the Louisiana Insurance Code, Title 22 of the Louisiana Revised Statutes of 1950, and directed its provisions be redesignated into a new format and numbering scheme, without changing the substance of the provisions.

. La. R.S. 22:254(A) provides: "Prior to the issuance of any certificate of authority, each health maintenance organization applying therefor shall deposit with the commissioner a safe keeping receipt or trust receipt from banking corporations doing a banking business within the state of Louisiana or from a savings and loan association or other insured financial institution chartered to do business in the state of Louisiana, evidencing that the health maintenance organization has deposited with the several institutions one million dollars in cash to guarantee its financial responsibility. No single deposit shall exceed the insured deposit limit of any financial depository."

.In fact, the record further supports the conclusion that the amount of the parental guarantee was $2 million. In the letter from *560 the La-DOI, Exhibit 867, in which the La-DOI requested a new parental guarantee, the department listed eight areas of concern after its review of the 1996 Annual Statement of the Louisiana HMO. The La-DOI request with regard to the parental guarantee, in its entirety, states:
8. The department requests a parental guarantee be executed between Foundation Health System, Inc. and Foundation Health, A Louisiana Health Plan, Inc. (Foundation Health), where Foundation Health System, Inc. guarantees Foundation Health will meet the statutory networth requirement as long as Foundation Health is a subsidiary of Foundation Health System, Inc., or until the HMO dissolves, whichever occurs first. The document must have the following wording: "non-cancelable by any party without the Commissioner's approval.” The document must also list the assets pledged to guarantee payment in case need arose to call on the guarantee. The document should waive any defense the guarantor has in not honoring the guarantee, (emphasis added)
The additional requirements requested by the La-DOI were the changes to the cancellation procedure and the designation of specific assets to secure the guarantee. As noted in the body of the opinion, the precursor to Health Net rejected the changes proposed by the La-DOI, retaining the 60-day notice provision for cancellation and relying upon the assets of the parent corporation to secure the contract.
This rejection was noted by the court of appeal:
At this point in time, [Foundation] had the option of retaining the definite sixty-day notice "bailout” provision that required a written notice or agreeing with La-DOI's request for a less definite provision that provided for termination based on the conditions precedent of (1) [the Louisiana HMO] not remaining a subsidiary of [Foundation], or (2) the dissolution of [the Louisiana HMO], and (3) Commissioner approval. [Foundation] consciously chose the sixty-day notice “bailout” provision. If [Foundation] had chosen to agree to the proposed termination provision with Commissioner approval, the suretyship would have terminated only upon a sale and Commissioner approval, and this action would be without merit. It is reasonable to infer from [Foundation]'s rejection of the proposed changes that [Foundation] determined that it was in its best interest to remain with the status quo.
Wooley I, p. 4-5, 7 So.3d at 663.
Since the only changes suggested by the La-DOI were changes to the cancellation procedure and a request that specific assets be designated, and no changes were mentioned with regard to the amount which the contract guaranteed, then the amount which the contract guaranteed, as stated by the La-DOI was "the statutory net worth requirements.” As discussed in the body of the opinion, the statutory net worth requirement for a Louisiana HMO at the time the parental guarantee was signed was $2 million.

. The La-DOI did not call upon Health Net to fulfill its obligation as surety under the parental guarantee until after AmCare-La had been placed into receivership and was no longer doing business. Consequently, we were not presented with facts which would require us to explore the continuing nature of the parental guarantee, such as whether the language of die guarantee or the statutory language of La. R.S. 22:2010 — which calls for the surety to maintain the capital and surplus requirements — would support a finding that the surety was obligated to make up the shortfall in any accounting period in which the capital and surplus funding level dropped below $2 million, for a potentially - unlimited amount, or whether the surety's obligation was a total liability of $2 million only. The Louisiana Receiver presented evidence solely that the Louisiana HMO at its demise had a deficit in the amount of $9,511,624.19, triggering Health Net's responsibility to pay the entire $2 million capital and surplus requirement under the parental agreement for this discreet point in time. We express no opinion as to other obligations which may have arisen from the parental guarantee, being constrained by the facts before us.

. Wooley II, p. 174-196, 14 So.3d at 435-449.

. At this time, there were still defendants actively defending in the litigation other than Health Net. The district judge ruled:
... in any event, it seems that the Texas substantive law should indeed apply because, in the opinion of this court, as outlined in the foregoing statements, that the genesis occurred in Texas, the enterprise, the design, the impact, quite a bit of the. damage, and that it had a ripple effect.
Therefore, with respect to the choice of law, the court is going to apply Texas law on the substantive issues of law as outlined and is going to apply Louisiana law on the procedural issues....
Exhibit Envelope 12, Box 2, Transcript of May 9, 2005 hearing, p. 86-87.

. See Wooley II, p. 45, 14 So.3d at 358. Our review of Health Net’s appellate briefs show the defendant sometimes argued Texas law should not have governed the adjudication of certain claims. However, immediately thereafter, Health Net would acknowledge the error as harmless since Texas law was substantially similar to any other law urged. In addition, while Health Net sometimes argued die evidence was insufficient under Texas law, it failed to argue the district court’s selection of Texas law itself was in error. In sum, we find the court of appeal's conclusion that Health Net did not specifically raise this issue as an assignment of error on appeal is a fair characterization of the issues discussed in Health Net’s appellate briefs.
The record shows Health Net did file a motion, a little over a week before trial, seeking reconsideration of the district court’s choice of law ruling. Vol. 54(89), p. 11465 et seq. However, no writs were taken when the motion for reconsideration was denied with the notation “previously heard.” Vol. 55(89), p. 11886 and Vol. 56(89), p. 11971. Moreover, the record shows Health Net’s requested reconsideration of this issue was only one of several other pretrial rulings for which Health Net sought reconsideration immediately before trial.

. Wooley II, p. 46, 14 So.3d at 358-359.

. Wooley II, p. 65-68, 14 So.3d at 370-372.

. La. C.E. art. 202 in pertinent part provides:
Art. 202. Judicial notice of legal matters
A. Mandatory. A court, whether requested to do so or not, shall take judicial notice of the laws of the United States, of every state, territory, and other jurisdiction of the United States, ...
*564 B. Other legal matters. (1) A court shall take judicial notice of the following if a party requests it and provides the court with the information needed by it to comply with the request, and may take judicial notice without request of a party of:
(d) Rules which govern the practice and procedure in a court of the United States or of any state, territory, or other jurisdiction of the United States, and which have been published in a form which makes them readily accessible.
(e) Rules and decisions of boards, commissions, and agencies of the United States or of any state, territory, or other jurisdiction of the United States which have been duly published and promulgated and which have the effect of law within their respective jurisdictions.
(2) A party who requests that judicial notice be taken and the court, if notice is taken without request shall give reasonable notice during trial to all other parties.
C. Information by court. The court may inform itself of any of the foregoing legal matters in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information.
D.Time of taking notice. Judicial notice of the foregoing legal matters may be taken at any stage of the proceeding, provided that before taking judicial notice of a matter in its instructions to the jury, the court shall inform the parties before closing arguments begin.
E.Question for court. The determination of the foregoing legal matters shall be made by the court.

. Maraist & Lemmon, 1 La. Civ. Law Treatise, Civil Procedure, § 11.7(5), p. 289, cited at Wooley II, p. 67, 14 So.3d at 372, provides a historical perspective to better understand the purpose of this rule of evidence:
Although the Code of Civil Procedure originally provided that "[ejvery court of this state shall take judicial notice of the common law and statute of every state,” the courts often held that if the law of another state applies and the parties do not offer proof of that law, the court will presume that the law of the foreign state is the same as that of Louisiana. The code of Evidence now provides that "[a] court, whether requested to do so or not, shall take judicial notice of the law of ... every state....” This legislative repudiation of the judicial "presumption” may, like its predecessor, have fallen upon deaf judicial ears.
Although the court of appeal cited to this treatise commentary, the ad hoc panel failed to apply its meaning to the instant matter.

. We note the district court record was certified on April 20, 2006. Vol. 89(89), p. 19212. The appellate court judgments on the main tort and contract claims were handed down on December 20, 2008.

. La. C.C. art. 3515 is found in Book IV of the Louisiana Civil Code, entitled "Conflict of Laws” and provides:
Art. 3515. Determination of the applicable law; general and residual rule
Except as otherwise provided in this. Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

. Wooley II, p. 73, 14 So.3d at 435.

. Wooley II, p. 74, 14 So.3d at 435-436.

. Wooley II, p. 75, 14 So.3d at 436.

. Wooley II, p. 75-76, 14 So.3d at 436-438.

. See Vol. 59(89), p. 12726-28 and Vol. 64(89), p. 13695-701.

. At the November 21, 2005 hearing on attorneys fees/punitive damages for the Louisiana and Oklahoma Receivers, counsel for Health Net engaged in the following colloquy with the district judge:
Counsel for Health Net: One preliminary matter on our list, your Honor. Has the court had an opportunity to prepare written reasons and conclusions of law in connection with the Louisiana and Oklahoma judgment.
The Court: The final judgment.
Counsel for Health Net: The final judgment, yes, your Honor.
The Court: Yes, but it's not ready yet. The court has had [sic; will have] ample opportunity. As you know the court signed judgment about five days ago. And I have thirty days from the signing to do it. I intend to finish it shortly.
Counsel for Health Net: I just needed to know because we are rolling into some issues that are obviously governed by the judgment. I just wanted to know—
The Court: I noticed when I received it there was a second request. It was denominated second request for written reasons. And I recall when I got the first request it was premature because I hadn’t even signed a judgment. So as soon [as] I signed the judgment, I began to work on it. So it will be complete[d] shortly.
Counsel for Health Net. Thank you, your Hon- or.
Tr. 19(19), p. 3501-02.

. Vol. 65(89), p. 14044-47 and p. 14048-51.

. Vol. 65(89), p. 14076-81 and p. 14082-86; Vol. 66(89), p. 14087.

. Vol. 67(89), p. 14408-09.

. Supplemental Record, "Motion for Remand.”

. La. C.C.P. art. 1917 provides the following rule:
A. In all appealable contested cases, other than those tried by a jury, the court when requested to do so by a party shall give in writing its findings of fact and reasons for judgment, provided the request is made not later than ten days after the mailing of the notice of the signing of the judgment.
*569 B. In nonjury cases to recover damages for injury, death, or loss, whether or not requested to do so by a party, the court shall make specific findings that shall include those matters to which reference is made in Paragraph C of Article 1812 of this Code. These findings need not include reasons for judgment.

.La. C.C.P. art. 1812(C) provides the rules for special verdicts:
C. In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, non-party means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.

. Supplemental Record, Wooley v. Lucksinger, 2006-1140 (La.App. 1 Cir. 7/10/07) (unpublished).

. The substance of the court of appeal’s remand order is reproduced in its opinion at Wooley II, p. 181-183, 14 So.3d at 440-441.

. Supplemental Record, Letter from Judge Janice Clark. See also Wooley II, p. 183, 14 So.3d at 441.

. Wooley II, p. 183, 14 So.3d at 441. This request is not found in the record.

. Supplemental Record, Court of Appeal Order dated 8/17/07 (unpublished).

. La. C.C.P. art. 2088(A) provides in pertinent part: "The jurisdiction of the trial court over all matters in the case reviewable under the appeal is divested, and that of the appellate court attaches, on the granting of the order of appeal and the timely filing of the appeal bond, in the case of a suspensive appeal or on the granting of the order of appeal, in the case of a devolutive appeal....”

. See Yuma Petroleum Co. v. Thompson, 1996-1840 (La.App. 1 Cir. 2/20/98), 709 So.2d 824, 827, aff'd in part, rav’d in part on other grounds, 1998-1399 (La.3/2/99), 731 So.2d 190; Custom-Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc., 32,441 p. 13-14 (La.App. 2 Cir. 12/8/99), 748 So.2d 594, 603; Hester v. Hester, 1996-0189 p. 8 (La.App. 4 Cir. 9/11/96), 680 So.2d 1232, 1236, writs denied, 1996-2452 (La.12/6/96), 684 So.2d 933 and 96-2468 (La.12/6/96), 684 So.2d 934; Anders v. Boudion, 93-0894 p. 2 (La.App. 5 Cir. 3/29/94), 636 So.2d 1029, 1031.

. Wooley II, p. 181-182, 14 So.3d at 440.

. In other words, there are 121 volumes of pleadings and transcripts which the district court did not have, which both the appellate court and this court have had, to decide these matters. In this case, we find the testimony of the witnesses was equally as important as the exhibits in the presentation of this case.

. Supplemental Record, Reasons for Judgment (emphasis supplied).

. We make no per se rule in this regard, either that the passage of x amount of time, or a record of x volumes makes a remand order impractical. Our ruling is limited to this case, with these facts, and this record.

. The appellate court additionally compounded its error by failing to answer the district court’s request for clarification.

. Wooley II, p. 195, 14 So.3d at 448.

. Wooley II, p. 196, 14 So.3d at 449.

. Wooley II, p. 195-196, 14 So.3d at 448-449.

. Wooley II, p. 173, 14 So.3d at 435.

. See Vol. 54(89), p. 11593-11619 (23 proposed jury instructions by Texas Receiver) and Vol. 57(89), p. 12109-12219 (although Health Net submitted 102 proposed jury instructions, and one supplemental proposed jury instruction, Health Net intentionally left two of its proposed instructions blank, so that there was actually a total of 101 proposed jury instructions from the defendant). See Vol. 57(89), p. 12109-12219.

. La. C.C.P. art. 1793(A) provides: "At the closi\ of the evidence, or at such earlier time as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests.”

. La. C.C.P. art. 1792(B) provides in pertinent part: "After the trial of the case and the presentation of all the evidence and arguments, the court shall instruct the jurors on the law applicable to the cause submitted to them.”

.See Tr. 17(19), p. 3306, where the district judge stated: "The court has reviewed the requests for instructions by counsel and notes for the record, again, that they were not timely filed. Nonetheless, the court did review them and points out to counsel that [the] trial judge is not required to give the precise instructions submitted but [must] merely give instructions that properly reflect the law applicable in light of the pleadings and the facts of the particular case.”

. La. C.C.P. art. 1793(B) provides: "The court shall inform the parties of its proposed action on the written requests and shall also inform the parties of the instructions it intends to give to the jury at the close of the evidence within a reasonable time prior to their arguments to the jury.”

. La. C.C.P. art. 1812 provides:
Art. 1812. Special verdicts
A. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event, the court may submit to the jury written questions susceptible of categorical or other brief answer, or may submit written forms of the several special findings which might properly be made under the pleadings and evidence, or may use any other appropriate method of submitting the issues and requiring the written findings thereon. The court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue. If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted unless, before the jury retires, he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding, or if it fails to do so, it shall be presumed to have made a finding in accord with the judgment on the special verdict.
B. The court shall inform the parties within a reasonable time prior to their argument to the jury of the special verdict form and instructions it intends to submit to the jury and the parties shall be given a reasonable opportunity to make objections.
C. In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1)Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, non-party means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.
D.The court shall then enter judgment in conformity with the jury's answers to these special questions and according to applicable law.

.Tr. 16(19), p. 3155. The record reflects the fierce disagreement of the parties, both as *577 to the form and as to the specific questions for the jury. The Texas Receiver submitted 19 proposed special interrogatories and Health Net submitted 48 proposed special interrogatories, with additional subparts. Tr. 16 (19), p. 3177-3193.

.The trial judge stated: "In any event, unless the parties want to take one more shot at trying to confect a joint one, then I will do some very plain, vanilla [interrogatories] that will not exceed, I can tell you right now, will not exceed ten or twelve questions maximum, maximum. So everyone will be equally unhappy. I am giving you one last chance to have meaningful input and come to a compromise. I thought you were working on that. [The Texas Receiver’s counsel] was close to a compromise there, and I encourage you to work with him a little later this evening and come up with something. I think you can. Can’t be too fact intensive in these. And can’t put a dissertation in them.” Tr. 16(19), p. 3194.

. Health Net objected to Interrogatory No. 2, which used the heading "Any other person” instead of listing specific individuals in the allocation of fault. Health Net also objected to the lack of a specific interrogatory on intervening and superseding cause. Health Net urged the court to inform the jury in its charge that Health Net stipulated or admitted the fault of other defendants who had settled in the litigation. Health Net additionally made a general objection "to the absence of certain of its own proposed jury interrogatories,” but failed to object specifically. Tr. 17(19), p. 3201. However, counsel for Health Net specifically accepted Interrogatories No. 1 and 3-15. Tr. 17(19), p. 3202.

. Tr. 17(19), p. 3212, 3270-3273, 3306.

. Tr. 17(19), p. 3223-3252.

. Tr. 17(19), p. 3271-3273.

. Tr. 17(19), p. 3299-3306.

. Wooley II, p. 172-173, 14 So.3d at 434-435.

. Wooley II, p. 87, 14 So.3d at 384.

. The record supports our conclusion this concept is a non-issue. Nowhere in the Texas Receiver’s 23 proposed jury instructions, and nowhere in the 101 jury instructions proposed by Health Net is this issue raised.

. Wooley II, p. 92, 14 So.3d at 386.

. Philip Preis, one of the Receivers’ expert witnesses, provided brief testimony expressing his belief the sale was a sham transaction. Counsel for the Texas Receiver briefly referred to the sale as a sham in closing argument when relating the evidence of conspiracy. See eg., Tr. 12(19), p. 2342 (Preis' testimony); Tr. 13(19), p. 2477 (Preis' testimony); Tr. 17(19), p. 3216-3217, 3222 (closing argument). The concept was not repeated in the Texas Receiver’s rebuttal closing argument.

.Wooley II, p. 228, 14 So.3d at 468.

.The appellate panel may have been influenced in this regard by the district judge. We note the district judge, in her belated written reasons for judgment, drafted two years after the judgment, indicated her belief the sale was a sham. While we find the written reasons for judgment accurately encompassed the broad concepts discussed at trial, we disagree with some of the specific facts found therein.

. Wooley II, p. 100, 14 So.3d at 391.

. Wooley II, p. 108, 14 So.3d at 396.

. Compare Wooley II, p. 108, 14 So.3d at 396 with Wooley II, p. 172, 14 So.3d at 434-435.

. See Southern Union Company v. City of Edinburg, 129 S.W.3d 74, 86-87 (Tex.2003) (noting the Texas Supreme Court had never considered the SBE concept in any detail and declining to decide whether the SBE theory was a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure); Formosa Plastics Corp. USA v. Kajima International, Inc., 216 S.W.3d 436, 460-463 (Tex.App.Corpus Christi 2006) (SBE doctrine recognized “in one context or another” only in intermediate appellate courts); PCH-Minden v. Kimberly-Clark Corp., 235 S.W.3d 163, 173 (Tex.2007)(Texas Supreme Court has never endorsed the SBE theory); Academy of Skills & Knowledge, Inc. v. Charter Schools, USA, Inc., 260 S.W.3d 529, 539 (Tex.App.-Tyler 2008) (considering the entirety of Texas law, and the Texas Supreme Court’s lack of endorsement, court held the SBE doctrine did not exist under Texas law).

. The court of appeal correctly concluded in this subsection "... it appears that (1) alter ego rather than single business enterprise is the proper description for piercing the corporate veil in Texas....” Wooley II, p. 104, 14 So.3d at 393 (emphasis in original).

. See Tr. 8(19), p. 1320-21; Tr. 9(19), p. 1455-1459, 1469 (Receivers’ expert witness, Edward W. Buttner, IV). Even Health Net's expert, Bryon Jones, was unaware of any documents which required AmCareco to contribute its capital to the HMOs or of any statutes or regulations which would allow the regulators to count the assets of AmCareco, the parent company, in determining the assets of the HMOs, the subsidiary companies. Tr. 16(19), p. 3092-3093.

. See La. C.C.P. art. 1792(B) ("... the court shall instruct the jurors on the law applicable to the cause submitted to them.”) (emphasis supplied). We additionally find meritless Health Net’s complaint, raised below, that there was inequity in the court’s consideration of the consolidated manner in which AmCareco operated the HMOs for the choice of law determination, but its failure to give an SBE-type instruction so the jurors could consider AmCareco's assets along with the assets of the HMOs, i.e. the consolidated manner of operation could be used as a "sword” (offensively), but not a "shield” (defensively). Although dealing with jurisdiction, rather than choice of law, courts applying Texas law have recognized the analysis for jurisdictional purposes is different from the one undertaken for liability purposes. See Berry v. Lee, 428 F.Supp.2d 546, 553 (N.D.Tex.2006), citing El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero S.A. de C.V., 82 S.W.3d 622, 634 (Tex.App.-Corpus Christi 2002, pet. dism’d w.o.j.) ("The analysis undertaken when determining whether separate corporate entities should be treated as one for jurisdictional purposes is different than that undertaken when determining whether separate corporate entities should be treated as one for liability purposes.”).

. Wooley, 2006-1140 p. 116-117, 14 So.3d at 401.

. Article 2.21(A) of the Texas Business Corporation Act was recodified and is currently located at Section 21.223 of the Texas For-Profit Corporation Law. See Tex. Bus. Orgs. Code Ann. § 21.223 (Vernon Supp.2006). Walker v. Anderson, 232 S.W.3d 899, 905 n. 1 (Tex.App.-Dall.2007); Dick’s Last Resort of West End, Inc. v. Market/Ross, Ltd., 273 S.W.3d 905, 908 n. 2 (Tex.App.Dall.2008). For ease of understanding, this opinion will refer to the statute under its former designation.

. See Tex. Bus. Corp. Act Ann. art. 2.21, Comment of Bar Committee-1996 ("The [1989] amendments should also be considered by analogy in the context of tort claims, in particular contractually based tort claims, and reflect a clear public policy that the corporate fiction should be recognized absent compelling circumstances to the contrary.").

. See Tr. 17(19), p. 3282-3283.

. Wooley II, p. 172-172, 14 So.3d at 434-435.

. Wooley II, p. 138, 14 So.3d at 415.

. Wooley II, p. 144, 14 So.3d at 419.

. Wooley II, p. 146, 14 So.3d at 420.

. Wooley II, p. 150-151, 14 So.3d at 421.

. Wooley II, p. 154-155, 14 So.3d at 424-425.

. Wooley II, p. 117-139, 14 So.3d at 401-415.

. Tr. 17(19), p. 3283.

.The trial judge further instructed the jury:
You are instructed that the controlling or dominating shareholders of a corporation, as well as the corporation's officers and directors, have fiduciary duties to the corporation and, when the corporation is insolvent or in the zone of insolvency, to the corporation’s creditors and potential creditors as well.
[definition of fiduciary duty described above]
A controlling or dominating shareholder[,] officer or director with fiduciary duties to the corporation and its creditors must prove by a preponderance of the evidence that transactions that the corporation enters into or transactions the controlling or dominant shareholder, officer, or director enters into, that affect the corporation or its creditors are inherently fair to the corporation and its existing or prospective creditors, and do not expose the corporation or its creditors or prospective creditors to a[n] unreasonable risk of loss, and were entered into after full and complete disclosure to the creditors and prospective creditors.
A shareholder is a controlling or dominant shareholder if that shareholder ] possesses directly or indirectly the power to direct or cause the direction of the management and policies of a corporation whether through the ownership of voting securities, by contract or otherwise, and has assumed a role in the formulation of strategic policy or a role in operational decisions.
An exception to the general rule that the corporations owe no duties to creditors arises when a corporation is insolvent. When a corporation is insolvent, the duty owed by the officers and directors, but not by a shareholder, of the corporation expands to include a duty to the creditors. Accordingly, when a corporation is insolvent, officers and directors of an insolvent corporation have a fiduciary duty to deal fairly with the corporation’s creditors and that duty includes preserving the value of the corporate assets to pay corporate debts without preferring one creditor over another or preferring themselves to the injury of other creditors.
However, a creditor may pursue corporate assets and hold officers and directors, but not shareholders, liable only for that portion of the assets that would have been available to satisfy his debt if they had been distributed pro rata to all creditors.
This duty to creditors does not apply to shareholders of the corporation unless the shareholder is also an officer or director of the corporation or unless the shareholder is in actual control of the management of the corporation and, therefore, is a controlling shareholder as previously outlined.
Tr. 17(19), p. 3283-3284, 3288.

. "Malice means a specific intent by the entities or individuals that breached their fiduciary duty to the HMO and their creditors to cause substantial injury or harm to the HMOs and their creditors.” Tr. 17(19), p. 3281.

. Crary was also identified in the record as the Senior Vice-President of Finance for the Western Division of Health Net. Tr. 12(19), p. 2232-2233.

. For the reasons already discussed, we express no opinion about the applicability of the former statute's preemptive provisions to Health Net’s post-sale activities as unnecessary to our discussion.

. Wooley II, p. 123, 14 So.3d at 405.

. VFB LLC further held a duty of loyalty against the parent would arise whenever the subsidiary represents some minority interest in addition to the parent, such as when a subsidiary is not wholly-owned, or if the subsidiary was insolvent, when the directors would have a fiduciary duty to the subsidiary's creditors. Wooley II, p. 124, 14 So.3d at 406.

. See 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations, § 844.30, at 230 (2010).

. Anadarko, 545 A.2d at 1172.

. Anadarko, 545 A.2d at 1174.

. First American Corp. held:
[The defendants] rely principally on the Delaware Supreme Court’s decision in Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171 (Del.1988), for the proposition that a wholly-owned subsidiary’s director’s fiduciary duties flow only to the parent corporation. That overstates the "narrow confines” of the court’s holding. See id. at 1178 (denying rehearing). In Anadarko, the parent corporation decided to spin off a wholly-owned subsidiary, and in advance of doing so, three kinds of contingent equity interests in the spin-off corporation were sold. See id. at 1173. Purchasers of these interests sued the spinoff’s board for breach of fiduciary duties for agreeing to modifications of contracts between the parent and the spin-off in the interim between when these interests were sold and the date the spin-off changed from being nothing more than an asset of the parent to an independent entity. The court held that during that liminal period, the spin-off’s Board did not owe any fiduciary duties to the prospective owners. Id. at 1177.

.First American, 17 F.Supp.2d at 26.

. This conclusion was based on three factors: (1) the subject language in Anadarko was dicta, as the facts there did not raise the issue whether any fiduciary duty was owed by a subsidiary's director directly to the subsidiary; (2) lower courts sitting in Delaware have not interpreted the Anadarko decision so broadly; and (3) the rule of Anadarko would not apply in an insolvency context when multiple creditors are the beneficiaries of the director’s fiduciary duties (referencing that Delaware law recognizes that the fiduciary duties of a director shift from the shareholders to the creditors when a corporation is insolvent). In re Southwest Supermarkets, 376 B.R. at 283-285.

. The federal bankruptcy court was referring to the facts in Cochran v. Stifel, infra, where a literal reading of Anadarko would result in a corporation being unable to sue a self-dealing director "for breach of fiduciary duties if it happens to be wholly owned, though it would have such a cause of action if just one share of its stock were owned by someone other than the parent.” See In re Southwest Supermarkets, 376 B.R. at 285.

. The parent corporation’s argument relied on Anadarko and asserted: "[bjecause a wholly-owned subsidiary is to be managed solely as to benefit its corporate parent,” "any action brought by a wholly-owned subsidiary is, by definition, brought 'by or in the right’ of the subsidiary’s corporate parent.” Cochran, *11. The phrase "by or in the right” references a specific Delaware statute at issue in that case.

. Cochran, *13.

. In Resolution Trust Corporation v. Bonner, 1993 WL 414679 (S.D.Tex.1993), relied on by the court of appeal panel here, the federal district court sitting in Texas dismissed breach of fiduciary duty claims brought by a receiver against the former directors and/or officers of a corporation. Although the federal district court dismissed the claim on the basis that the actions of the former directors/officers did not constitute those of an “interested” director, the court additionally found the cause of action for breach of fiduciary duty must be dismissed "because a parent corporation owes no duties to its wholly-owned subsidiary,” citing Ana-darko. Id., 1993 WL 414679 *3. Since this opinion did not specifically rule on the fiduciary duties of the subsidiaries’ directors visa-vis the subsidiary corporation, the decision fails to provide guidance for our question here.
In Kunzweiler v. Zero.Net, Inc., 2002 WL 1461732 (N.D.Tex.2002), the federal district court in Texas applied Delaware substantive law. Citing Anadarko, the court held the plaintiff was not a stockholder during the relevant time period, but only a potential investor, to whom no fiduciary duties were owed. Id., 2002 WL 1461732 *17.
In In re Mirant Corporation, 326 B.R. 646 (Bankr.N.D.Tex.2005), the federal bankruptcy court in Texas applied Georgia law. The defendants in that case relied on Anadarko and the court held the defendants gave an overly broad reading of Anadarko: "[in Anadarko ] the court held that directors of a parent owed no fiduciary duty to prospective shareholders of the subsidiary prior to a spinoff, not that the subsidiary's directors owed no duty to the subsidiary.” Id., 326 B.R. at 651 (emphasis added).
In Jackson v. Cherry (In re Cherry), 2006 WL 3088212 (Bankr.S.D.Tex.2006), the federal bankruptcy court in Texas applied Oklahoma substantive law to the claims raised, since the bankruptcy complaint incorporated claims put forth in an earlier action pending in a federal district court in Oklahoma. Since the defendant was a director of the parent corporation, as well as the subsidiaries, the federal bankruptcy court, citing Anadarko, held the defendant would have been breaching his duty as a director to both the parent and the subsidiaries when he allegedly diverted funds from the subsidiaries. Id., 2006 WL 3088212 *20 (emphasis added).
In ASARCO LLC v. Americas Mining Corporation, 382 B.R. 49, 69 (S.D.Tex.2007), on reconsideration in part, 396 B.R. 278, 394 n. 133 (S.D.Tex.2008), the federal district court in Texas applied New Jersey or Delaware law to the claim of breach of fiduciary duty raised in that case.

. Trenwick, 906 A.2d at 201 (emphasis added).

. Trenwick, 906 A.2d at 202 (emphasis added).

. Trenwick, 906 A.2d at 203 (emphasis added).

. Trenwick, 906 A.2d at 203-204.

. This point was stressed by one of the Receivers’ experts. Tr. 12(19), p. 2288 (Preis).

. Wooley II, p. 137-138, 14 So.3d at 414-415.

. Wooley II, p. 138, 14 So.3d at 415.

. Admittedly, the jury was not specifically instructed that a corporation acts through its human agents. See Holloway, 898 S.W.2d at 795. However, the jury was instructed that persons are "natural, individual, or may be artificial, corporate” and that "[ejvery person is responsible for the damage that he or it occasions, not merely by his act but by his fault or negligence or his imprudence or his want of skill.” Tr. 17(19), p. 3279. Under the circumstances of this case, we do not think the jury improperly held Health Net liable for breaches of fiduciary duties which were committed at its behest.

. As previously stated, former Art. 2.21(A)(2) provided:
Art. 2.21. Liability of Subscribers and Shareholders
A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under no obligation to the corporation or to its obligees with respect to:
(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate; ... (emphasis added).

. As previously stated, former Art. 2.21(B) provided:
B. The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate diereof or of the corporation for that obligation under common law or otherwise, except that nothing contained in this article shall limit the obligation of a holder, owner, subscriber, or affiliate to an obligee of the corporation when:
(1) the holder, owner, subscriber, or affiliate has expressly assumed, guaranteed, or agreed to be personally liable to the obligee for the obligation; or
(2) the holder, owner, subscriber, or affiliate is otherwise liable to the obligee for the obligation under this Act or another applicable statute.
(Emphasis added).

. Wooley, 2006-1140 p. 139-144, 14 So.3d at 415-419.

. We express no opinion about the applicability of the former statute’s preemptive provisions as applied to Health Net’s post-sale activities, as such is unnecessary to our discussion.

. Tr. 17(19), p. 2385; the district judge’s erroneous insertion of "or” rather than "and" is in bold.

. Vol. 57(89), p. 12167.

. Pursuant to the re-designation of the Texas Insurance Code, former Article 21.21, regarding unfair methods of competition, and unfair or deceptive acts or practices, is now found in Tex. Ins.Code § 541.001 et seq.

. Former Tex. Ins.Code Art. 21.21 § 4(1).

. Former Tex. Ins.Code Art. 21.21 § 4(2).

. Former Tex. Ins.Code Art. 21.21 § 4(5).

. Former Tex. Ins.Code Art. 21.21 § 4(11).

. Former Tex. Ins.Code art. 21.21 § 1(a) is currently found at Tex. Ins.Code § 541.001.

. Former Tex. Ins. code. art. 21.21 § 1(b), currently found at Tex. Ins.Code § 541.008, provided "(b) This Article shall be liberally construed and applied to promote its underlying purpose as set forth in this section.”

. Vol. 30(89), p. 6262. At the time, Health Net claimed the only violations of Art. 21.21 of the Texas Insurance Code raised by the Receivers were directed at post-sale acts of Health Net.

. The district judge instructed the jury:
You are instructed that an unfair or deceptive act or practice is as follows: Filed with any supervisory or other public official or make, publish, disseminate, circulate or deliver to any person or place before the public or cause directly or indirectly to be made, published, disseminated, circulated, delivered to any person anyplace or placed before the public any false statement or financial condition of an insurer with intent to deceive.
Two, make any false entry in any book report, or statement of any insurer with the intent to deceive any agent or examiner lawfully appointed to examine its condition or any of its affairs or any public official to whom such insurer is required by law to report, or who has the authority by law to examine its condition or into any of its affairs, or with like intent willfully omitting to make a true entry of any material fact pertaining to the business of such insurer in any book, report, or statement of such insurer.
Or make, publish, disseminate, circulate or place before the public or cause directly or indirectly to be made, published, disseminated, circulated or placed before the public in a newspaper, magazine or any other publication or in the form of a notice, circular, pamphlet, letter or poster or over any radio, television station, or in any other way an advertisement, announcement, or statement containing any assertion, representation, or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business which is untrue, deceptive, or misleading and that caused actual damages to plaintiff.
Tr. 17(19), p. 3285-3286.

. Wooley II, p. 150-155, 14 So.3d at 422-425.

. The trial court submitted the following definition of civil conspiracy to the jury in Triplex: "A 'civil conspiracy’ is a combination of two or more persons who agree between themselves to accomplish an unlawful or negligent purpose or to accomplish a lawful purpose by unlawful or negligent means.” Id., 900 S.W.2d at 720 n. 2. (emphasis in original).

. Since the jury in that case failed to find the existence of a civil conspiracy, even under the more liberal standard presented in the erroneous definition, the Texas Supreme Court found that any error in the definition was not dispositive to the case. Triplex, 900 S.W.2d at 720 n. 2.

. See Tr. 17(19), p. 3285 and 3287.

. See Vol. 57(89), p. 12171 (Health Net charge 58) and Vol. 57(89), p. 12170 (Health Net charge 57).

. Wooley, 2006-1140 p. 160, 14 So.3d at 428.

. See Perez, 881 S.W.2d at 493.

. See Isaacs, 249 S.W.3d at 107-108.

. We find the same result would be obtained if the matter was reviewed under Louisiana procedural law, as urged by the Texas Receiver. Louisiana law uses the same abuse of discretion standard for review of this type of alleged error. See La. C.C.P. art. 1812; Murphy v. Jefferson Health Care Center LLC, 2009-0304 p. 6 (La.App. 5 Cir. 10/27/09), 27 So.3d 899, 903 (“An appellate court will not set aside a trial judge's framing of questions to be posed to the jury absent an abuse of discretion.”); State ex rel. DOTD v. Wade, 2007-1385 p. 4 (La.App. 3 Cir. 5/28/08), 984 So.2d 918, 921, writ denied, 2008-1896 (La.12/12/08), 997 So.2d 561 ("... the trial court is given wide discretion in determining and framing questions to be posed as special jury interrogatories, and absent some abuse of that discretion, this court will not set aside those determinations.”); Schram v. Chaisson, 2003-2307 (La.App. 1 Cir. 9/17/04), 888 So.2d 247, 251 (same); Young v. First Nat. Bank of Shreveport, 34,214 p. 14 (La.App. 2 Cir. 8/22/01), 794 So.2d 128, 130, writ not considered, 2001-2762 (La.1/4/02), 805 So.2d 1195, reconsideration granted, 2001-2762 (La.3/22/02), 811 So.2d 936 (same); Price v. La. DOTD, 608 So.2d 203, 210 (La.App. 4 Cir.1992) (same).

. See Wooley II, p. 413 n. 145, 14 So.3d at 575 n. 145.

. The briefs of the parties which were filed in the court of appeal are a part of the appellate record.

. See Vol. 57, p. 12169, Defendant’s Requested Jury Charge No. 56 (In Pari Delicto).

. See Vol. 57, p. 12214-12215, Defendant's Requested Jury Charge No. 101 (Duty to Mitigate) and No. 102 (Duty to Mitigate/Unavoidable Consequences).

. Joint Brief Of The Appellee Receivers In Opposition To Motions To Remand (Re Evidence Of "Regulator Fault”), p. 15.

. Insofar as our holding may conflict with Wooley v. Lucksinger, et al., 2006-1167 (La.App. 1 Cir. 5/4/07), 961 So.2d 1228, it is overruled.

. Wooley, 2006-1140 et seq., p. 160-172, 14 So.3d at 428-434.

. This is Health Net’s entire statement in this regard: “However, in light of the glaring and pervasive instructional errors discussed above [those instructional errors not acted on by the appellate court and found invalid in this section of our opinion], and the fact that appellants have waived it, this alternative legal basis for de novo review was unnecessary to the Court of Appeal’s decision and need not be reviewed here.” Health Net’s Brief Regarding the Texas Case, p. 23.

. See Supreme Court Rules, Rule 7, § 6: "The court may consider as abandoned any assignment of error which has not been briefed.”

. La. Const, art. 5, § 5(C) provides in pertinent part: "Except as otherwise provided by this constitution, the jurisdiction of the supreme court in civil cases extends to both law and facts.”

. At oral argument, counsel for Health Net argued so many of the witnesses testified via videotaped deposition, or through having deposition testimony read aloud, there could be no credibility determinations made by the fact-finders in this case to which deference was owed. We find to the contrary. Many of the key players in the alleged conspiracy testified in person or by videotaped deposition and the fact-finders were able to judge the witnesses’ demeanor in making their credibility det§rminations. The appellate court, and this court, are unable to do so. Although the record contains the transcribed testimony of these witnesses, the videotaped depositions are not a part of the appellate record.
Although we have expressed our disagreement with some of the district court's specific written reasons filed years after her judgment, we nevertheless note that reasons supporting her factual findings are necessarily and clearly implied by the record, especially her contemporaneously expressed oral reasons for her rulings. We find the district court's judgments were, in large part, based on her contemporaneous credibility determinations and are entitled to deference. Leal v. Dubois, 2000-1285 p. 4-5 (La.10/13/00), 769 So.2d 1182, 1185.

. Insolvency of the HMOs, and AmCareco, was also raised as an issue in the post-sale time period. However, as we have declined to investigate Health Net’s obligations post-sale as unnecessary to our analysis, no further discussion on this point is necessary.

. The actual amount of the cash sweep was $8,367,414; this approximate number will be used hereinafter.

. The Receivers argued Ex. 3055, an October 22, 1998 memorandum from Deloite & Touche, the external auditors for Health Net, was further evidence that no sale occurred. The memorandum explores whether the proposed sale strategy constituted a sale under accounting principles. We find to the contrary, believing Health Net requested an opinion from its external auditors in order to ensure a sale occurred and that impediments to the transaction being considered a sale in fact under accounting principles were avoided in the sale documents.

. Testimony established the State of Texas oversees approximately 5000 insurance companies; the State of Louisiana oversees approximately 2000 insurance companies. The number of financial analysts who regulate these companies is, by contrast, small. In Louisiana at the relevant time, there were eight financial analysts. Consequently, the regulators must rely on the accuracy of the information filed with them. See Tr. 10(19), p. 1734 and Tr. 11(19), p.2112-2113.

. Tr. 10(19), p. 1692.

. Tr. 11(19), p. 2103.

. Tr. 12(19), p. 2261.

. Tr. 15(19), p. 2751, 2772 (Espinosa).

. Tr. 14(19), p. 2624 (Saenz); Tr. 15(19), p. 2784-2788 (Patterson). The financial analysis of the Texas HMO was performed by Max Viescas, who did not testify at trial, nor was his deposition testimony submitted. Instead, the Texas holding company analyst, Licette Espinosa, and her superiors at Tx-DOI, Danny Saenz and Betty Patterson testified via videotaped deposition excerpts.

. Tr. 15(19), p. 2756 (Espinosa).

.Tr. 14(19), p. 2631 (Saenz).

. Tr. 11(19), p. 2120 (Brignac); Tr. 13(19), p. 2498 (Smith).

. Tr. 11(19), p. 2133 (Brignac).

. Tr. 11(19), p. 2128 (Brignac).

. Tr. 11(19), p. 2129 and Tr. 12(19), p. 2199 (Brignac).

. Tr. 12(19), p. 2199 (Brignac).

. Ex. 3194, Deposition excerpt, p. 4 (House).

. Ex. 3194, Deposition Excerpt, p. 7 (House).

. Ex. 3194, Deposition Excerpt, p. 3-5 (House).

. Ex. 3194, Deposition Excerpt, p. 6 (House).

. Ex. 3195, Deposition Excerpt, p. 1 (Wire).

. Ex. 3195, Deposition Excerpt, p. 2-3 (Wire).

. See Ex.2016 and Ex. 447 (Exhibit E to the Closing Agreement); Tr. 10(19), p. 1683-1685.

. See Ex.2016; Tr. 10(19), p. 1683-1685.

. Tr. 8(19), p. 1368-1373 and Tr. 9(19), p. 1489.

. Tr. 9(19), p. 1436.

. Tr. 10(19), p. 1739.

. Tr. 10(19), p. 1752 (emphasis added).

.Tr. 10(19), p. 1740.

. Tr. 11(19), p. 1931.

. Tr. 11(19), p. 1941-1945.

. Tr. 8(19), p. 1328 (Buttner).

. Buttner disagreed with Health Net’s argument that the intercompany accounts were zeroed out after the sale because that was not how the statutory financial statements of the companies handled these matters. Instead, Buttner treated these accounts the same way the companies did in his analysis. Tr. 9(19), p. 1448.

. Tr. 8(19), p. 1324, 1328 (Buttner). Ex. 3158.

. Tr. 8(19), p. 1324, 1335, 1337, 1339 (Buttner).

. A civil conspiracy, as we have discussed, is a combination of two or more persons, natural or juridical, to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Operation Rescue-National, 975 S.W.2d at 553. The essential elements of a civil conspiracy are: (1) a finding that two or more persons combined; (2) to accomplish an object; (3) which the persons agreed upon; (4) one or more unlawful overt acts in pursuit of the object; and (5) damages as a proximate result. Id.

. Tr. 9(19), p. 1489 (Buttner); Tr. 10(19), p. 1679-1680 (Westen).

. Tr. 8(19), p. 1309 (Coburn).

. Tr. 8(19), p. 1372 (Buttner).

. Tr. 8(19), p. 1373 (Buttner).

. Tr. 8(19), p. 1355 (Buttner).

. Tr. 9(19), p. 1526-1527 (Lucksinger).

. Tr. 8(19), p. 1346 (Buttner).

. Tr. 10(19), p. 1739 (Keller).

. Tr. 11(19), p. 2136 (Brignac).

. Tr. 11(19), p. 2167.

. Tr. 12(19), p. 2326 (Preis).

. Tr. 13(19), p. 2470-2471 (Preis).

. Tr. 13, p. 2397-2399 (Preis) ("... but I am a little stunned is what I am that this agreement would make the argument that it would be based on three million versus four million when everybody knew going into this, the transaction, that $4 million was the number Louisiana was requiring.").

. Tr. 10(19), p. 1671.

. Tr. 10(19), p. 1674.

. Tr. 16(19), p. 3012.

. Tr. 16(19), p. 2982.

. Tr. 16(19), p. 2989.

. Tr. 11(19), p. 2102.

. Tr. 11(19), p. 2108.

. Id.

. Tr. 11(19), p. 2109.

. See ex. Tr. 12(19), p. 2266 (Jansen).

. Tr. 12(19), p. 2233-2234, 2240.

. Tr. 12(19), p.2235.

. Tr. 12(19), p. 2332.

. Tr. 13(19), p. 2482.

. Tr. 9(19), p. 1512.

. Tr. 17(19), p. 3309.

. The jury was instructed on these issues, as follows:
Gross negligence means an act or omission by the entities or individuals that breached their fiduciary duty, which when viewed objectively from the standpoint of the entities or individuals that breach their fiduciary duty at the time of the occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and of which the entities and individuals that breached their fiduciary duty had actual subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others.
Malice or gross negligence. Malice must be proven by clear and convincing evidence. Clear and convincing evidence means that measure or degree of proof that produces in your mind a firm belief or conviction as to the truth of the allegations sought to be established. Malice means a specific intent by the entities or individuals that breached their fiduciary duty to the HMO and their creditors to cause substantial injury or harm to the HMOs and their creditors.
Malice means a specific intent to cause substantial injury or an act or omission which, when viewed objectively from the standpoint of plaintiff at the time of the occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and of which the defendant had actual subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.
To prove gross negligence a plaintiff must show the act or omission, when viewed objectively from defendant’s standpoint at the time it occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and that the defendant had actual subjective awareness of the risk but still proceeded with a conscious indifference of the rights, safety, or welfare of others.
Tr. 17(19), p. 3281-3282. These jury instructions were devised from jury instructions proposed by the Receivers and Health Net. See Vol. 54, p. 11606-11607 (Receivers' proposed jury instructions) and Vol. 57(89), p. 12205-12206 (Health Net’s proposed charges no. 92 and no. 93).

. Tr. 10(19), p. 1767.

. Tr. 10(19), p. 1691.

. Tr. 10(19), p. 1692.

. Tr. 11(19), p. 2235.

. Tr. 12(19), p. 2242, 2244.

. Tr. 12(19), p. 2251.

. Tr. 8(19), p. 1382-1383.

. Tr. 8(19), p. 1345.

. See Tr. 12(19), p. 2174-75, 2180 (Brignac); Tr. 12(19), p. 2244, 2247, 2251 (Crary); Tr. 15(19), 2882 (Westen).

.Tr. 9(19), p. 1439.

. Tr. 9(19), p. 1492.

. Tr. 12(19), p. 2287-2288.

. Tr. 12(19), p. 2288.

. Tr. 12(19), p. 2288.

. Tr. 12(19), p. 2315.

. Tr. 16(19), p. 3015-3039.

. Tr. 16(19), p. 3060.

. Tr. 16(19), p. 3088.

. Tr. 16(19), p. 3089.

. Tr. 16(19), p. 3072, 3090-3092.

. Tr. 16(19), p. 3093.

. Tr. 16(19), p. 3099-3100.

. Tr. 16(19), p. 3100.

. Tr. 16(19), p. 3129.

. Tr. 16(19), p. 3140-3141.

. Brief on Behalf of Health Net, Inc., Regarding the Texas Case, 2009-C00571, p. 21.

. Tr. 17(19), p. 3289-3290. The charge includes two jury instructions proposed by Health Net. See Vol. 57(89), p. 12203 (Health Net proposed charge no. 90) and p. 12210 (Health Net proposed charge no. 97).

. Tr. 17(19), p. 3292.

. In Health Net’s proposed charge # 87, the instruction provides that in order for the plaintiffs to recover, they must prove by a preponderance of the evidence that the loss sustained was proximately caused by Health Net's alleged wrongdoing. The instruction warns against speculation. In Health Net’s proposed charge # 88, the instruction provided that any damages awarded must be reasonable and should only be for the sum which would adequately compensate the Texas Receiver for the damages sustained which are attributable to the fault of Health Net. This instruction also warns jurors against speculating as to the amount of the award, but cautions the award must be supported by evidence proved with a reasonable certainty. Vol. 57(89), p. 12200-12201.

. Health Net’s reliance on Jackson v. Fontaine's Clinics, Inc., 499 S.W.2d 87 (Tex.1973) is meritless. In Jackson, Fontaine’s sought recovery based on its loss of net profits. The Texas Supreme Court found the jury instruction was fatally defective because the jury was given no guideline for determining a loss of net profits. The instruction given "simply failed to guide the jury to a finding on any proper legal measure of damages.” Id., 499 S.W.2d at 90. That is not the case here.

. See La. C.C.P. art. 1792(B) ("... the court shall instruct the jurors on the law applicable to the cause submitted to them.”).

. In addition to Health Net’s brief to this court, we have also reviewed its argument on this issue in its motion for JNOV. See Brief on Behalf of Health Net, Inc. Regarding the Tex *625 as Case, p. 21-22 and Vol. 60(89), p. 12763-12764.

. The procedure is different in Louisiana and Oklahoma, where untimely-filed claims must still be considered, although they are ranked differently from timely-filed claim. Tr. 11(19), p. 2023.

. Tr. 11(19), p. 2023-2026. The figure was later stated to be $52,302,446.00. Tr. 11(19), p. 2043.

. Tr. 11(19), p. 2055.

. Tr. 11(19), p. 2028, 2044. None of the funds which the Texas Receiver had been able to collect was due to settlements achieved in this litigation.

. Tr. 11(19), p. 2036.

. Tr. 11(19), p. 2066.

. Tr. 11(19), p. 2068, 2078.

. Tr. 11(19), p. 2007, 2069, 2094-2095.

. Tr. 11(19), p. 2031.

. Tr. 11(19), p. 2042.

. Tr. 11(19), p. 2056.

. Tr. 11(19), p. 2043.

. Alter stating her ruling, counsel for Health Net specifically queried the district judge on this point:
Health Net: ... Is the court rejecting our request for a further reduction of $12 million in die amount of compensatory damages?
Court: Yes, sir.
Tr. 17(19), p. 3393.

.We have already discussed our rejection of Health Net’s request that a further reduction in the amount of compensatory damages be made in the amount of the two promissory notes from AmCareco.

. The amount before reduction for fault allocations.

. See Health Net’s Appellant's Brief Regarding The Oklahoma Judgment (2006-CA-1143, 1144, 1145), p. 76-78.

. Tr. 11(19), p. 1925.

. Tr. 11(19), p. 1960.

. Tr. 11(19), p. 1962-1963; Ex. 3145, “Assistant Receiver's Revised Report on Claims Against the Estate, and Recommendation to the District Court on the Priority and Amount of Allowance of Such Claims,” filed in the District Court for Oklahoma County, State of Oklahoma, Case No. CJ-2003-5311.

. Tr. 11(19), p. 1964, Ex. 3167 (incorrectly initially referred to as Ex. 3163-see Tr. 11(19), p. 1990).

. Tr. 11(19), p. 1964.

. Tr. 11(19), p. 1965.

. Tr. 11(19), p. 1969, 1972.

. Tr. 11(19), p. 1972.

. Tr. 11(19), p. 1977.

. Tr. 11(19), p. 1975; Tr. 12(19), p. 2225.

. Tr. 11(19), p. 1979-1980.

. Tr. 11(19), p. 1980.

. Vol. 63(89), p. 13633.

. The amount before reduction for fault allocations.

. See Health Net’s Appellant’s Brief Regarding The Louisiana Judgment (2006-CA-1140, 1141, 1142), p. 74-77.

. Tr. 11(19), p. 2000-2001.

. Tr. 11(19), p. 191, 2002.

. Tr. 11(19), p. 1992.

. Tr. 11(19), p. 2006.

. Tr. 11(19), p.2008.

. Tr. 11(19), p. 2009.

. Tr. 11(19), p. 1994.

. Tr. 11(19), p. 1994-1995.

. Tr. 11(19), p. 1985.

. Tr. 11(19), p. 1986. The Deputy Receiver explained that an estate medical claim is a claim which the receivership adjudicated in the system which it was obligated to pay, but for which no proof of claim had yet been received. Id. The Deputy Receiver admitted that if no proof of claim is ever submitted, he was unaware of any authority which would allow those claims to be paid. Tr. 11(19), p.1993.

. Tr. 11(19), p.1987; Ex. 3144, Ex. 3166 (initially incorrectly identified as Ex. 3164-see Tr. 11(19), p. 1990).

. Tr. 11(19), p. 1988.

. Tr. 11(19), p. 1996.

. Tr. 12(19), p. 2345-2354.

. Vol. 63(89), p. 13640.

. We consider Health Net’s argument both in brief to this court, and in its brief to the court of appeal on these issues. See Brief on Behalf of Health Net, Inc., Regarding the Texas Case, p. 22; Health Net's Original Brief Regarding The Texas Judgment, 2006-CA-1161, 1162, 1163, p. 93-97.

. Tr. 17(19), p. 3308.

. Tr. 17(19), p. 3308.

. Tr. 17(19), p. 3308-3311.

. Tr. 17(19), p. 3312-3314.

. Tr. 17(19), p. 3315.

. Tr. 17(19), p. 3315.

. Tr. 17(19), p. 3315.

.La. C.C.P. art. 1793(C) provides: "A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury-”

. Tex. Civ. Prac. & Rem.Code § 41.010(a) provides: "Before making an award of exemplary damages, the trier of fact shall consider the definition and purposes of exemplary damages as provided by Section 41.001.”

. Tr. 17(19), p. 3289.

.La. C.C.P. art. 1792(A) provides: "At any time during the trial, the court may instruct the jury on the law applicable to any issue in the case.”

. See Tr. 17(19), p. 3309 (the unanimity of the jury verdict was mentioned in the argument of counsel for the Texas Receiver) and is not contested by Health Net.

. Texas courts reviewing exemplary damages on an excessiveness claim likewise require an analysis of the relationship between the actual harm suffered and the exemplary damages awarded. Bunton v. Bentley, 153 S.W.3d 50, 53 (Tex.2004). Bunion cites with approval the cases of State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), BMW, supra, and Cooper, supra., and the de novo review of the factors discussed therein.

. See Vol. 60(89), p. 12764-12769 and Health Net’s Original Brief Regarding The Texas Judgment, 2006-CA-1161, 1162, 1163, p. 97-100.

. "Economic damages” are defined as "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss; the term does not include exemplary damages or noneconomic damages.” Tex. Civ. Prac. & Rem.Code § 41.001(4).

. "Noneconomic damages” are defined as "damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages.” Tex. Civ. Prac. & Rem. Code § 41.001(12).

.Emphasis added. We note in addition the provisions of Tex. Civ. Prac. & Rem.Code § 41.007, which prohibits the assessment or recovery of prejudgment interest on an award of exemplary damages. In making the special verdict of the jury the judgment of the court in her ruling of August 2, 2005, the district court ordered that Health Net pay punitive damages in the amount of $65 million, "plus judicial interest under Louisiana law from the date of this judgment until paid.” Vol. 59(89), p. 12748.

. Health Net's objection to Brignac's testimony is found at Tr. 11(19), p.1951. Her testimony appear at Tr. 11(19), p. 2110-2144; Tr. 12(19), p. 2148-2222.

. See Vol. 63(89), p. 13633 and 13640.

. Vol. 65(89), p. 14044-47 and 14048-51.

. Vol. 64(89), p. 13834-35; Vol. 65(89), p. 14042-43, 14057-58 (the judgment incorrectly show the year as “2000.”). The Texas Receiver did not seek an award of attorneys fees.

. Vol. 67(89), p. 14411-17.

. Vol. 66(89), 14094.

. Vol. 67(89), 14403-04.

. Vol. 67(89), p. 14419-21, 14431-34.

. See Wooley v. AmCare Health Plans of Louisiana, Inc., 2006-1146, 2006-1147, 2006-1148, 2006-1149, 2006-1150, 2006-1151, 2006-1152, 2006-1153, 2006-1154 (La.App. 1 Cir. 1/17/07), 952 So.2d 720.

. Id., p. 14, 952 So.2d at 728.

. Id., p. 16, 952 So.2d at 730.

. Id., p. 15-16, 952 So.2d at 730.

. Id., p. 17, 952 So.2d at 730.

. Id., p. 16, 952 So.2d at 730.

. Id., p. 8, 952 So.2d at 725.

. Id., p. 14, 952 So.2d at 729.

. Under this agreement, the Texas Receivership would receive 60%, Oklahoma would receive 28.5%, and Louisiana would receive 11.5% of any settlement or fee.

. This was the amount of punitive damages after the 30% reduction in the JNOV.

. Tr. 20(20), p. 3826.

. The court of appeal’s ruling, which found to the contrary, is reversed.

. We note that our review of the exemplary damage award satisfies the requirements of Tex. Civ. Prac. & Rem.Code § 41.013(a) which in pertinent part provides: "... an appellate court that reviews the evidence with respect to a finding by a trier of fact concerning liability for exemplary damages or with respect to the amount of exemplary damages awarded shall state, in a written opinion, the court’s reasons for upholding or disturbing the finding or award. The written opinion shall address the evidence or lack of evidence with specificity, as it relates to the liability for or amount of exemplary damages, in light of the requirements of this chapter.”

. Id., 2008-0762 p. 30, 5 So.3d at 858.

. Tr. 17(19), p. 3369-3371.

. Tr. 17(19), p. 3371.

. Tr. 17(19), p. 3391.

. Tr. 17(19), p. 3392 (emphasis added). The court additionally rejected Health Net’s request for a further reduction of $12 million in the amount of compensatory damages. Tr. 17(19), p. 3393.

. Wooley II, p. 410-411, 14 So.3d at 574-575.

. La. C.C.P. art. 1920 provides: "Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.”